UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

| | |
|---|---|
| UNITED STATES ex rel.<br>ALISIA ROBINSON-HILL and DAVID<br>A. PRICE<br><br>BRINGING THIS ACTION ON<br>BEHALF OF THE UNITED STATES OF<br>AMERICA<br><br>c/o James Zerhusen<br>United States Attorney<br>230 W. Vine Street-Suite 300<br>Lexington, KY 40507-1612<br><br>-and-<br><br>c/o Michael B. Mukasey<br>Attorney General of the United States<br>Department of Justice<br>10th & Constitution Avenue, N.W.<br>Washington, D.C. 20530<br><br>**Plaintiffs,**<br><br>v.<br><br>NURSES REGISTRY AND HOME<br>HEALTH CORPORATION<br><br>    *Serve*:<br>      Lennie G. House<br>      Registered Agent<br>      101 Venture Court<br>      Lexington, KY  40511<br><br>**Defendant**. | COMPLAINT FOR VIOLATIONS OF<br>FEDERAL FALSE CLAIMS ACT<br><br><br><br>JURY TRIAL DEMAND<br><br>Case No: _____<br><br><br>JUDGE: |

Come the Relators, ALISIA ROBINSON-HILL and DAVID A. PRICE, by and through

their undersigned counsel, and on behalf of the Plaintiff, the United States of America, allege

2

based upon personal knowledge and relevant documents, as follows for their Complaint under the Federal False Claims Act:

## I. INTRODUCTION

This is an action (1) to recover damages and civil penalties on behalf of the United States of America arising from the false and fraudulent records, statements and claims made, used and caused to be made, used or presented by the Defendant NURSES' REGISTRY AND HOME HEALTH CORPORATION (referred to herein as "Nurses' Registry" or the "Defendant"), and/or its agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended; and (2) to recover damages and equitable relief on behalf of ALISIA ROBINSON-HILL and DAVID A. PRICE, for violations of the Federal False Claims Act, 31 U.S.C. § 3730(h), arising from the discharge of employment, threats, harassment, discrimination and other retaliatory acts suffered as a result of their lawful acts in furtherance of this *qui tam* action based on the false and fraudulent claims filed by Defendant Nurses' Registry.

Upon information and belief, Defendant Nurses' Registry presented and caused to be submitted false and fraudulent records, statements and Medicare claims for payment to the U.S. Government. Nurses' Registry engaged in a pervasive pattern of submitting false and fraudulent records and claims for Medicare reimbursements by: (a) upcoding the severity of a patient's medical condition in order to bill Medicare for more extensive and expensive services; (b) providing therapy services to patients without any medical necessity; (c) retaining patients absent any medical necessity for further home health care services; (d) backdating patient records; and (e) implementing a program to routinely waive Medicare cost-sharing requirements.

Mrs. Robinson-Hill and Mr. Price (collectively referred to as "Relators," or individually as "Relator") were employees of Nurses Registry who internally challenged Nurses Registry's

3

fraudulent practices with respect to Medicare. As a result of their lawful actions, the Relators were subjected to retaliation by their superiors at Nurses Registry, in the form of threats, harassment, discrimination, continuous scrutiny, demotion, and eventual constructive termination of their employment. This harassment continued even after Relators' employment was terminated, as Defendant filed malicious and frivolous lawsuits against Relators and even monitored the residence of Mrs. Robinson-Hill.

## II. JURISDICTION AND VENUE

1.      This Court has personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 1391(b). The Defendant can be found in, resides, transacts, or has transacted business in the Eastern District of Kentucky.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

3.      Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because the Defendant can be found in and transacts or has transacted business in the Eastern District of Kentucky. At all times relevant to this Complaint, Defendant has regularly conducted substantial business within the Eastern District of Kentucky.

## III. PARTIES

4.      The Relator, ALISIA ROBINSON-HILL ("Mrs. Robinson-Hill") is a resident of the Eastern District of Kentucky, was employed by Defendant Nurses' Registry from 1997 or 1998 through November of 2007. Mrs. Robinson-Hill is a registered nurse who was employed

by Nurses Registry in a number of positions including the Director of Nursing and the Vice President of Operations and Administration. Her employment with Nurses' Registry was not continuous as she left Nurses' Registry on two different occasions during this period to work for other employers.

5.     Mrs. Robinson-Hill's first period of employment began in 1997 or 1998 when she was hired by Nurses' Registry as a waiver case manager in their Lexington office. She was soon promoted to the position of an OASIS Educator for Nurses Registry. In this position Mrs. Robinson-Hill was responsible for training and orienting Nurses' Registry employees with systems in place to handle billing procedures. During her employment as an OASIS Educator, Nurses' Registry began to implement the OASIS system.[1] The OASIS system is a complex list of items used to describe patient health and functional status. Nurses' Registry is required to complete an OASIS when seeking payments from Medicare.

6.     While at Nurses' Registry, Mrs. Robinson-Hill helped to train new and current employees with the use of the OASIS system. Her expertise with the OASIS system was such that she became one of a limited number of nationally certified OASIS experts certified through examination by the OASIS Competency Board.

7.     In 2000, Mrs. Robinson-Hill was promoted to the Assistant Director of Nursing and placed in Nurses' Registry's Lexington office. Her tenure in this position, however, was short lived and in September of 2000 she resigned as the Assistant Director of Nursing and left Nurses' Registry due to work related stress.

8.     In November of 2001, Mrs. Robinson-Hill was contacted by Lennie House, the president and principal owner of Nurses' Registry, and asked to return to Nurses' Registry. She

---

[1] It should be noted that proposed regulations regarding OASIS were published by the Health Care Financing Administration on January 25, 1999, and made final on June 18, 1999.

accepted Mr. House's employment offer and returned to Nurses' Registry in January of 2002 as a case manager in the Richmond office. Mrs. Robinson-Hill remained at this position for nearly one full year and was then switched to the compliance department in or around October of 2002.

9.      In April of 2005, Mrs. Robinson-Hill was promoted to the Director of Nursing, replacing the then current Director of Nursing, Amy Gray, who was consequently demoted to Assistant Director of Nursing. In October of 2005 Mrs. Robinson-Hill resigned her position and left Nurses' Registry due again to work related job stress.

10.     In March of 2006, she was again approached by Mr. House with an offer of employment. She agreed to become the Director of Education at that time of Nurses' Registry and returned to work in April of 2006

11.     In May of 2007, Mrs. Robinson-Hill was moved from the Director of Education to the Vice President of Operations. As the V.P. of Operations, she had oversight over the clinical aspects of Nurses' Registry and was responsible for reporting directly to the President, Mr. House.

12.      She remained the Vice President of Operations until she was subsequently demoted and constructively terminated in November of 2007.

13.     The Relator, DAVID PRICE ("Mr. Price") is a resident of the Eastern District of Kentucky, who was an employee of Nurses' Registry from December of 2005 through on or about November of 2007. At the time Mr. Price's employment was constructively terminated, he served as a case manager and as the office administrator of the Venture Court Office, one of Nurses' Registry's satellite office.

14.     In his initial position with Nurses' Registry, Mr. Price was a case manager in charge of scheduling. His duties required scheduling field nurses to make home visits to

patients. In or around March of 2006, Mr. Price was given the responsibility of working with OASIS Reports and communicating with coders about how to charge Medicare for the services provided. These responsibilities and duties revolved mostly around preparing OASIS reports in accordance with the instructions of his superiors, Amy Gray and Jeanie LeMaster.

15. The Defendant, NURSES' REGISTRY AND HOME HEALTH CORPORATION, is a for-profit Kentucky corporation, doing business in the Eastern District of Kentucky, which provides home health care services.

16. According to records on file with the Kentucky Secretary of State's Office, Nurses' Registry maintains its principal office and registered office at 101 Venture Court, Lexington, Kentucky 40511. The registered agent of Nurses' Registry in the Commonwealth of Kentucky is Lennie G. House, who is also identified as the President of Nurses' Registry. The Secretary and Treasurer of Nurses' Registry is Vicki S. House.

17. Nurses' Registry Nurses' Registry maintains satellite offices in Winchester, Lancaster, Richmond, Paris, Berea, and Georgetown as well as multiple offices throughout Lexington.[2]   With offices in multiple locations and 600 employees, Nurses' Registry provides home health care services in 16 counties throughout central and eastern Kentucky in addition to nurses and nurse staffing services in 21 counties.

18. According to the Nurses' Registry's internet website,[3] Nurses' Registry "provides a range of home health care services including skilled nursing, in-home IV therapy, homemaker aid (bathing, dressing, grooming), and various therapies."

---

[2] Nurses' Registry's Lexington offices include 607 North Broadway (Durable Medical Equipment); 1420 North Broadway (corporate headquarters);  101 Venture Court (accounts payable and clinical functions); 501 North Broadway; 5002 Old Versailles Road (Nurses' Registry Warehouse); and 1794 Byran Station Road (Training Center),
[3] http://www.nursesregistry.com

19.    Nurses Registry receives compensation from various sources for providing home health care services including Medicare, Medicaid, and private insurance. It is believed that approximately 72 to 75 percent of Nurses' Registry's business is divided from Medicare.

*SETTLEMENT WITH UNITED STATES*

20.    In October of 2005, Nurses' Registry entered into a Settlement Agreement (the "Settlement Agreement") with the United States Department of Justice, the Office of the Inspector General for the Department of Health and Human Services, and the Commonwealth of Kentucky, acting through the Medicaid Fraud Control Unit of the Kentucky Attorney General's Office. The Settlement Agreement involved certain claims against Nurses Registry related to the submission of improper claims for payment to Medicare and the state Medicaid program for the years 1997, 1998, 1999, 2000, 2001, 2002 and 2003.

21.    The Settlement Agreement[4] required Nurses' Registry to make payment in the amount of $1,611,588, in compromise of claims for involving the years 1997-2003 under the Federal False Claims Act and other federal and state laws.

22.    In further consideration of the terms contained in the Settlement Agreement, Nurses' Registry agreed to be bound by the terms of a Corporate Integrity Agreement ("CIA").[5] Under the CIA, Nurses' Registry is required for a period of three years beginning on October 21, 2005 to implement certain compliance programs in order to ensure compliance with Medicaid, Medicare and other federal health care programs. Consistent with the CIA, Nurses' Registry is required, among other things, to:

> A.    Maintain a ***Compliance Officer*** and a ***Compliance Committee*** in order to meet the obligations of the CIA;

---

[4] Attached as Exhibit 1 .
[5] Attached as Exhibit 2 .

B.    Implement a written *Code of Conduct* setting forth, among other things, Federal health care program requirements;

C.    Provide *Training and Education* to employees regarding compliance with Federal health care programs;

D.    Retain an *Independent Review Organization* to perform a claims review for unallowable costs;

E.    Maintain a *Disclosure Program* to permit individuals to disclose potential violations of Federal law with an emphasis on nonretribution and nonretaliation; and

F.    Report any substantial *Overpayment*.

23.    Upon information and belief, Nurses' Registry has violated its obligations under the Settlement Agreement and the CIA, including, but not limited to, its obligations to report substantial overpayments to Medicare and to institute a disclosure program.

## IV. LEGAL BACKGROUND

### A. *Federal False Claims Act*

24.    The Federal False Claims Act, originally enacted in 1863 during the Civil War, was substantially amended by the False Claims Amendments Act of 1986 and signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the Federal False Claims Act.

25.    The Federal False Claims Act (the "False Claims Act") provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of damages sustained by the Government, and attorneys' fees. The False Claims Act allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any

9

recovery. The complaint is to be filed under seal for 60 days (without service on the Defendant during such 60-day period) to enable the Government: (a) to conduct its own investigation without the defendant's knowledge and (b) to determine whether to join the action.

26. The False Claims Act further provides that any employee who is subjected to retaliation by an employer for lawful actions taken in furtherance of an action under the False Claims Act is entitled to all relief necessary to make the employee whole, including but not limited to, reinstatement with full seniority, two times the amount of back pay, interest on back pay, special damages, costs and reasonable attorneys' fees.

**B.** *Home Health Prospective Payment Systems*

27. In 1965, as part of the Social Security Act, Congress established the Medicare program of health insurance for the elderly and disabled. Part A of the Medicare statute covers, *inter alia*, home health services.

28. Home health services are services generally provided by a home health agency ("HHA") in a patient's home. These services include bathing, grooming, dressing, feeding, catheter and colostomy care, wound care and the administration of certain types of medication, when necessary to maintain a person's health or to facilitate treatment.[6] Home health care is, in appropriate cases, a less expensive and more comfortable alternative to hospital or skilled nursing facility care.

29. Payments from Medicare are made to all participating health care providers under a method referred to as a Prospective Payment System ("PPS"). PPS is a method of reimbursement in which Medicare payment is made based on a predetermined, fixed amount. The payment amount for a particular service is derived based on a classification system for services.

---

[6] 42 CFR §§ 409.44 to 409.45

30.     HHAs are subject to specific rules governing PPS and Medicare reimbursements. These rules are referred to as home health PPS (or "HH PPS").

31.     HH PPS provides payments based on a 60-day period of care for each patient. If a patient is still eligible for home health care services after the end of the first 60-day episode, then a second 60-day episode can commence. The determination to provide a patient with a subsequent 60-day period of care is also referred to as a "recertification."

32.     Three of the principal features of HH PPS are:

        a.     60-Day Episodes per patient.  Payments under home health PPS are made in two installments. The first installment paid to the HHA is one-half (1/2) of the estimated base payment for the full 60-day period of care. The amount of the estimated base payment is determined based on the patient's particular needs and the skilled services expected to be provided to the patient. The second installment is made to the HHA at the close of the 60-day episode. This installment is for the residual half of the base payment less any applicable adjustment.

        b.     Determining estimated base payments for each beneficiary using OASIS. Before a HHA may implement any plan of care, a physician must first prescribe the patient a home health *plan of care*. At the beginning of the 60-day episode of care, the HHA must then assess the patient's particular needs and the likely need for skilled nursing care, therapy, medical social services and home health aide services. This assessment is recorded and documented by the HHA using what is referred to as the Outcome and Assessment Information Set ("OASIS"). The OASIS outlines a large set of questions to determine the patient's conditions as well as any

11

therapy needs. To complete the OASIS, an OASIS report must be completed that contains the relevant questions.[7]

In order to determine the estimated base payment, the OASIS utilizes a system known as the Human Health Resource Groups ("HHRG"). The HHRG is a point system used to determine the estimated base payment for each individual patient. Therefore, a completed OASIS will result in a point value under HHRG, which will in turn determine the amount of the estimated base payment from Medicare to the home health provider. A higher HHRG point level will result in a larger Medicare payment.

c.    Diminished payments using LUPA. If the patient has four (4) or fewer visits from the HHA, then the home health PPS makes adjustments to the payments made to the HHA using a Low Utilization Payment Adjustment ("LUPA").

## C. The OASIS Report and HHRG

33.    As described above, the OASIS report contains a scoring system referred to as the HHRG. The HHRG is used to determine Medicare reimbursements paid to the HHA based on the patient's acuity. Generally speaking, the more severe a patient's physical ailments, the higher the HHRG point level, and the greater the Medicare reimbursement to the HHA.

34.    The HHRG is composed of three dimensions: clinical,[8] functional,[9] and service.[10] The clinical and service dimensions each have a level measured from 0 to 3, while the functional dimension is measured from 0 to 4. The combination of the four clinical, five functional, and four service levels provide for 80 different HHRGS.[11]

---

[7] There are multiple types of OASIS reports, also referred to as "comprehensive assessments." Enclosed as Exhibit 3 is the OASIS report utilized for the certification of adult patients. There is another type of OASIS report used for the recertification of adult patients.
[8] Indicated as "CSD" on OASIS report.
[9] Indicated as "FSD" on OASIS report.
[10] Indicated as "SUD" on OASIS report.
[11] 4 Clinical x 5 Functional x 4 Service = 80 different case mixes

35.     The HHRG (which impacts the amount of Medicare reimbursement) is determined by completing an OASIS report.  The OASIS report contains eighteen (18) pages of items of information related to the patient's acuity.  Each individual item is enumerated from M0010 through M0826.  The individual items are casually referred to in the industry as a "MOO" because of the numbering system.  MOO items that have HHRG values associated with them are indicated with a dark blue background on the OASIS report.[12]

36.     For instance, under M0420 of the OASIS report,[13] a patient's "frequency of pain interfering with activity or movement" is measured.  Depending on the patient's pain, the nurse completing the OASIS report indicates 0 through 3; with "0" being the lowest level where the patient has "no pain or pain [that] does not interfere with activity or movement," and "3" indicating that the patient has pain interfering with activity or movement "all the time."

37.     Point values 2 and 3 of M0420 have an associated HHRG point value indicated as "CSD +5" whereas point value 0 and 1 do not have any associated HHRG point value.

**D. *Process for Completing an OASIS report***

38.     The process for completing an OASIS report is prescribed pursuant to 42 CFR § 484.55.

39.     Under this regulation, "an HHA must provide, a patient-specific, comprehensive assessment that accurately reflects the patient's current health status."  Id.  The "comprehensive assessment" is also referred to as an OASIS report.[14]

40.     The OASIS report must be completed upon an initial assessment visit to the patient by a registered nurse, or by a therapist when applicable.  42 CFR § 484.55(a)(1) and (2).

---

[12] See Exhibit 3, p.1, top of page in blue lettering.
[13] See Exhibit 3, p.5
[14] See Exhibit 3, p.1 top of page "Comprehensive Adult Nursing Assessment"

13

41.     The OASIS report "must be completed in a timely manner, consistent with the patient's immediate need, but no later than 5 calendar days after the start of care." 42 CFR § 484.55(b)(1).

## V. FACTUAL BACKGROUND

42.     During the Relators' periods of employment with Nurses' Registry, they became familiar with the method and the manner in which Nurses' Registry processed Medicare billing reports using the OASIS System.  The Relators, in their various positions, continuously had responsibilities related to the completion OASIS reports on behalf Nurses' Registry.

43.     The Relator, Mrs. Robinson-Hill, had a high level of expertise with the OASIS system.  She discovered that the procedure utilized by Nurses Registry to process OASIS reports was intended to increase the profitability of Nurses' Registry, and not for the purpose of providing true and accurate information to the Government for processing Medicare claims.

44.     During the Relators' employment at Nurses' Registry, and presumably continuing after the Relators' departed Nurses' Registry, employees at Nurses' Registry were not only encouraged but directed and required to follow a continuous and pervasive pattern of reporting information for Medicare billing purposes in a method that falsely inflated the severity of the patient's medical condition.

45.     The Relators' were informed by a number of employees at Nurses' Registry that Lennie House was attempting to sell his interest in Nurses' Registry.

46.     Charlene Wilson was responsible for preparing financial statements and records of Nurses' Registry for distribution to potential buyers.

47.     Motivated to increase profits and attract potential buyers, many Nurses' Registry executives began to direct case managers to falsify OASIS reports in order to manipulate the

acuity of patients' physical conditions, which increased Medicate reimbursements and in turn increased Nurses' Registry's revenue and profits.

48.     There were numerous methods of inflation that were pushed upon case managers in order to falsify OASIS reports and in turn increase the profitability and attractiveness of Nurses' Registry to potential buyers.  These methods were: (a) upcoding the severity of the patient's condition or diagnosis; (b) providing therapy services to patients without any medical necessity; (c) recertifying patients for further home health care services absent any medical necessity; (d) backdating OASIS reports; and (e) routinely waiving patient co-pays.

## A.     UPCODING

### (i) *Factual Basis and Patterns followed by Nurses' Registry*

49.     Nurses' Registry followed a consistent and pervasive pattern of falsifying patients' OASIS reports.  These records were falsified by engaging in multiple patterns of "upcoding" in order to falsely exaggerate the severity of a patient's physical condition.

50.     Nurses' Registry followed a pattern of increasing certain individual MOO items on the OASIS report, in particular those MOO items which had high point values (under the HHRG) and would increase Medicare reimbursements.

51.     Nurses' Registry followed a pattern of falsifying patients' records in the following methods:

        a.     Pattern #1- Increasing Frequency of Pain.  Under MO420, a patient's level of pain was recorded.   HHRG point values were given for patients who had high levels of pain that "interfer[ed] with patient's activity or movement" either (a) daily, but not constantly or (b) all the time.  Case managers were instructed to ignore the field nurse's Nursing Notes and OASIS report indications of a patient's pain and to review the patient's records themselves.  If

the patient was taking any medication for pain (whether Tylenol, Advil, or stronger narcotic), the case manager was instructed to indicate that the patient had a high level of pain which would provide more HHRG points.   The Relators estimate that the frequency of pain indicator under MO 420 was increased 70 percent of the time.   These alterations were made by Nurses' Registry's case managers at the direction of their superiors, without meeting with patients and without communicating with the field nurse who met with and assessed the patient.

      b.    Pattern #2 - Increasing Primary Diagnosis to diagnosis with high HHRG value:  Under MO230, a patient's primary diagnosis is recorded.   Certain categories of Primary Diagnoses have an associated HHRG point value. The high HHRG value diagnoses categories were: (1) "Orthopedic Dx," (2) "Diabetes Dx," and (3) "Neurological Dx."  Case managers were instructed to review OASIS reports and Nursing Notes[15] in order to determine the primary diagnosis.  If there were any facts which would give the case managers reason to put the high HHRG value items as the primary diagnosis, the case managers were instructed to do so regardless of the patient's actual primary diagnosis.   For instance, if a patient had diabetes but had the disease controlled and had no medical need for home health services based on diabetes, Nurses' Registry would still indicate the patient's primary diagnosis as diabetes to increase the HHRG value.   This was done regardless of the patient's physical condition and without consulting the patient.  At times, Nurses' Registry even went as far as to indicate the patient's primary diagnosis as diabetes when the patient was not diabetic.

      As a result of patients with increased pain under Pattern #1, Nurses' Registry now had a high census of patients with pain, whether real or fabricated.  As a result, Nurses' Registry began

---

[15] "Nursing Notes" are notes prepared by field nurses upon a patient's home visit.  Nursing Notes were prepared by hand on a form provided by Nurses' Registry.  The form provides 2 pages of compact medical information on the patient.  A copy of the form is attached as Exhibit 4.

to give a high number of these patients with inflated pain a primary diagnosis of "Arthropathy" which had a HHRG value associated with it under the category of "Orthopedic Dx".

Nurses' Registry also had several patients who needed home health care services only for the reason of changing the patient's catheter. These patient's actual primary diagnosis should have been "Urinary Retentition" which did not have any associated HHRG value. Nurses' Registry, however, would record the patient's primary diagnosis as "Multiple Sclerosis" which had an associated HHRG value under "Orthopedic" without any medical justification.

52.    To understand these patterns of upcoding, it is necessary to fully understand the process of seeking Medicare reimbursements for home health care services.    The initial assessment visit was typically conducted and recorded by field nurses or therapists based on that nurse's clinical experience and observations of the patient.  The patient's physical condition would be assessed and Nursing Notes (or Therapy Notes) and an OASIS report would be completed by the field nurse.  These reports, to the best of the Relators' knowledge, were generally done accurately.

53.    The case manager would subsequently receive the Nursing Notes or Therapy Notes and the OASIS report from the field nurse or therapist.[16]  The case manager would review the OASIS report.  After insuring the documents were drafted correctly, the case manager entered the results of the OASIS report into the Homesys computer program.  The data entered into the computer was then transferred to coding specialists, or coders.

54.    The coder reviewed the data to ensure that it was inserted into the Homesys program correctly.  However, the coder was also instructed to follow the patterns of upcoding described above in order to increase Medicare payments to Nurses' Registry.

---

[16] In the event of a start of care, a field nurse or therapist would complete an OASIS report.  A Nursing Note or Therapy Note would not  be completed upon a start of care.

55.     If the coder found that any of the patterns of upcoding could be used, the coder instructed the case manager to change the OASIS report in order to increase the HHRG point value.  These changes were made without communicating with the patient, or the field nurse who assessed the patient.  The coder would indicate, without contacting the individual making the medical assessment or the patient, that the patient's condition was worse than indicated in the Nursing Notes and in the OASIS report.  These changes were ordinarily communicated by the coder to the case manager via e-mail, however, they were also done occasionally by telephone.

56.     When the case managers received these directions from the coders, they were told to make changes to the Homesys data as well as to the OASIS report.  In addition, they were required to complete a Progress Note[17], or OASIS correction form, to report the change. However, due to the high volume of alterations that occurred with each patient, upcoding changes were typically made directly onto the Homesys data system.  The OASIS reports were occasionally changed.  The Nursing Notes were never amended by the case managers.

### (ii) *Relators' Direct Knowledge of Upcoding*

57.     The Relator, David Price, had direct knowledge of these patterns of upcoding in his role as a case manager.  Mr. Price was responsible for completing a portion of the OASIS reports which came through Nurses' Registry's Venture Drive satellite office.

58.     Mr. Price was instructed by his superiors on repeated occasions: (a) to increase a patient's pain assessment under MO 420; and (b) to change a patient's primary diagnosis to one of the three primary diagnoses categories with high HHRG values under MO230 (collectively referred to as "patterns of upcoding").

59.     These instructions for upcoding were received by Mr. Price from *coders* at Nurses Registry.  The coders were Anthony Bush, Tonya Lindsay, Linda Cummins as well as Jeanie

---

[17] A Progress Note is a form used by Nurses' Registry to insert any information into the patient's file.

LeMaster and Amy Gray. The coders operated under the direction of Nurses' Registry's chief compliance officer, Jeanie LeMaster. The instructions to follow the patterns of upcoding also came to Mr. Price directly from the Director of Nursing, Amy Gray.

60.     Because Mr. Price was uncertain about the legitimacy of these patterns of upcoding, he frequently indicated "per your direction" or "service requests" upon the OASIS report when he was instructed to upcode.

61.     The Relator, Mrs. Robinson-Hill, had direct knowledge of the patterns of upcoding through her various positions at Nurses' Registry.    Mrs. Robinson-Hill would frequently compare data in the Homesys computer system to the medical records created by the field nurse or therapist conducting assessment visits to the patient.  In the course of comparing records she discovered that Nurses' Registry was frequently upcoding the patient's condition.

62.     Mrs. Robinson-Hill brought these patterns of upcoding to the attention of Jeanie LeMaster and Lennie House.  Nurses' Registry did not take any steps to correct these patterns of upcoding.

## B.    LACK OF MEDICAL NECESSITY FOR THERAPY SERVICES

### (i) *Factual Basis and Patterns followed by Nurses' Registry*

63.     Nurses Registry provided patients therapy services without any medical necessity or justification for these services.  This fraudulent activity of providing unnecessary therapeutic services occurred on two levels.  At the first level, Nurses' Registry would begin providing therapeutic services to patients who had no medical need for the services.  On the second level, Nurses Registry would continue providing therapeutic services to patients even if services were no longer needed, in order to avoid refunding amounts to Medicare under LUPA, also referred to as "fallouts".

Level 1: Commencing Unnecessary Therapy Services

64.     As mentioned above, Nurses' Registry followed a persistent pattern of falsifying a patient's frequency of pain.  By upcoding the patient's pain indicator, Nurses' Registry received increased Medicare reimbursements.   However, the improper benefits to Nurses Registry of inflating a patient's pain also extended to therapeutic services.

65.     The pain inflation created a domino effect.  Nurses' Registry's records indicated that they were carrying a high patient census with pain because of the upcoding.  For each patient with pain, regardless if the pain was authentic or fabricated through upcoding, Nurses' Registry urged these patients to receive therapeutic services by having employees of Nurses' Registry contact the patient in order to sell the patient on therapeutic services.

Level 2: Continuing Unnecessary Therapy Services

66.     Under the HH PPS, if a patient was diagnosed with the need for home therapy services, then Medicare would make a payment to the HHA under the presumption that 10 therapy sessions would be provided to the patient during the 60 day episode of care.

67.     If 10 therapy sessions were not provided to the patient during the 60 day episode of care, then Medicare would retract payments to the HHA under LUPA.

68.     These therapy sessions were only to be provided to the patient on an as-needed basis.  Therefore, the therapy services were required to stop once the patient no longer had a medical need for the therapy services, regardless whether the patient received 10 therapy visits or less during the 60 day period.

69.     Nurses' Registry instituted a system to ensure that any patient who received therapy services received at least 10 therapy visits regardless of the patient's need in order to prevent the retraction of payments under LUPA.  Reports, referred to as LUPA Fallout Reports,

20

were prepared that showed the number of visits the patient needed to have to prevent the LUPA payment. Using the LUPA Fallout Reports, Nurses Registry instructed therapists what patients to visit and when to visit the patients. These instructions were given to therapist without concern for the patient's actual medical needs.

70. Nurses' Registry had a sector that monitored a patient's records to ensure all patient receiving therapy services received at least 10 therapy services within the applicable 60 day period. Once the patient was scheduled for therapy visits, Nurses' Registry would immediately work on scheduling the patient at least 14 visits within the 60 day plan of care. The scheduling would be done so that the majority of the visits were done at the beginning of the 60 day plan of care. The typical schedule was for 2 visits in the first five weeks and 1 visit each of the final four weeks. Nurses' Registry always overscheduled to prevent the possibility of not reaching the 10 visit threshold.

71. Under the system instituted by Nurses' Registry, patients who had received 8 or 9 therapy visits were "red-flagged" and given top priority for therapy sessions to insure the 10 visit threshold was reached.

72. Many therapists expressed complaints to the Relators that they were servicing patients who needed only one to two therapy sessions, if any at all. However, they were obligated by Nurses' Registry to provide the patient 10 therapy sessions within the 60 day period.

73. Because the therapy sessions were provided without any medical necessity, the therapy visits became a farce around the Nurses' Registry office. The visits were referred to as "social" visits by the employees and therapists associated with Nurses' Registry.

21

**(ii)** *Relators' Knowledge of Medically Unnecessarily Therapy Visits*

74.     The Relator, Mrs. Robinson-Hill, had direct knowledge of Nurses' Registry's practice of providing medically unnecessary therapy services to patients through her employment with Nurses' Registry in her various positions at Nurses' Registry.  Mrs. Robinson-Hill acquired knowledge that Nurses' Registry established employment positions at whose sole duties were to monitor therapists and insure 10 visits with each patient regardless of need.  Mrs. Robinson-Hill also had knowledge that Nurses' Registry prepared the LUPA Fallout Reports and that these reports were being implemented to insure LUPA Payments were not made.

75.     Mrs. Robinson-Hill was also in direct communication with the therapists for Nurses' Registry in her various positions.   The therapists continually expressed to Mrs. Robinson-Hill that they were providing services for individuals who were not qualified to receive the therapy services.

76.     Mr. Price knew that Nurses' Registry was placing an emphasis on therapy visits because he received internal email communications regarding the priority of scheduling therapy patients.  Mr. Price also saw LUPA Fallout Reports and witnessed schedulers at the instruction of Brenda Tea, David Stoell, and Jill Bailey, contact patients to ensure that 10 therapy visits were made before the 60 day plan of care was completed.

**C.     LACK OF MEDICAL NECESSITY FOR RECERTIFICATIONS**

**(i)     *Factual Basis of Patient Recertifications***

77.     Nurses' Registry followed a routine, pervasive and persistent pattern of improperly refusing to discharge patients from its care.

78.     Under the procedures followed by Nurses' Registry, Nurses' Registry reviewed the patient's record after a patient received the initial 60-day episode of care to determine if the

patient was eligible for discharge. If the patient was determined by Nurses' Registry to be ineligible for discharge and in need of continued home care, the patient was recertified by Nurses' Registry, and Nurses' Registry would continue to seek and receive reimbursements from Medicare with respect to the patient.

79. Nurses' Registry looked for five indications that a patient was ineligible for discharge: (1) hospitalizations; (2) falls; (3) pharmaceutical changes; (4) emergency room visits; and (5) exacerbation of disease.

80. Nurses' Registry followed a consistent pattern of improperly refusing to discharge patients and attempted to incorporate any purported factual scenario into one of these 5 factors for recertification. For instance, Nurses' Registry would rely on the slightest change in medication as a basis for avoiding the discharge of a patient. If a patient switched between two similar medications, the patient was refused discharge. If a patient changed daily dosage, no matter how slight, then the patient was refused discharge. If a patient was considering surgery, then the patient would be recertified under the presumption that the patient was going to be hospitalized.

81. Discharges were continuously denied and recertifications granted by Nurses' Registry without regard to the medical necessity of these recertifications. These fraudulent recertifications are reflected in Nurses Registry's rehabilitation data and statistics. Because the purpose of home health care is to rehabilitate patients, Nurses' Registry's records would logically indicate a poor performance for patient rehabilitation based on its practice of fraudulently recertifying patients.

82.    As indicated in Home Health Compare,[18] Nurses' Registry patient rehabilitation outcomes are far below the national and state average in a number of different categories.

83.    For instance, the following quality measures show that Nurses' Registry is far below the national and state average in certain categories:

| *Quality Measures* | *Nurses' Registry* | *State Average* | *National Average* |
|---|---|---|---|
| Percentage of patients who get better at getting in and out of bed | 26 % | 54 % | 54 % |
| Percentage of patients who have less pain when moving around | 46 % | 63 % | 64 % |
| Percentage of patients whose bladder control improves | 25 % | 45 % | 50 % |
| Percentage of patients who get better at bathing | 52 % | 61 % | 64 % |

84.    The Home Health Compare data does not accurately reflect the true medical diagnosis or condition of each patient because of the systematic manipulation of OASIS reports conducted by Nurses' Registry as described in this Complaint. Nurses' Registry engaged in multiple patterns of exaggerating the severity a patient's condition in order to manipulate the rehabilitation data.   Nurses' Registry ordered case managers to improperly exaggerate the seriousness or severity of a patient's condition in order to falsely inflate the progress made by the patient in Nurses' Registry's care.   This misconduct was done with the purpose of defrauding any individual or entity relying on Nurses' Registry's rehabilitative statistics.   Therefore, had Nurses' Registry accurately reported a patient's condition (rather than making their conditions appear than they truly were), these rehabilitation numbers would be far worse because of the

---

[18] Home Health Compare is a tool created by the Department of Health and Human Services that provides detailed statistics on Medicare-certified home health providers.

constant recertifications.  It was a balancing act done carefully enough so that the scales would tilt, but not tumble.

85.    Because patient recertifications were continuously denied, Nurses' Registry retained many of their patients for an unusually high number of 60-day plans of care.  It was not unusual to see patients undergo 6 continuous 60-day plans of care.  There are even patients who received 10 to 20 recertifications.

86.    Because of Nurses Registry's emphasis on retaining patients regardless of medical need, case managers found it more difficult to discharge a patient than to get the patient recertified.

87.    Nurses' Registry provided performance bonuses to employees who discouraged patient discharges.  These inappropriate bonuses are discussed further below.

### (ii)    *Relators' Knowledge of Fraudulent Patient Recertifications*

88.    The Relator, Mrs. Robinson-Hill, through her various positions at Nurses' Registry, faced repeated obstacles to discharging patients who no longer has a medical need for home health services.

89.    On or May, 2007, Mrs. Robinson-Hill was promoted to Vice President of Operations, at which time she was given the responsibility of discharging patients.

90.    Mrs. Robinson-Hill began to discharge many of the patients that no longer had a medical need for home health care services.

91.    Unhappy with the high number of patients being discharged, sole authority to discharge was taken from Mrs. Robinson-Hill.  Nurses' Registry created a committee to monitor patient discharges referred to as the Discharge Team.  Mrs. Robinson-Hill was subsequently invited to join the Discharge Team, which also included Brenda Tea, Jerry Chaney, Jeanie

LeMaster, Joetta Hutson, and Nancy Noffsinger.   The Discharge Team was created with the ostensible purpose of assisting Nurses' Registry with better Medicare compliance.   Mrs. Robinson-Hill, however, soon found that the Discharge Team was operating only to increase Nurses' Registry's profitability by retaining patients regardless of medical need.  The Discharge Team could not discharge a patient if one member voted for recertification.  Some members of the Discharge Team had no clinical background or clinical training and were placed on the team by Mr. House only for the purpose of maintaining or increasing patient census.

92.     During the first month in operation, Mrs. Robinson-Hill found the Discharge Team meetings to be tense situations.  The patients' records were reviewed with a slant towards recertification.  Any determination that the patient did not have a serviceable "skill"[19], meaning that the patient should be discharged, was generally met with disapproval by members of the Discharge Team.

93.     The Discharge Team made determinations regarding whether to discharge or recertify a patient for continued care.  However, rather than put these determinations to a vote of the Discharge Team members, a patient was recertified and denied discharge if only one member of the Discharge Team objected to discharge.  The Discharge Team operated in this manner even though it had members who had no clinical training or background.  Thus, individuals with no formal clinical training were essentially responsible for making discharge determinations.

94.     Many of the members of the Discharge Team were heavily influenced by the president of Nurses' Registry, Lennie House.  Mr. House personally and openly expressed his intentions to increase the recertifications of patients in order to increase the profitability of

---

[19] "Skill" is an industry term referring to a particular physical condition that a patient may have which would require the need of skilled medical services reimbursable under Medicare guidelines.

Nurses Registry. Lennie House had even gone as far to challenge employees at Nurses' Registry to find him a patient who did not have a "skill."

95.     In the first month of Mrs. Robinson-Hill's participation as part of the Discharge Team, the number of discharges issued by Nurses' Registry in May 2007 was 399. Due to pressure from team members and Mr. House to increase recertifications, Mrs. Robinson-Hill eventually left the Discharge Team.

96.     Discharges quickly dropped without the presence of Mrs. Robinson-Hill on the Discharge Team. The following month, June of 2007, saw only 241 discharges. Then in July of 2007, there were 270 discharges. August of 2007 saw only 195 discharges.

97.     The Relator, Mr. Price, had knowledge of fraudulent patient recertification. As a case manager, Mr. Price would recommend whether a patient should be recertified or discharged. Mr. Price's requests for a discharge were nearly always denied.

98.     Mr. Price had certain patients who were continuously granted recertification despite his repeated requests for discharge. Mr. Price discovered that many of the individuals responsible for discharges were continuously denying discharges for purported reasons mostly related to changes in medications. These purported changes in medications, however, often did not justify a recertification.

## D. BACKDATING OASIS REPORTS

### (i)     Factual Basis of Backdating OASIS Reports

99.     Nurses' Registry followed a routine practice of backdating OASIS reports in order to maximize Medicare reimbursements.

100.    Under Medicare guidelines, an OASIS report must be completed within five (5) days of the initial assessment visit by the nurse or therapist. 42 CFR § 484.55(b).

101.    Nurses' Registry followed a practice of completing OASIS reports based on Nursing Notes or Therapy Notes which were more than five days old when there was a change in the source of payment, or "payor change". Frequently, these Nursing Notes or Therapy Notes were more than one month old. These backdated OASIS reports were frequently completed without consulting the visiting nurse or the patient.

102.    Nurses' Registry engaged in the practice of backdating OASIS reports when there was a payor change. A payor change occurred when the patient's payor source changed from a non-Medicare source (such as private insurance) to Medicare. In this situation, Nurses' Registry would complete an OASIS report based on old Nursing Notes or Therapy Notes. Nurses' Registry would change the date of the patient's start of care to the date the patient's payor source changed.

103.    The correct procedure during a payor change would have been to first discharge the patient and then start a whole new 60 day plan of care.

104.    It is believed that Nurses' Registry did not follow this procedure because: (i) the Medicare reimbursement for completing an OASIS report was $150 where as the reimbursement for a regular skilled nursing visit was only $100; and (ii) by backdating the OASIS reports, Nurses' Registry could go back and pick up a patient's start of care earlier so that they could recertify the patient sooner leading to greater reimbursements.

105.    Nurses' Registry also undertook a mass process of backdating OASIS reports using stale Nursing Notes when patients switched from Medicare A to Medicare Managed Care in early 2006. The change from Medicare A to Medicare Managed Care represented a payor change. Because of the extraordinarily high volume of OASIS reports being improperly

modified, Nurses' Registry directed that employees who were not registered nurses and who had no medical training complete backdated OASIS reports.

      *(ii)     Relators' Knowledge of Backdating OASIS reports*

    106.   The Relator, Mr. Price, has direct knowledge of the backdating of OASIS reports. As a case manager, Mr. Price was instructed by his superiors, Amy Gray and Jeanie LeMaster, to backdate OASIS reports using Nursing Notes and Therapy Notes which were more than 5 days old to create a new OASIS in the event of a payor change. Mr. Price followed the instructions of his superiors and backdated the OASIS reports.

    107.   During January and February of 2007, Mr. Price saw Amy Gray completing a high volume of OASIS reports. He also noticed that many employees who were not registered nurses and not therapists were completing OASIS reports and having Amy Gray affix her signature.

    108.   Mrs. Robinson-Hill did not participate in the backdating of OASIS reports. However, other employees at Nurses' Registry brought the backdating of OASIS reports to Mrs. Robinson-Hill's attention. When she received this information, Mrs. Robinson-Hill informed Jeanie LeMaster that the backdating of OASIS reports was in contravention of Medicare guidelines.

**E.     ROUTINE WAIVER OF COPAYMENTS**

    109.   Nurses' Registry implemented a computer program to routinely waive patients' copayments.

    110.   In or around May, 2007, the Relator, Mrs. Robinson-Hill was in a meeting with Mr. House. Mr. House expressed a desire to waive copayments for patients who were on Medicare Managed Care.

111.     In the presence of Mrs. Robinson-Hill, Mr. House then telephoned Dwayne Burberry, who was involved in the information and technology aspects of Nurses Registry.

112.     Mr. House requested on speaker phone that Mr. Burberry design a program that would deduct any co-payments upfront on the Homesys system before the patient received the bill and calculate the number of patient visits which would best allow Nurses' Registry to absorb the cost of the co-payment.

113.     Mr. Burberry designed such a program and implemented it into the Homesys system.

114.     With the Burberry designed program in place, Nurses Registry frequently included a deduction above the net total amount due that read in red lettering "15% due to MMC". The line item deducted 15% from the patient's total amount. This 15% deduction was not reflected in the bill sent to the patient.

115.     When a patient had the 15% waiver, however, Nurses' Registry would decrease the patient's visits.   Therefore, if the patient was billed for 9 visits but the 15% waiver was effected, Nurses Registry would only provide 6 or 7 visits to make up for the 15% waiver.

116.     Mrs. Robinson-Hill was instructed by Mr. House to have all coders make adjustment to patient visits in accordance with the 15% diminishments on all Managed Medicare patients.

## F.     COMPENSATION BONUSES

117.     Nurses' Registry relied on fraudulent billing practices in order to increase and maintain their patient census.  These fraudulent billing practices were promoted and facilitated by performance-based incentives provided to Nurses' Registry employees.

118.   This additional performance-based compensation was recommended and approved by Lennie House as the president of Nurses' Registry.

119.   Under this program of performance-based compensation, Nurses' Registry employees received additional compensation based on the ability of the employee to maintain and increase the number of patients in Nurses Registry's care.

120.   In August of 2007, each case manager was offered a five hundred dollar ($500) bonus if the case manager's patient census increased by five percent (5%).

121.   Mrs. Robinson-Hill was given a one thousand dollar ($1,000) for ensuring that census rates remained at the same level that they did.

122.   This additional compensation had the purpose and effect of clouding the case manager's judgment regarding patients.  Case managers were provided monetary incentives to increase the number of recertifications and deny patient discharges.

123.   Similarly, certain individuals who were employed by Nurses' Registry in executive positions also received compensation bonuses which were directly tied to the promotion of fraudulent billing practices.

124.   Amy Gray, Bendrea Wilson, Jeanie LeMaster, Joetta Hutson, and Brenda Tea were all employed in high level executive positions at Nurses' Registry.   The Relators believe that they all received additional bonus compensation that was directly tied to maintaining and promoting certain of the improper practices describe herein.

**F.      RETALIATION AGAINST THE RELATOR, ALISIA ROBINSON-HILL**

125.   Because Mrs. Robinson-Hill refused to cooperate in the needless patient recertifications with the Discharge Team and because she refused to submit fraudulent OASIS reports, Mrs. Robinson-Hill was under continuous scrutiny at Nurses' Registry.

126.    Mrs. Robinson-Hill was continuously harassed, threatened, and verbally abused by Lennie House because she objected to the improper practices occurring at Nurses' Registry. Mr. House repeatedly threatened to demote and/or terminate Mrs. Robinson-Hill if she did not comply with these practices.

127.    On or around November 5, 2007, Mrs. Robinson-Hill took medical leave from Nurses' Registry due to work related stress.

128.    When she returned on or around November 19, 20007, she was told that her office was moved from Nurses' Registry's Broadway office to their Bryan Station Drive office.  This move suggested to Mrs. Robinson-Hill that she was being demoted from her position as the Vice President of Operations.

129.    She soon discovered that her emails were being secretly monitored by Nurses' Registry.  Every email that she sent out was getting carbon copied to a member of an executive management team (Jeanie LeMaster, Brenda Tea, Joetta Hutson).  In addition, David Price was informed by Kelly Webb, a Nurses' Registry employee, that anything he told to Mrs. Robinson-Hill in confidence should be hand delivered or told to her in person.

130.    As a result of this continuous scrutiny, unnecessary pressure, harassment, threats, and apparent demotion, Mrs. Robinson-Hill felt forced to resign her position in order to maintain her personal health.  On or around November 28, 2008, she hand delivered her resignation to Nurses Registry.  Upon informing Lennie House that she was resigning, he informed Mrs. Robinson-Hill that he had already demoted her.

131.    On or around December 14, 2007, Mrs. Robinson-Hill was contact via telephone by Agent Randy Pope of the Federal Bureau of Investigations.

132.   After speaking with Agent Pope, she immediately contacted Mr. House to inform him that she had been contacted by the FBI.  Mr. House informed her that he was aware that Agent Pope was contacting Nurses' Registry employees.

133.   After speaking with the FBI, Mrs. Robinson-Hill was under even more scrutiny by Nurses' Registry.  She discovered on two occasions, once in January and once in February, 2008, that Nurses' Registry had sent Jerry Chaney to sit outside of her residence at early morning hours and late night hours to monitor her house.

134.   In January of 2008, Nurses' Registry filed a civil lawsuit against Mrs. Robinson-Hill in Kentucky, Fayette Circuit Court, case number 08-CI-00098, claiming that she was violating a non-compete agreement.  Nurses' Registry had full knowledge that her current employer was not a home health agency and was not in competition with Nurses Registry.  This groundless lawsuit was filed for the purpose of harassment and to intimidate Mrs. Robinson-Hill from pursuing this action.

## G.   RETALIATION AGAINST THE RELATOR, DAVID PRICE

135.   Because Mr. Price refused to cooperate with the fraudulent activity of Nurses' Registry, and because Mr. Price had aligned himself with Mrs. Robinson-Hill in his stance on fraudulent activity at Nurses Registry, Mr. Price was constructively terminated.

136.   In November of 2007, Mr. Price was informed by Jill Bailey that she had heard that Brenda Tea was going to get Mr. Price terminated in the near future.

137.   Mr. Price telephoned Brenda Tea and asked her whether what he had heard from Jill Bailey was true and accurate.  Brenda Tea informed Mr. Price that she questioned his management skills.

138.    Within a week of receiving this information from Jill Bailey, Mr. Price was ordered into a meeting with Brenda Tea, Rita Ritchie, Joetta Hutson, Arlene Pneuman, and Jeanie LeMaster.  During this meeting Mr. Price was informed that he was being demoted to the pre-bill department, that his salary was being significantly decreased.  The alleged reasons for Mr. Price's demotion was because of patient complaints and poor work performance.

139.    However, Mr. Price did not perform any face to face patient visits in his position as case manager and office manager and, all of his performance evaluations were very strong.

140.    This demotion was the result of Mr. Price's objections to the fraudulent practices occurring at Nurses' Registry.

141.    On November 12, 2007, he resigned from Nurses' Registry because of this demotion and the harassment and threats to which he was subjected.

142.    Within a month after Mr. Price's constructive termination, Mr. Price was contacted by Agent Randy Pope regarding improprieties at Nurses' Registry.

143.    In January of 2008, Nurses' Registry filed a civil lawsuit against David Price in Kentucky, Fayette Circuit Court, case number 08-CI-00099, claiming that he was violating a non-compete agreement.  Nurses' Registry had full knowledge that his current employer was not a home health agency and was not in competition with Nurses Registry.  At the time, he was working for the same company that employed Mrs. Robinson-Hill.  This frivolous lawsuit was filed for the purpose of harassment and to intimidate Mr. Price from pursuing this action.

## COUNT I

### Violations of Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1) and (a)(2)

144.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs  of this Complaint.

145.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

146.   By virtue of the acts described above, Defendant Nurses' Registry, by and through its officers, agents, supervisors and employees, knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval in violation of U.S.C. § 3729(a)(1).

147.   By virtue of the acts described above, Defendant Nurses' Registry, by and through its officers, agents, supervisors and employees, knowingly made, or caused to be made or used false records and statements, and omitted material facts, with the knowledge and intent to induce the Government to approve and pay false and fraudulent claims in violation of U.S.C. §3729(a)(2).

148.   Defendant Nurses' Registry, by and through its officers, agents, supervisors and employees, authorized the various officers, agents, supervisors and employees to take the actions described above.

149.   Because of Defendant Nurses' Registry's actions, Relator was denied the benefit of working for an honest employer, experienced the embarrassment of working for and with a company that committed fraud against the U.S. Government and suffered stress, anxiety and mental anguish, which contributed to the constructive termination of Relators' employment.

150.   Each claim that was filed or submitted by Defendant Nurses Registry to a Federal health care insurance program which was impacted or affected by Defendant's fraudulent practices described herein represents a false or fraudulent claim presented to the U.S. Government for payment or approval in violation of violation of U.S.C. § 3729(a)(1).

151.    Each record or statement created as a result of, or affected by, Defendant's fraudulent practices described herein represents a false record or statement made or used by Defendant to induce the Government approve and pay false claims in violation of U.S.C. § 3729(a)(2).

152.    Plaintiffs cannot at this time identify all of the false claims for payment that resulted from Nurses' Registry's conduct.  The false claims were prepared by various employees and/or agents of Nurses' Registry over a period of many years.  Plaintiffs have no control over the activities of those employees and/or agents and currently have no access to the records in Nurses' Registry's possession.

153.    However, Relators estimate that Federal health insurance programs have paid millions of dollars in claims as a result of the false or fraudulent claims submitted by the Defendant.

154.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendant, paid and continues to pay claims that would not be paid but for Nurses' Registry's false and illegal conduct, and has been damaged as a result.

155.    As set forth in the preceding paragraphs, Defendant Nurses' Registry has knowingly violated 31 USC Section 3729(a)(1) and (a)(2), and has thereby damaged, and continues to damage, the United States Government by its actions in an amount to be determined at trial.

## COUNT II

### Retaliation Against Relator Alisia Robinson-Hill in Violation of 31 USC § 3730(h)

156.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

157.   Throughout Relator Alisia Robinson-Hill's employment at Nurses' Registry, Ms. Robinson-Hill complained to Nurses' Registry management regarding the improper practices engaged in by Nurses' Registry, including upcoding, medically unnecessary therapy services, and improper patient recertifications.

158.   Relator's actions in internally reporting the improper practices and Defendant's violations of the Medicare program were protected activities within the meaning of 31 USC § 3730(h).

159.   Defendant was aware of Relator's complaints regarding Defendant's practices.

160.   Relator's complaints regarding Defendant's practices put Defendant on notice that Relator's complaints could lead to *qui tam* action under the False Claims Act.

161.   Defendant constructively discharged Relator in retaliation for her complaints regarding Defendant's improper practices and its False Claims Act violations.

162.   Defendant threatened, harassed, and discriminated against Relator, in violation of 31 USC § 3730(h), in order to intimidate her from cooperating or assisting in the investigation of this action under the False Claims Act.

163.   Defendant's efforts to threaten, harass, intimidate and discriminate against Relator, in violation of 31 USC § 3730(h), created a working environment which was so intolerable that a reasonable person would have been compelled to resign.

164.   As a result of Defendant's efforts to threaten, harass, intimidate and discriminate against Relator, in violation of 31 USC § 3730(h), Relator terminated her employment with Defendant.  Defendant's actions constituted a constructive discharge of Relator.

165.   Defendant Nurses' Registry's actions have caused, and continue to cause Relator to suffer substantial damages, in violation of 31 USC § 3730(h), in an amount to be determined at trial.

166.   Pursuant to 31 USC § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of her reputation and in the pursuit of this retaliation claim.

## COUNT III

### Retaliation Against Relator David A. Price in Violation of
### 31 USC § 3730(h)

167.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

168.   Throughout Relator David A. Price's employment at Nurses' Registry, Mr. Price complained to Nurses' Registry management regarding the improper practices engaged in by Nurses' Registry, including upcoding, medically unnecessary therapy services, and improper patient recertifications.

169.   Relator's actions in internally reporting Defendant's the improper practices  and violations of the Medicare program were protected activities within the meaning of 31 USC § 3730(h).

170.   Defendant was aware of Relator's complaints regarding Defendant's practices.

171.   Relator's complaints regarding Defendant's practices put Defendant on notice that Relator's complaints could lead to *qui tam* action under the False Claims Act.

172.   Defendant constructively discharged Relator in retaliation for his complaints regarding Defendant's improper practices and its False Claims Act violations.

173.    Defendant threatened, harassed, and discriminated against Relator, in violation of 31 USC § 3730(h), in order to intimidate him from cooperating or assisting in the investigation of this action under the False Claims Act.

174.    Defendant's efforts to threaten, harass, intimidate and discriminate against Relator, in violation of 31 USC § 3730(h), created a working environment which was so intolerable that a reasonable person would have been compelled to resign.

175.    As a result of Defendant's efforts to threaten, harass, intimidate and discriminate against Relator, in violation of 31 USC § 3730(h), Relator terminated his employment with Defendant.  Defendant's actions constituted a constructive discharge of Relator.

176.    Defendant Nurses' Registry's actions have caused, and continue to cause Relator to suffer substantial damages, in violation of 31 USC § 3730(h), in an amount to be determined at trial.

177.    Pursuant to 31 USC § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and in the pursuit of this retaliation claim.

## **PRAYER**

WHEREFORE, the Realtors, on behalf of themselves and the United States Government, pray for judgment against Defendant as follows:

a.    That the Defendant cease and desist from violating 31 U.S.C. §3729 et seq.;

b.    That this Court enter judgment against the Defendant in an amount equal three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $10,000 for

each violation of 31 U.S.C. §3729, and the costs of this action, with interest, including the costs to the U.S. Government for its expenses related to this action;

    c.     That, in the event the U.S. Government continues to proceed with this action, the Relators be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of this action or the settlement of the claim;

    d.     That, in the event the U.S. Government does not proceed with this action, the Relators be awarded an amount that the Court determines is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of this action or the settlement of the claim;

    e.     That this Court enter judgment against Defendant in an amount equal to twice the economic damages Relators have suffered, plus full damages for the Relators' mental anguish, suffering and humiliation, including damages for future lost wages and benefits as a result of the unlawful constructive discharge of their employment with Defendant and other retaliatory action in violation of 31 USC § 3730(h);

    f.     That Relators be awarded all costs incurred in this action, including attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d);

    g.     That Relators be awarded pre-judgment interest; and

    h.     That the United States Government and the Relators be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

trial by jury.

Respectfully submitted,

**Wallingford Law, PSC**

By: _Mal a. Wohlander_

Mark A. Wohlander
mark@wallingfordlaw.com
Brian A. Ritchie
brian@wallingfordlaw.com
Nick Wallingford
nick@wallingfordlaw.com
3141 Beaumont Centre Circle, Suite 302
Lexington, Kentucky 40513
Telephone; (859) 219-0066
Fax: (859) 219-0077
*Co-Counsel for Relators*

For: _Martin Hatfield_  By: Nick Wallingford

Martin L. Hatfield
martin@mhatfieldlaw.com
P.O. Box 1600
205 W. Columbia Street
Somerset, Kentucky 42502-0618
*Co-Counsel for Relators*