CIVIL ACTION NO. 08-145-KKC

UNITED STATES OF AMERICA
*ex rel.* ALISIA ROBINSON-HILL and
DAVID A. PRICE

                                                                PLAINTIFFS

vs.

## UNITED STATES' COMPLAINT IN INTERVENTION

NURSES' REGISTRY AND HOME
HEALTH CORP.; LENNIE G. HOUSE;
and VICKI S. HOUSE                                              DEFENDANTS

* * * * * * * * * *

Plaintiff, the United States of America, by and through its undersigned counsel, states as follows:

## INTRODUCTION

1.      This is an action brought by Plaintiff, the United States of America ("United States" or "Government"), to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), and to recover damages under the common law theories of fraud, payment by mistake, and unjust enrichment.

2.      Relators, Alisia Robinson-Hill and David A. Price, originally filed this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).  The United States files this Complaint in Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A).

3.     From January 1, 2004 through the present (the "relevant period"), Nurses'
Registry and Home Health Corp. ("NR") knowingly and systematically billed Medicare for
home health services provided to patients who did not need or qualify for such services under
applicable Medicare rules.  NR attempted to avoid detection of this fraudulent scheme by making
false entries in patient records in order to create the false appearance of a need for home health
services.  Even when certain patients qualified for home health services, NR provided or claimed
to provide – and billed Medicare for – a level, type, or amount of service that was not justified
by the patients' medical condition, in order to generate greater revenues for NR.  NR's owner
and CEO, Lennie G. House ("Mr. House"), knew of this scheme and instructed his employees to
participate in it.

4.     Throughout the relevant period, NR, Mr. House, and Vicki S. House ("Mrs.
House") (collectively, "Defendants") provided remuneration to physicians and other referral
sources in order to induce the referral of patients to NR.  Such remuneration included cash or
cash equivalents, tickets to University of Kentucky basketball and football games, and tickets to
various social, charitable, and entertainment events.

5.     Defendants provided this remuneration with the intent to induce patient referrals
from the recipients, and to reward recipients for prior referrals, all in violation of the Anti-
Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b.  In addition, pursuant to the Stark Law, 42
U.S.C. § 1395nn, the provision of this remuneration created a prohibited financial relationship
with referring physicians who received the remuneration.  Defendants' claims for payment for
home health services arising out of these patient referrals were false and/or fraudulent.
Defendants knew that they were not entitled to payment for services procured through violations

of the AKS and Stark Law.

6.     The United States' claims against NR and Mr. House under the FCA are based upon false certifications and false or fraudulent claims that NR and Mr. House presented or caused to be presented to Medicare in order to obtain millions of dollars in reimbursement. These claims to Medicare were false or fraudulent in that they requested payment for home health services that were not medically necessary and did not meet the Medicare rules for compensable home health services, and/or requested payment for home health services in an amount that had been knowingly and falsely inflated.

7.      The United States' claims against all Defendants under the FCA are also based upon false certifications and false or fraudulent claims that the Defendants presented or caused to be presented to Medicare for services provided to patients referred by physicians and other referral sources with whom NR had illegal financial relationships under the AKS and Stark Law.

8.     The United States also brings this action against Defendants under the common law theories of fraud, payment by mistake, and unjust enrichment.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 because this action is brought by the Government as plaintiff pursuant to the FCA.

10.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business within the Eastern District of Kentucky.

11.     Venue is proper in this District  under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c).

# PARTIES

12.     The plaintiff in this action is the United States of America, suing on its own behalf and on behalf of the United States Department of Health and Human Services ("HHS") and HHS' component agency, the Centers for Medicare and Medicaid Services ("CMS"). HHS, through CMS, administers the Medicare program ("Medicare"), which was created in 1965 as part of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, to provide federally-funded health insurance, including for home health care, for persons age 65 or older, persons under age 65 with certain disabilities, and persons of all ages with end-stage renal disease.

13.     Relator Alisia Robinson-Hill is a former NR employee whose positions at NR included Director of Nursing and Vice President of Operations and Administration. Ms. Robinson-Hill is a citizen of the United States and a resident of the State of Louisiana.

14.     Relator David A. Price is a former NR employee who worked as a Case Manager in NR's Lexington, Kentucky office. Mr. Price is a citizen of the United States and a resident of the State of West Virginia.

15.     Defendant Nurses' Registry and Home Health Corporation is a Kentucky corporation with its principal place of business at 101 Venture Court, Lexington, Kentucky 40511, in the county of Fayette. NR provides home health care services in Fayette County, Kentucky and the surrounding area.

16.     Defendant Lennie G. House is a citizen of the United States and a resident of Scott County in the Commonwealth of Kentucky. Mr. House is President, Chief Executive Officer, and sole owner of NR, and has been at all times relevant to this Complaint. Together with Mrs. House, Mr. House serves as co-director of NR's governing board.

17.     Defendant Vicki S. House is a citizen of the United States and a resident of Scott County in the Commonwealth of Kentucky.  Mrs. House is the Secretary of NR.  Together with Mr. House, Mrs. House serves as co-director of NR's governing board.

## LEGAL BACKGROUND

### A.     The False Claims Act

18.     The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009).[1]   In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).  The FCA further prohibits knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money back to the federal government.  31 U.S.C. § 3729(a)(1)(G).

19.     The term "knowingly" under the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b).  No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  *Id.*

20.     Violations of the FCA subject the defendant to civil penalties of not less than $5,500 and not more than $11,000 per false claim, as adjusted for inflation, plus three times the

---

[1] Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009, making certain amendments retroactive, including 31 U.S.C. § 3729(a)(1)(B).  It amended the FCA again as part of the Patient Protection and Affordable Care Act on March 23, 2010.

amount of damages that the Government sustains as a result of the defendant's actions.  31

U.S.C. § 3729(a).

**B.**      **The Anti-Kickback Statute**

21.      The AKS, 42 U.S.C. § 1320a-7b(b), prohibits any person from offering or paying

remuneration in order to induce or reward referrals for services paid for under federal healthcare

programs.  The statute provides in relevant part:

(b)      Illegal remuneration

* * * * *

(2) whoever knowingly and willfully offers or pays any
remuneration (including any kickback, bribe or rebate) directly or
indirectly, overtly or covertly, in cash or in kind to any person to
induce such person –

(A) to refer an individual to a person for the furnishing or
arranging for the furnishing of any item or service for which
payment may be made in whole or in part under a Federal health
care program, or

(B) to purchase, lease, order or arrange for or recommend
purchasing, leasing or ordering any good, facility, service, or item
for which payment may be made in whole or in part under a
Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more
than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).  The AKS is violated if any one purpose of the remuneration is to

induce or reward referrals of federal health care program business.  66 Fed. Reg. 856, 918 (Jan.

4, 2001).

22.      The AKS arose out of Congressional concern that providing things of value to

those who can influence healthcare decisions may corrupt professional healthcare decision-

making, and may result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The AKS prohibits payment of kickbacks in order to protect the integrity of Medicare. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

### C. The Stark Law

23.     42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits certain medical providers, including home health agencies, from submitting claims to Medicare for services provided to patients who were referred by a physician with whom the provider has an impermissible "financial relationship." The Stark Law was designed by Congress to remove monetary influences from physicians' referral decisions, and thereby protect federal health care programs from paying for the costs of questionable utilization of services. The Stark Law establishes a presumptive rule that providers may not bill, and Medicare will not pay, for certain health care services generated by a referral from a physician with whom the provider has a financial relationship.

24.     In relevant part, the Stark Law states:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

> (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment

otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

\* \* \* \* \*

(g) Sanctions

(1) Denial of payment

No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section.

(2) Requiring refunds for certain claims

If a person collects any amounts that were billed in violation of subsection (a)(1) of this section, the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amounts so collected.

42 U.S.C. § 1395nn(a), (g).

25.     The Stark Law broadly defines "financial relationship" to include any "compensation arrangement" between the provider and the referring physician.  42 U.S.C. § 1395nn(a)(2).  "Compensation arrangement" is further defined to mean "any arrangement involving any remuneration between a physician . . . and an entity."  "Remuneration" means "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1395nn(h)(1)(A), (B).

26.     There are statutory and regulatory exceptions to the Stark Law that permit certain financial relationships between health care providers and physicians without triggering Stark's referral, billing, and payment prohibitions.  42 U.S.C. § 1395nn(b); 42 C.F.R. § 411.357.  For example, non-monetary compensation paid from a provider to a referring physician that does not

8

exceed an aggregate of $300 per calendar year (as adjusted for inflation) is permissible, *provided that* (1) the compensation is not determined in any manner that takes into account the volume or value of referrals or other business generated by that physician, (2) the compensation is not solicited by the physician or the physician's practice, and (3) the compensation arrangement does not violate the AKS. 42 C.F.R. § 411.357(k)(1). Thus, regardless of aggregate annual value, the referral and billing prohibitions of the Stark Law fully apply when a home health agency provides non-monetary compensation, such as tickets to sporting or entertainment events, to a physician: where the provision of that gift takes into account the volume or value of that physician's patient referrals; where the physician or physician's staff solicits the compensation; or where the compensation is intended to induce or reward patient referrals in violation of the AKS.

## MEDICARE PAYMENT FOR HOME HEALTH SERVICES

27. Under Medicare, the United States pays for certain home health services rendered to Medicare beneficiaries who meet specific coverage requirements. 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A). Services covered under this benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or intermittent skilled home health aide services, and medical social services. 42 U.S.C. § 1395x(m).

28. Medicare will pay for home health services only if a physician certifies that:

   (1) the patient needs skilled nursing care, speech-language pathology, or physical or occupational therapy;

   (2) the patient is confined to the home ("homebound"); and

   (3) a plan of care has been established by and is periodically reviewed by a

physician.

42 C.F.R. § 424.22; 42 C.F.R. §§ 409.41, 409.42.  The physician must re-certify that these conditions exist, and re-certify a plan of care for the patient, at least once every sixty days if the home health agency wishes to submit further claims to Medicare for additional episodes of care. *Id.*

29.     "Homebound" means that the patient is normally unable to leave his home under his own power without a severe or taxing effort.  Medicare Benefit Policy Manual 100-02 ("Manual"), Chapter 7, Section 30.1.1.

30.     To be covered by Medicare, a home health agency's skilled nursing services must be reasonable and necessary to the treatment of the patient's condition, and they must be intermittent.  Manual, Chapter 7, Section 40.1.

31.     Where other requirements are met, Medicare covers skilled therapy services provided in the home. "The service of a physical therapist, speech-language pathologist, or occupational therapist is a skilled therapy service if the inherent complexity of the service is such that it can be performed safely and/or effectively only by or under the general supervision of a skilled therapist.  To be covered, the skilled services must also be reasonable and necessary to the treatment of the patient's illness or injury or to the restoration or maintenance of function affected by the patient's illness or injury."  Manual, Chapter 7, Section 40.2.1.

32.     Throughout the relevant period, Medicare has paid home health providers under what is known as the Prospective Payment System ("PPS").

33.     Medicare payments under PPS are based upon sixty-day "episodes" of care.  The PPS rate is intended to reimburse the home health agency for all reasonable and necessary

nursing and therapy services, routine and non-routine medical supplies, and home health aide and medical social services required for the care of an individual patient during that sixty days. The amount of the payment for each sixty-day episode of care is adjusted to account for the patient's health condition, clinical characteristics, and service needs.

34.     The adjustment in payment for the patient's health condition, clinical characteristics, and service needs is known as the case-mix adjustment.  CMS has currently established eighty (80) case-mix groups, or Home Health Resource Groups ("HHRGs"), in which to classify patients for payment purposes.

35.     At the beginning of each sixty-day episode of care, the home health agency assesses the patient's condition and likely need for skilled nursing care or therapy using an instrument called the Outcome and Assessment Information Set, or OASIS.  The OASIS contains certain data elements designed to assess a patient's "clinical severity domain," "functional status domain," and "service utilization domain."  Each data element is assigned a score value.  The HHRG in which the patient falls, and the Health Insurance Prospective Payment System ("HIPPS") code used to determine the home health agency's payment amount, is determined by summing the score values reflected on the OASIS.

36.     CMS contracts with regional home health intermediaries ("Intermediaries") to assist in the administration of home health claims processing and payment.  Home health providers submit claims for payment from Medicare to these Intermediaries.

37.     For initial episodes of care, Medicare pays 60% of the estimated payment for the sixty-day episode of care as soon as the Intermediary receives the home health provider's initial claim.  The estimated payment is based upon the patient's HHRG, which, as described above, is

derived from the OASIS.  The residual 40% of the payment is made at the close of the sixty-day episode, unless there is some applicable adjustment to the payment amount.  For subsequent episodes of care, the initial and residual payments are split evenly.

38.     One potential adjustment to the Medicare payment occurs when a patient is visited four or fewer times by the home health agency during the 60-day episode of care.  This results in a reduction in payment known as a low-utilization payment adjustment, or LUPA.

39.     Additionally, if the home health provider fails to meet certain "therapy thresholds" in its treatment of a given patient, an adjustment may occur and result in a reduced payment to the home health provider.  During the relevant period, for episodes beginning before January 1, 2008, the "therapy threshold" was ten therapy visits within an episode of care.  By providing ten or more therapy visits, the home health agency could use a different HIPPS code on the claim for payment that would result in a higher payment amount from Medicare.  For episodes beginning on or after January 1, 2008, CMS adopted a three-tiered "therapy threshold" structure that based payments upon the patient's receipt of six, fourteen, or twenty therapy visits within an episode of care.  Thus, it is financially advantageous for a home health agency like NR to provide at least five visits to a patient, and/or to meet certain therapy thresholds, within an episode of care.

40.     After the sixty-day episode of care has concluded, a patient may be re-certified for an additional sixty-day period or periods of care, provided that such home health care remains reasonable and necessary to the treatment of the patient's condition and otherwise meets Medicare's coverage rules.

41.     "Adjacent episodes" are defined by CMS as episodes of home health care with

less than sixty days separating the last day of the first episode and the first day of the subsequent episode. For example, if a patient's initial episode of care ended on July 1, 2010, and his next episode of care commenced on any date prior to August 30, 2010, the two episodes would be considered "adjacent."

## DEFENDANTS' STATEMENTS AND SUBMISSIONS TO MEDICARE

42.    At all times relevant herein, NR submitted Medicare claims to an Intermediary called Palmetto Government Benefits Administrators ("Palmetto").

43.    During the relevant period, NR submitted claims for payment to Medicare electronically, through Palmetto. In order to do so, NR entered into an Electronic Data Interchange ("EDI") Enrollment Agreement.

44.    As part of that EDI Enrollment Agreement, NR agreed to "submit claims that are accurate, complete, and truthful." In signing the EDI Enrollment Agreement, NR acknowledged that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under Medicare, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

45.    To the extent that NR did not submit electronic claims for payment during the relevant period, it submitted claims to Medicare using Form CMS-1450 (UB-04). Each Form CMS-1450 submitted contained the following certifications and/or acknowledgements:

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

13

> The submitter of this form understands that misrepresentation or
> falsification of essential information as requested by this form,
> may serve as the basis for civil monetary penalties and assessments
> and may upon conviction include fines and/or imprisonment under
> federal and/or state law(s).

46.    Claims submitted by way of Form CMS-1450 were also presented by NR to
Palmetto, which would process those claims for payment on behalf of Medicare.

47.    In order to be paid for services furnished to Medicare beneficiaries, a home health
agency must file an annual cost report with the relevant Intermediary.  42 C.F.R. §
405.1801(b)(1).  The cost report contains certain provider information including utilization data,
cost data, and PPS payment data.

48.    NR submitted cost reports to Palmetto for each year during the relevant period.

49.    The cost reports submitted by NR during the relevant period contain the following
acknowledgments:

> Misrepresentation or falsification of any information contained in
> this cost report may be punishable by criminal, civil and
> administrative action, fine and/or imprisonment under federal law.
> Furthermore, if services identified in this report were provided or
> procured through the payment directly or indirectly of a kickback
> or were otherwise illegal, criminal, civil and administrative action,
> fine and/or imprisonment may result.

50.    In order to submit a complete cost report, and thereby remain eligible to receive
Medicare payments, NR was required to make the following certification in its cost report each
year:

> I hereby certify that I have read the above statement and that I
> have examined the accompanying home health agency cost report
> and the balance sheet and statement of revenue and expenses
> prepared by Nurses Registry and Home Health, [Provider Number]
> 187109 for the cost report period . . ., and that to the best of my
> knowledge and belief, it is a true, correct, and complete report

14

prepared from the books and records of the provider . . . . I further
certify that I am familiar with the laws and regulations regarding
the provision of health care services, and that the services
identified in this cost report were provided in compliance with
such laws and regulations.

51.    NR was required to certify that its cost report as filed with Palmetto was

(1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct,

*i.e.*, that it was entitled to reimbursement for the reported costs in accordance with applicable

instructions; (3) complete, *i.e.*, that the cost report is based upon all information known to NR;

and (4) that the services identified in the cost report were not corrupted by kickbacks, were billed

in compliance with the Stark Statute, and were otherwise provided in compliance with all

applicable health care laws and regulations.

52.    Mr. House made the foregoing certification on behalf of NR by signing the cost

report for years 2004, dated May 27, 2005; 2006, dated May 29, 2007; 2007, dated May 22,

2008; 2008, dated May 19, 2009; 2009, dated May 10, 2010; and 2010, dated May 16, 2011.

53.    Mrs. House made the foregoing certification on behalf of NR by signing the cost

report for the year 2005, dated May 31, 2006.

## FACTUAL BACKGROUND

54.    NR was incorporated in 1986.  At all times relevant to this Complaint, Mr. House

has owned 100% of NR's stock, and has served as its President and CEO.  At all times relevant

to this Complaint, Mr. House and Mrs. House have served as co-directors of NR's governing

board.

55.    The majority of NR's patients are Medicare beneficiaries, and Medicare

constitutes a significant source of revenue for NR.  During the relevant period, NR has received

more than $100 million from Medicare as a result of claims it submitted to that program.

56.     NR's Medicare cost reports for the years 2005 through 2009 indicate that NR earned net income of approximately $20.5 million for that period.

57.     Those same cost reports indicate that Mr. House withdrew approximately $18.1 million from NR in the form of a personal, interest-free loan.  In addition to this loan, Mr. House is paid an annual salary for his work as President and CEO of NR.  In 2009, Mr. House's annual gross salary exceeded $2.3 million.  Mrs. House personally benefitted from this salary and interest-free loan through her marital relationship with Mr. House.


A.     **Upcoded Claims and Claims for Medically Unnecessary Services**

58.     At all times relevant to the Complaint, NR and Mr. House knowingly submitted or caused to be submitted false or fraudulent claims to Medicare that were (1) falsely inflated or "upcoded," and (2) for home health services that did not otherwise qualify as a covered service under applicable Medicare rules.

59.     At all times relevant to the Complaint, NR and Mr. House knowingly made, used, or caused to be made or used false records or statements that were material to these false claims, or that were made or used in order to get these false claims paid by the government.

60.     NR and Mr. House instructed employees of NR to document or create a continued need for skilled care in patients, and thus a continued need for home health services, even if none existed.  This instruction resulted in numerous patients remaining in NR's care long after their eligibility for such care expired.

61.     On average, NR's patients had significantly longer lengths of stay on home health

16

care than patients staying in the care of other Kentucky home health agencies. These longer lengths of stay were an element and the intended result of NR's scheme to defraud the government.

62. NR's scheme worked in several interrelated ways. First, NR placed false information regarding a patient's condition into OASIS reports and other records in order to create the false appearance of a reasonable need for continuing home health services, including therapy services. NR used these falsified records to justify long lengths of stay, often in excess of twenty adjacent episodes of care. Second, NR sought to ensure that a certain number of therapy or nursing visits were made to the patient's home during each episode of care, regardless of the patient's eligibility for such visits, in order to reach certain payment thresholds and avoid LUPAs. Third, relying on the falsified OASIS reports, and in connection with its scheme to provide therapy and nursing visits for which the patient was not eligible under Medicare rules, NR would use HIPPS codes on its claims for payment that were not justified by the patient's condition or service utilization, thereby falsely inflating the amount of payment it would receive from Medicare. The falsified OASIS reports were designed to support and conceal the false claim for payment. However, at times NR used HIPPS codes on its claims for payment that were not supported even by the falsified OASIS, again for the purpose of increasing its Medicare revenue stream.

### 1. Falsified OASIS Reports and Plans of Care

63. NR systematically defrauded Medicare by falsifying records in order to create the appearance of eligibility for home health care payments under Medicare, and bill Medicare for payment amounts that were not justified by the patients' medical condition. Alterations to

OASIS assessment reports are one example of this fraud.

64.     NR nurses or therapists who work regularly with patients in their homes typically conduct the initial patient assessment and complete the OASIS report. The OASIS report is submitted along with nurses' notes and other paperwork to an NR case manager, who is responsible for reviewing the data reflected in that OASIS and paperwork and entering it into a proprietary NR computer system.  The information is then sent electronically to coders at NR who are responsible for applying the appropriate HIPPS codes to the claim for payment, based on the patient's clinical and functional status as reflected on the OASIS report.

65.     If the NR case manager or coder finds that the OASIS report originally completed by the field nurse does not reflect eligibility for home health care under Medicare rules, and/or does not reflect a patient condition that will qualify the company for a desired level of reimbursement, the OASIS report is sent back to the nurse for alterations.

66.     The instructions to change the OASIS reports came from, among others, Mr. House, Jeannie LeMaster, the director of NR's compliance department, and Amy Gray, the director of nursing at NR at various times during the relevant period.

67.     These alterations routinely resulted in the patients appearing to have a worse clinical and/or functional status than what was originally assessed by the nurses when they visited with the patients in person, contrary to the patients' actual condition.

68.     These alterations also resulted in a falsely inflated OASIS points score that permitted the use of certain HIPPS codes on NR's claims for payment.  These HIPPS codes secured for NR a higher payment from Medicare than what NR would have received had it not altered the OASIS report.

69.     By way of example only, the OASIS report attached as Exhibit 1 and dated

November 18, 2004 was altered after the original assessment in the following respects:

      a.     **Vision**.  The patient was originally described as having "[n]ormal vision." That assessment was subsequently changed to "[p]artially impaired" vision.  By making this change, NR added six points to the patient's clinical severity domain score on the OASIS.

      b.     **Pain.**  The patient was originally described as having "no pain or pain that does not interfere with activity or movement."  That assessment was subsequently changed to describing the patient as having pain "daily, but not constantly."  By making this change, NR added five points to the patient's clinical severity domain score on the OASIS.

      c.     **Respiratory Status**.  The patient was originally described as not being short of breath.  That assessment was subsequently changed to state that the patient experienced shortness of breath with moderate exertion, such as while dressing or using the commode.  By making this change, NR added five points to the patient's clinical severity domain score on the OASIS.

      d.     **Bathing**.  The patient was originally described as being able to bath independently.  That assessment was subsequently changed to describe the patient as requiring the aid of a device in order to bathe herself.

      e.     **Transferring**.  The patient was originally described as being able to transfer independently.  That assessment was changed to state that the patient "transfers with minimal human assistance or with use of an assistive device."  By making this change, NR added three points to the patient's functional status domain score on the OASIS.

      f.     **Ambulation/Locomotion.**  The patient was originally described as being able to walk independently on even or uneven surfaces, and being able to climb stairs without a railing.  That assessment was changed to state that the patient "requires use of a device (e.g., cane, walker) to walk alone or requires human supervision or assistance to negotiate stairs or steps or uneven surfaces."  By making this change, NR added six points to the patient's functional status domain score on the OASIS.

70.     As originally assessed, this patient had normal vision, no pain or shortness of

breath, and could walk, transfer, and bathe independently.  By altering this OASIS report, NR

created a false picture of a much more disabled individual, thereby justifying a "need" for skilled

nursing services and a claim to Medicare for such services.  By altering this OASIS report, NR

also added twenty-seven points to the OASIS score for this episode of care, which would have

lead to a higher, and unjustified, payment from Medicare.[2]

71.     NR and Mr. House instructed employees to make such alterations to the nurses notes or OASIS forms despite knowing that the alterations did not reflect the actual condition of the patients and were false and improper.

72.     These falsified documents present a picture of the patients' clinical and functional status that is contradicted by contemporaneous records from the patients' primary care physicians, and by the notes of other NR nurses and therapists.

73.     The falsified documents created a purported justification for NR's continued provision of home health services to patients for whom such services were no longer reasonable and necessary, or authorized by the relevant Medicare rules.  The falsified documents also led to the provision of a level and amount of skilled home health services, including physical therapy, that was not necessary and that was designed to increase NR's claims for payment to Medicare. NR and Mr. House knowingly submitted or caused to be submitted false claims to Medicare for such services.

74.     Because certain patients did not actually need or were not authorized to receive home health services paid for by Medicare, their physicians would not sign plans of care for such services.  In some instances, NR proceeded to utilize plans of care with forged physicians' signatures, and submitted claims for payment to Medicare for services provided pursuant to those plans of care.  NR either knew of the forgery at the time it submitted the claim for

_____

[2]     NR provided less than five visits to Patient No. 1 during this episode of care, resulting in a LUPA; in addition, Patient No. 1 was discharged just prior to the end of this episode of care.  As a result NR did not receive the full payment it claimed when it falsified Patient No. 1's OASIS and submitted its initial request for payment to Palmetto.

payment, or recklessly disregarded the evidence of a forged physician's signature.

75.     For example, Dr. William McKemie was Patient No. 1's treating physician.  NR submitted claims for episodes of care for Patient No. 1 based on plans of care purportedly signed by Dr. McKemie.  However, Dr. McKemie did not re-certify this patient for these episodes of home health care, dated March 27, 2004 - May 25, 2004; July 25, 2004 - September 22, 2004; November 22, 2004 - January 20, 2005; July 5, 2005 - September 2, 2005; September 3, 2005 - November 1, 2005; November 2, 2005 - December 31, 2005; January 1, 2006 - March 1, 2006; March 2, 2006 - April 30, 2006; May 1, 2006 - June 29, 2006; June 30, 2006 - August 28, 2006; August 29, 2006 - October 27, 2006; October 31, 2006 - December 29, 2006; December 30, 2006 - February 27, 2007; and February 28, 2007 - April 28, 2007.  The signature on the plans of care associated with these episodes of Patient No. 1's care does not belong to Dr. McKemie.  See Exhibit 2.

76.     Without a physician's certification that the patient needs or continues to need home health care, the patient is not eligible for Medicare's home health benefit.  NR knew of or recklessly disregarded the fact that Dr. McKemie, Patient No. 1's physician of record, was not signing these plans of care.  Notwithstanding this knowledge, NR submitted claims for payment to Medicare for Patient No. 1's care.

77.     Upon information and belief, similar forgeries are present in the plans of care and physician orders for numerous other patients treated by NR.

**2.      Unnecessary Therapy Visits**

78.     At all times relevant to the Complaint, NR knowingly provided an inflated level and amount of therapy service that was not justified by the patient's medical condition but was

instead intended to secure for NR a larger payment from Medicare.

79.     From the beginning of the relevant period until December 31, 2007, a home health agency's provision of ten or more therapy visits during an episode of care permitted the agency to use a different HIPPS code that typically resulted in a higher Medicare PPS payment.

80.     NR sought to ensure that patients received at least ten therapy visits, regardless of the patients' medical need for such visits, in order to obtain the higher payment.

81.     NR monitored the number of therapy visits provided to patients during a sixty-day episode of care.  If it appeared that a patient might not receive ten therapy visits, NR would intervene in the normal course of that patient's treatment and send physical or occupational therapists to the patient's home as many times as necessary to ensure that the patient received the threshold number of therapy sessions entitling NR to a higher PPS payment amount.

82.     Thus, from January 1, 2005 to December 31, 2007, NR provided approximately 150 episodes of care to patients in which the patient received nine therapy visits.  During that same time period, NR provided approximately 1,000 episodes of care to patients in which the patient received ten therapy visits.  The increase in the number of episodes in which ten therapy visits were made instead of nine is attributable to the fact that ten therapy visits permitted NR to use certain HIPPS codes on its claims for payment that would result in higher Medicare payments.

### 3.     Upcoding

83.     At all times relevant to the Complaint, NR knowingly submitted claims to Medicare using HIPPS codes that did not reflect the actual condition and service utilization of

the Medicare beneficiaries for whose care NR sought payment.

84.     This practice was facilitated in part by alterations to OASIS reports, which both reflect the condition of the patient and provide the basis for determination of the appropriate HIPPS code.

85.     The following examples demonstrate how alterations to the OASIS reports lead to significant differences in the payments NR received as a result of the falsifications.

86.     Exhibit 3 is an OASIS report completed by NR on September 21, 2004.  As originally completed, prior to alterations, the OASIS point totals were seventeen clinical severity domain points, zero functional status domain points, and zero service utilization domain points. These point totals require the use of HIPPS code HBEJ1, which for this patient would have led to a Medicare payment of $1,230.07 for this episode of care.

87.     The OASIS report attached as Exhibit 3 was altered in the following respects: (1) respiratory status was changed to reflect shortness of breath with moderate exertion, thereby adding five clinical severity domain points; (2) transferring ability was changed to reflect that the patient could not transfer independently, but instead required minimal human or device assistance, thereby adding three functional status domain points; (3) ambulation ability was changed from being able to walk independently to requiring the use of a device, thereby adding six functional status domain points.  The addition of five clinical severity domain points and nine functional status domain points resulted in the use of a different HIPPS code, HCFJ1, which resulted in a Medicare payment of $1,762.56 to NR for this episode of care – an increase of $532 for this single episode.  The claim for this payment, paid in whole by the government on March 18, 2005, was false.

88.     NR altered numerous other OASIS reports for this patient and other patients, resulting in false and inflated claims for payment to Medicare.

89.     In addition, NR knowingly submitted claims to Medicare using HIPPS codes that were not supported even by the falsified OASIS reports, in an effort wrongfully to obtain greater payments from the government.

90.     For example, Exhibit 4 is an OASIS report completed by NR on April 26, 2006. As originally completed, prior to alterations, the OASIS point totals were zero clinical severity domain points, zero functional status domain points, and zero service utilization domain points. These point totals require the use of HIPPS code HAEJ1, which for this patient would have lead to a Medicare payment of $1,041.48 for this episode of care.

91.     NR subsequently altered this OASIS report with a single change: the patient's primary and secondary diagnoses were switched, so that diabetes mellitus was now listed as the primary diagnosis instead of hypotension. By using diabetes as the primary diagnosis, NR added seventeen points to its clinical severity domain score. This change would have permitted NR to use HIPPS code HBEJ1, which would have resulted in a Medicare payment of approximately $1,230.

92.     However, NR did not use HIPPS code HBEJ1. Instead, it used HIPPS code HCGJ1. In order to use that code legitimately, the OASIS would have had to reflect at least an additional three clinical severity domain points and an additional sixteen functional status domain points. The OASIS, even as amended, does not reflect any of those additional points. By using code HCGJ1 on the claim NR submitted to Medicare, NR received payment of $1,968.01 – $926 more than what a claim based on the original OASIS would have paid, and

$737 more than what a claim based on the altered OASIS would have paid. This claim for payment, paid in whole by the government on August 24, 2006, was also false.

93.     Throughout the relevant time period, NR engaged in a pattern and practice of submitting false claims to Medicare for home health services, as described above. The false claims described below are also reflective of that practice.

a.     *Patient No. 1*

94.     Patient No. 1 was a diabetic whose original need for home health care was grounded in a purported inability to manage her diabetes on her own.

95.     For the sixty-day episode beginning on September 23, 2004 and ending on November 21, 2004, NR provided Patient No. 1 with eight skilled nursing visits, ostensibly to treat her diabetes. The physician records for Patient No. 1, and NR's own records, reflect that the patient had no difficulty in managing her diabetes on her own. During this episode of care, Patient No. 1 was not homebound. Because Patient No. 1 was not homebound, and because the skilled nursing visits were not reasonable and necessary to treat Patient No. 1's condition, she did not qualify for Medicare's home health benefit.

96.     NR knew that Patient No. 1 did not qualify for Medicare's home health benefit during this episode of care, but still submitted claims for payment to Medicare, through Palmetto. Medicare reimbursed NR $1,762.56 as a result of this false claim.

97.     Patient No.1 was discharged from NR's care on January 6, 2005, and re-admitted to NR's home health care on July 5, 2005. For the sixty-day episode beginning on July 5, 2005 and ending on September 2, 2005, NR provided Patient No.1 with eight skilled nursing visits, again ostensibly to treat her diabetes. The OASIS form for this episode does not support the

conclusion that Patient No. 1 is homebound. She is independent in her activities of daily living and is able to climb stairs on her own. There is nothing in the physician's medical record to indicate that Patient No. 1 requires home health care.

98.     NR knew that Patient No. 1 did not qualify for Medicare's home health benefit during this episode of care, but still submitted claims for payment to Medicare, through Palmetto. Medicare reimbursed NR $1,897.36 as a result of this false claim.

99.     Between September 3, 2005 and April 24, 2007, NR continued to bill Medicare for another ten adjacent episodes of care for Patient No. 1. Patient No. 1 was not homebound during this period of time, and/or did not require further repetitive teaching regarding her diabetes, which she managed on her own. NR falsified medical records in order to justify these unnecessary and improper claims for payment.

100.    For example, NR completed an OASIS dated October 27, 2005 that states that Patient No. 1 is not homebound. NR then completed another OASIS on October 31, 2005 that describes Patient No. 1 as being unable to leave home without assistance, having severe shortness of breath, having residual weakness, and otherwise being in a much more fragile and functionally disabled state than the condition reflected in the OASIS completed days earlier. Patient No. 1's physician records are consistent with the October 27, 2005 OASIS, but not the October 31, 2005 OASIS, which was falsified.

101.    The revised assessment conducted on October 31, 2005 also added another twenty-eight points to Patient No.1's OASIS points score, which in turn affected the HIPPS coding on this claim and led to a higher, and falsely claimed, payment from Medicare.

102.    Furthermore, as described above, NR knowingly used plans of care with forged

physician's signatures to support its claims to Medicare for services rendered to Patient No. 1.

103. NR knew that Patient No. 1 did not qualify for Medicare's home health benefit during the ten episodes of care provided between September 3, 2005 and April 24, 2007. Nevertheless, it submitted false claims for payment to Medicare for the following episodes of care, and received the following reimbursements as a result:

| Episode Dates | Payment Amount | Final Payment Date |
|---|---|---|
| September 3, 2005 - November 1, 2005 | $1,879.85 | February 24, 2006 |
| November 2, 2005 - December 31, 2005 | $1,684.29 | March 3, 2006 |
| January 1, 2006 - March 1, 2006 | $1,968.01 | May 31, 2006 |
| March 2, 2006 - April 30, 2006 | $1,968.01 | July 28, 2006 |
| May 1, 2006 - June 29, 2006 | $1,968.01 | August 24, 2006 |
| June 30, 2006 - August 28, 2006 | $1,763.29 | October 25, 2006 |
| August 29, 2006 - October 18, 2006 | $1,763.29 | December 18, 2006 |
| October 31, 2006 - December 29, 2006 | $1,575.56 | March 9, 2007 |
| December 30, 2006 - February 27, 2007 | $1,620.95 | April 25, 2007 |
| February 28, 2007 - April 24, 2007 | $1,727.70 | June 1, 2007 |

b. _Patient No. 2_

104. Patient No. 2 was admitted to NR on November 1, 2003, and was continuously re-certified for additional episodes of home health care by NR until June 26, 2008. Patient No. 2 was discharged for a brief period of time and then re-admitted to NR's care, where she was re-certified for at least another ten adjacent episodes of care.

27

105.     As with the records of Patient No. 1, Patient No. 2's records are replete with alterations and inconsistencies designed by NR to create the false appearance of eligibility for Medicare home health care coverage, and to falsely inflate the amount of payment it would receive from Medicare.

106.     On the OASIS form dated February 21, 2005, in the "Analysis of Findings" section, the nurse wrote that Patient No. 2 was "independent in [Activities of Daily Living] except bathing."  The OASIS form as originally completed was consistent with that assessment: it stated that while Patient No. 2 needed human assistance with bathing, she could dress herself without any assistance, could get to and from the toilet independently without assistance or a device, and could transfer with minimal assistance.

107.     Those findings were subsequently altered to state that Patient No. 2 could dress her upper and lower body only if her clothes and shoes were laid out for her, that Patient No. 2 was unable to transfer herself, and that Patient No. 2 was "totally dependent in toileting."  These changes made Patient No. 2's clinical and functional condition appear worse than it was in reality.  These changes also added fourteen points to the OASIS score for this episode, resulting in a different HIPPS code on the Medicare claim, and increased payment from Medicare.

108.     Following the completion of this falsified assessment, NR submitted false or fraudulent claims to Medicare for the episode of Patient No. 2's care beginning on February 23, 2005 and ending on April 23, 2005, and received reimbursement in the amount of $3,432.81.

109.     NR's documentation of Patient No. 2's care as reflected in skilled nursing notes, physical therapy notes, physician orders, and OASIS reports was inconsistent and often conflicting.  The records conflicted because some of them had been falsified in order to create

the appearance of an ongoing need for home health services.

110. NR's frank assessments on some documents belied the falsity of others. For instance, Patient No. 2's husband was also admitted as a NR home health patient during the relevant period. A skilled nursing note for Patient No. 2 dated October 29, 2009 – a time at which her husband was being seen by NR for home health care – states that Patient No. 2 was home alone upon the nurse's arrival because her husband was out on their farm.

111. Patient No. 2's husband was a Medicare beneficiary, meaning that in order to receive reimbursements, NR had to represent that Patient No. 2's husband was confined to his home. Upon information and belief, NR's records of Patient No. 2's husband state that he was homebound, and not that he was able to be out on his farm unassisted. The representation of a homebound condition for Patient No. 2's husband was false, and NR's claim for payment to Medicare for care provided to Patient No. 2's husband from October 7, 2009 through December 5, 2009, was also false. As a result of that false claim, NR received $1,981.67 from the federal government

112. From October 26, 2004 through October 16, 2009, NR submitted false claims for payment to Medicare for the following episodes of care provided to Patient No. 2, and received the following reimbursements as a result:

| Episode Dates | Payment Amount | Final Payment Date |
|---|---|---|
| October 26, 2004 - December 24, 2004 | $3,937.18 | March 23, 2005 |
| December 25, 2004 - February 22, 2005 | $2,049.23 | June 21, 2005 |
| February 23, 2005 - April 23, 2005 | $3,432.81 | December 30, 2005 |
| April 24, 2005 - June 22, 2005 | $3,762.33 | November 10, 2005 |

| | | |
|---|---|---|
| June 23, 2005 - August 21, 2005 | $3,762.33 | October 20, 2005 |
| October 21, 2005 - December 19, 2005 | $3,762.33 | February 17, 2006 |
| December 20, 2005 - February 17, 2006 | $3,751.25 | April 26, 2006 |
| February 18, 2006 - April 18, 2006 | $3,938.82 | July 20, 2006 |
| April 19, 2006 - June 17, 2006 | $3,938.82 | August 18, 2006 |
| June 18, 2006 - August 16, 2006 | $3,938.82 | November 9, 2006 |
| August 17, 2006 - October 15, 2006 | $3,938.82 | January 19, 2007 |
| October 16, 2006 - December 14, 2006 | $3,938.82 | April 3, 2007 |
| December 15, 2006 - February 12, 2007 | $4,052.28 | April 27, 2007 |
| February 13, 2007 - April 13, 2007 | $3,859.32 | May 18, 2007 |
| April 14, 2007 - June 12, 2007 | $3,859.32 | July 5, 2007 |
| June 13, 2007 - August 11, 2007 | $2,001.94 | November 6, 2007 |
| August 12, 2007 - October 10, 2007 | $2,001.94 | December 5, 2007 |
| October 11, 2007 - December 9, 2007 | $2,001.94 | January 11, 2008 |
| December 10, 2007 - February 7, 2008 | $2,003.29 | February 29, 2008 |
| February 8, 2008 - April 7, 2008 | $1,738.26 | April 29, 2008 |
| April 8, 2008 - June 6, 2008 | $1,499.16 | September 18, 2008 |
| June 7, 2008 - June 26, 2008 | $434.57 | September 17, 2008 |
| October 22, 2008 - December 20, 2008 | $4,912.39 | January 20, 2009 |
| December 21, 2008 - February 18, 2009 | $4,601.09 | March 16, 2009 |
| February 19, 2009 - April 19, 2009 | $4,306.31 | May 14, 2009 |
| April 20, 2009 - June 18, 2009 | $1,501.60 | July 13, 2009 |

| | | |
|---|---|---|
| June 19, 2009 - August 17, 2009 | $3,291.02 | September 15, 2009 |
| August 18, 2009 - October 16, 2009 | $4,124.50 | November 9, 2009 |

c.       *Patient No. 3*

113.    Patient No. 3 was admitted to NR on or about March 1, 2004, and was continuously re-certified for thirty-five additional episodes of home health care by NR until January 27, 2010.

114.    NR failed to provide a reason on Patient No. 3's Start of Care OASIS assessment for her homebound status, and that assessment does not show Patient No. 3 to be homebound. This OASIS, dated March 1, 2004 and completed by NR, describes Patient No. 3 as relatively independent: she is oriented, not confused, and has no memory deficit; she is able to groom herself, dress herself, bathe herself, get to the toilet by herself, and transfer and ambulate with minimal assistance from a device; she is able to prepare her own meals, and can do her laundry and other housekeeping by herself.  Patient No. 3 is described as a "non-driver" but is able to ride in a car if one is provided.  Patient No. 3 is described as having normal vision and no shortness of breath.  Her rehabilitation potential is "good."  Her primary diagnosis is hip joint pain, followed by abnormality of gait and hypertension.

115.    NR admitted Patient No. 3 to its home health care as a Medicare beneficiary, despite the lack of information in her assessment supporting her eligibility for such care.

116.    Once Patient No. 3 was admitted to its care, NR commenced its pattern and practice of falsifying records to make this patient appear much sicker than originally assessed in order to create the false appearance of eligibility for Medicare's home health care benefit, and

bill Medicare inflated amounts for that care.

117.     The first recertification OASIS for Patient No. 3, dated April 28, 2004, lists a new primary diagnosis: diabetes mellitus.  By making diabetes the primary diagnosis instead of joint pain, NR added seventeen points to its clinical severity domain score, which in turn lead to a HIPPS code on its claim for payment that would cause Medicare to pay NR an inflated amount.

118.     In contrast to the Start of Care OASIS, NR described Patient No. 3 as having partially impaired vision.  This notation added six points to its clinical severity domain score.

119.     In contrast to the Start of Care OASIS, NR described Patient No. 3 as being short of breath with minimal exertion, meaning that she became short of breath while talking or eating.  This notation added five points to its clinical severity domain score.

120.     In contrast to the Start of Care OASIS, NR described Patient No. 3 as having a memory deficit, thereby adding three clinical severity domain points, and suffering from impaired decision making, adding another three clinical severity domain points.

121.     In contrast to the Start of Care OASIS, NR described Patient No. 3 as needing assistance with dressing and bathing, adding another sixteen points to its functional status domain score.

122.     In this recertification OASIS, NR described Patient No. 3 as being unable to transfer herself, but contradicted that by also stating that she was able to get to and from the toilet independently.

123.     Instead of having a good potential for rehabilitation, as indicated by the Start of Care OASIS, Patient No. 3's rehabilitation potential was now described as "guarded."

124.     NR's assessment of Patient No. 3, as reflected in the recertification OASIS dated

April 28, 2004, is false. That false assessment permitted NR to bill Medicare for another sixty-day episode of care for Patient No. 3, and to increase its OASIS point score by more than nineteen functional status domain points and thirty-four clinical severity domain points.

125.    NR's "assessments" of Patient No. 3 continued to conflict with one another thereafter. Her next recertification assessment, dated June 24, 2004, describes her as never short of breath, fully oriented and not forgetful, able to transfer independently, and able to dress and bathe herself with minimal assistance. However, her rehabilitation potential remained "guarded."

126.    The following recertification assessment, dated August 23, 2004, reverts back to the more severe description of Patient No. 3's condition: she again suffers from a memory deficit and shortness of breath with minimal exertion, and she is unable to transfer herself. The claims NR submitted to Medicare as a result of these two subsequent assessments were false, in that the underlying assessment that lead to the claim for payment was purposefully inaccurate, and inasmuch as Patient No. 3 was not homebound and did not need skilled nursing care. For the episode of care dated June 29, 2004 through August 27, 2004, NR received payment from Medicare of $1,959.39. For the episode of care dated August 28, 2004 through October 26, 2004, NR received payment from Medicare of $2,823.57.

127.    Following these first four episodes of care, NR continued to bill Medicare for another twenty-nine consecutive episodes of home health service for Patient No. 3. However, the vast majority of the skilled therapy and nursing services that NR provided to Patient No. 3, and that it billed to Medicare, were not reasonable and necessary to the treatment of Patient No. 3's condition. Patient No. 3 was able to manage her own medical issues, and did not require

skilled treatment. Indeed, throughout the time period in which NR billed Medicare for home health care provided to Patient No. 3, Patient No. 3 was the sole caregiver to her wheelchair-bound son, who was mentally and physically handicapped.

128. From March 1, 2004 through November 29, 2009, NR submitted false claims for payment to Medicare for the following episodes of care, and received the following reimbursements as a result:

| Episode Dates | Payment Amount | Final Payment Date |
|---|---|---|
| March 1, 2004 - April 29, 2004 | $3,642.66 | June 24, 2004 |
| April 30, 2004 - June 28, 2004 | $2,823.57 | August 25, 2004 |
| June 29, 2004 - August 27, 2004 | $1,959.39 | December 3, 2004 |
| August 28, 2004 - October 26, 2004 | $2,823.57 | February 2, 2005 |
| October 27, 2004 - December 25, 2004 | $2,823.57 | April 22, 2005 |
| December 26, 2004 - February 23, 2005 | $3,051.64 | December 6, 2005 |
| February 24, 2005 - April 24, 2005 | $3,051.64 | July 27, 2005 |
| April 25, 2005 - June 23, 2005 | $3,051.64 | October 14, 2005 |
| June 24, 2005 - August 22, 2005 | $3,051.64 | October 21, 2005 |
| August 23, 2005 - October 21, 2005 | $3,051.64 | December 28, 2005 |
| October 22, 2005 - December 20, 2005 | $3,051.64 | March 21, 2006 |
| December 21, 2005 - February 18, 2006 | $4,173.56 | May 15, 2006 |
| February 19, 2006 - April 19, 2006 | $4,173.56 | August 23, 2006 |
| April 20, 2006 - June 18, 2006 | $3,808.02 | September 14, 2006 |
| June 19, 2006 - August 17, 2006 | $4,093.91 | October 23, 2006 |

| | | |
|---|---|---|
| August 18, 2006 - October 16, 2006 | $4,173.56 | January 17, 2007 |
| October 17, 2006 - December 15, 2006 | $4,173.56 | April 5, 2007 |
| December 16, 2006 - February 13, 2007 | $4,364.57 | May 10, 2007 |
| February 14, 2007 - April 14, 2007 | $4,364.57 | May 31, 2007 |
| April 15, 2007 - June 13, 2007 | $4,364.57 | July 5, 2007 |
| August 13, 2007 - October 11, 2007 | $4,364.57 | November 13, 2007 |
| October 12, 2007 - December 10, 2007 | $4,364.57 | January 30, 2008 |
| December 11, 2007 - February 8, 2008 | $4,363.36 | March 14, 2008 |
| February 9, 2008 - April 8, 2008 | $4,609.01 | April 30, 2009 |
| April 9, 2008 - June 7, 2008 | $4,609.01 | April 30, 2009 |
| June 8, 2008 - August 6, 2008 | $4,330.36 | September 2, 2009 |
| August 7, 2008 - October 5, 2008 | $4,330.36 | October 29, 2008 |
| October 6, 2008 - December 4, 2008 | $5,290.64 | December 29, 2008 |
| December 5, 2008 - February 2, 2009 | $3,688.46 | March 3, 2009 |
| February 3, 2009 - April 3, 2009 | $5,259.21 | April 27, 2009 |
| April 4, 2009 - June 2, 2009 | $4,549.90 | July 6, 2009 |
| June 3, 2009 - August 1, 2009 | $4,826.89 | September 4, 2009 |
| August 2, 2009 - September 30, 2009 | $4,826.89 | October 21, 2009 |
| October 1, 2009 - November 29, 2009 | $4,581.64 | April 26, 2010 |

129.    At all times relevant to the Complaint, NR engaged in this pattern and practice of

falsifying OASIS reports and other records in order to create the false appearance of eligibility

for Medicare's home health care benefit, and/or in order to inflate its claim for payment to Medicare. Mr. House was aware of and encouraged this practice. As a result, NR and Mr. House submitted or caused to be submitted hundreds of false claims to Medicare during the relevant period on behalf of numerous patients.

130.    As a result of this pattern of fraud described above, NR's patient population included hundreds of patients who had extremely long lengths of stay, often in excess of fifteen to twenty adjacent episodes of care.

131.    In or around November 2009, NR, with the knowledge and approval of its Chief Operating Officer, Ronald W. Evans, contracted with a third-party health care consultant, Health Management Associates, Inc. ("HMA"), to review the medical records of approximately 400 episodes of care NR had provided to its patient population, and determine whether home health services for those NR patients were reasonable, necessary, and otherwise met the coverage requirements for the Medicare home health benefit.

132.    In or around January 2010, HMA provided NR with the results of its review of NR's patient records. HMA concluded, among other things, that more than 50% of the episodes of care reviewed were provided by NR to patients who did not appear to meet Medicare's home health eligibility requirements. Mr. House knew of HMA's conclusions. As a result of HMA's review, NR discharged hundreds patients from its care, as those patients did not qualify for home health services.

133.    NR had an obligation to repay Medicare all amounts billed to and received from Medicare for each episode of care provided to the discharged patients who did not meet Medicare's eligibility criteria for the home health benefit.

134.    NR did not repay Medicare any of the amounts it had billed to Medicare for such services.

**B.    The Community Education Department**

135.    In order to market its home health services to the local medical community, NR created a "Community Education Department." Employees working within this department, called "community educators," are ostensibly responsible for informing physicians of the services NR can provide to physicians' patients. Community educators are also responsible for dropping off and collecting physician orders, including plans of care, and for obtaining patient referrals from referral sources.

136.    NR assigns each community educator to a particular geographic region, or territory, and the community educator is responsible for visiting physicians and referral sources within that territory.

137.    Community educators are compensated with a base salary plus commissions. The commissions are based on the number of patient referrals NR receives from referral sources within each community educator's territory. "Sales contests" or bonus programs are offered by the company, and community educators can receive additional bonus compensation based upon the number of referrals they obtain during a defined time period.

138.    NR incentivizes its employees to obtain referrals of Medicare patients, as opposed to patients whose care is paid for by other insurance. Accordingly, NR pays commissions and monetary bonuses to community educators based on the number of Medicare referrals those employees can obtain from physicians and other referral sources, provided that the referral results in the admission of that patient to NR's care. NR does not pay equivalent commissions or

bonuses for the referral of non-Medicare patients.

139.    The more Medicare referrals a NR community educator obtains from referral sources within his or her territory, the greater the community educator's compensation.

140.    Mr. House personally approves the commission structure and any bonus awards designed to compensate employees for obtaining Medicare referrals.

**C.    Inducements to Referral Sources**

141.    At all times relevant to this Complaint, NR community educators regularly provided physicians and other referral sources with monetary and non-monetary remuneration.

142.    Mr. House and Mrs. House knew of this remuneration, and at times directly and personally authorized the provision of certain remuneration to referral sources.

143.    The purpose of this remuneration, in whole or in part, was to induce and reward the referral of patients to NR for home health services.

**1.    Cash**

144.    During the relevant period, NR paid cash or cash equivalents to referral sources.

145.    For instance, between March 2006 and March 2007, NR gave Dr. William Childers a series of checks in the amount of $1,000, written on NR's account.  Some of those checks were signed by Mr. House; others were signed by Mrs. House.  See Exhibit 5.

146.    Dr. Childers is a physician who refers patients to NR for home health services.  In 2006 he referred twenty-one Medicare patients to NR, resulting in reimbursements from Medicare to NR of $149,193.23.  In 2007 he referred seventeen Medicare patients to NR, resulting in reimbursements from Medicare to NR of $98,331.17.

147.    By way of further example, NR gave Dr. David Keedy a check in the amount of

$1,000, dated March 31, 2006, and written on NR's account.  See Exhibit 6.  Dr. Keedy referred nine Medicare patients to NR in 2006, resulting in reimbursements from Medicare to NR of $20,400.41.

148.    The cash payments described above in paragraphs 145 to 147 created a financial relationship between NR and Drs. Keedy and Childers that triggered the Stark Law's referral, billing, and payment prohibitions.  Notwithstanding that financial relationship, NR proceeded to submit claims to Medicare for services provided to patients referred by Drs. Keedy and Childers, in violation of the Stark Law.

149.    The cash payments described above in paragraphs 145 to147 were made to Drs. Keedy and Childers for the purpose, in whole or in part, of inducing and/or rewarding the physicians' referral of patients to NR, in violation of the AKS.  Notwithstanding the provision of these illegal inducements, NR proceeded to submit claims to Medicare for services provided to patients referred by Drs. Keedy and Childers.

150.    NR made other cash payments to referral sources during the relevant time period that created improper financial relationships, and that were provided for the purpose, in whole or in part, of inducing and rewarding patient referrals to NR.

### 2.    Tickets

151.    Through its community education department, and with the approval of Mr. House and Mrs. House, NR regularly distributed non-monetary compensation to physicians and referral sources in the form of tickets to entertainment and sporting events, such as University of Kentucky football and basketball games, concerts at Rupp Arena, and social events.

152.    This remuneration was given by NR for the purpose, in whole or in part, of

inducing or rewarding patient referrals to NR. The provision of this remuneration also created

financial relationships between NR and certain physicians that triggered the Stark Law's referral,

billing, and payment prohibitions.

153.     In May 2009, NR purchased four tickets to a social event in Lexington, Kentucky

for a staff member in the medical office of Drs. Danilo Corales and Thomas Von Unrug. Mrs.

House approved the purchase of these tickets after being informed by NR's Director of Nursing

that this physicians' office was one of the company's largest referral sources, and that a

community educator was picking up two Medicare referrals from Drs. Corales and Von Unrug

that same day. See Exhibit 7.

154.     Dr. Corales and Dr. Von Unrug did in fact refer patients to NR for home health

services. In 2009, Dr. Corales referred forty-two (42) Medicare patients to NR, resulting in

Medicare reimbursements to NR of $324,958.64. In 2009, Dr. Von Unrug referred twenty-three

(23) Medicare patients to NR, resulting in Medicare reimbursements to NR of $148,057.25.

155.     On November 16, 2009, NR provided tickets to a University of Kentucky

basketball game to nurses employed by Drs. Christopher Wieting and Thuy Vo. These nurses

were considered by NR to be "referral sources" within that office.

156.     On November 20, 2009, Lindsay House, executive vice-president of NR, e-mailed

Dr. Wieting and Dr. Vo's patient referral statistics for that year to the community educator in

whose territory the doctors worked, and expressed a desire for referrals from these doctors to

increase now that they had received the basketball tickets. See Exhibit 8.

157.     NR's distribution of tickets to referral sources was so routine that physicians

would solicit NR for tickets to various events. In July 2009 a community educator e-mailed Mr.

House's secretary with a request from Dr. Corales for tickets to an upcoming concert by the band Journey. The e-mail noted that Mr. House had already promised Dr. Corales tickets to another concert, this one by the band The Jonas Brothers, but that Dr. Corales had said that he would keep his business coming to NR. See Exhibit 9. After this e-mail was sent, NR purchased the Journey concert tickets for Dr. Corales.

158. In April 2009 Dr. Gus Bynum asked a community educator if Mr. House could get him tickets to the Kentucky Derby. The community educator responded that she would inquire about tickets, but that in exchange the company would need more referrals from Dr. Bynum. See Exhibit 10.

159. The specific transactions identified in paragraphs 151 to 157 above are examples of a broader pattern and practice at NR of providing referral sources with non-monetary compensation for the purpose, in whole or in part, of inducing and rewarding patient referrals.

### 3. Other Inducements

160. The non-monetary compensation given by NR to referral sources also included items such as spa treatments, bottles of alcohol, and gift certificates for restaurants.

161. Non-monetary compensation other than tickets was typically purchased by a community educator and delivered by the community educator to the physician or referral source. The community educator would then submit a request for reimbursement to NR for the cost of the gift.

162. On April 2, 2009, a community educator purchased two bottles of tequila and one bottle of bourbon and gave those items to the office of Dr. Corales and Dr. Von Unrug. See Exhibit 11. The purchase of alcohol for these physicians was specifically approved by Mr.

House.  *Id.*

163.  The community educator submitted an "Expense Reimbursement Form" requesting that NR reimburse her for the cost of purchasing alcohol for Drs. Corales and Von Unrug.  NR reimbursed the community educator for this purchase.  *Id.*

164.  This same community educator purchased a $100 gift card to a local restaurant on May 1, 2009, and gave that gift card to Drs. Corales and Von Unrug.  This remuneration was also approved by Mr. House, and the community educator was reimbursed by NR for this expense as well.  See Exhibit 12.

165.  The purpose of this remuneration, in whole or in part, was to reward Drs. Corales and Von Unrug for their referral of patients to NR, and to induce the physicians to continue making such referrals.

166.  NR gave similar remuneration to other referral sources with the same intent.

167.  NR attempted to conceal this intent by, among other methods, instructing its community educators to avoid the use of certain words when filling out expense reimbursement forms.  Specifically, the community educators were told that if they used the words "gift" or "referral source" in their reimbursement request, the request would be denied.  Instead, NR instructed the community educators to use the generic term "supplies" to describe their inducements to physicians and other referral sources.  Both the alcohol and the gift card referenced above are described in the expense reimbursement forms as "supplies" for the doctors' office.

168.  Defendants tracked the number of referrals NR received from each physician or referral source.

169. Defendants used this information about referrals to aid in its determinations as to which referral sources should receive remuneration.

170. While NR tracked the number of referrals it received from its referral sources, for most of the relevant period it did not track the monetary value of the remuneration it gave to those referral sources, even though it knew that the Stark Law prohibited it from billing for referrals received from physicians to whom NR had given non-monetary compensation in excess of an aggregate value of $300 per year, as adjusted for inflation. NR did not track the aggregate annual value of the non-monetary compensation given to each physician until in or around July 2010.

171. NR created financial relationships with certain physicians through its provision to them of cash, tickets, and other inducements. The existence of such financial relationships prohibited NR from submitting claims for payment to Medicare that resulted from referrals made by these doctors. In violation of the Stark Law, NR proceeded to submit such claims.

172. Defendants provided physicians and other referral sources with cash, tickets, and other inducements throughout the relevant period, for the purpose, in whole or in part, of inducing and rewarding patient referrals. Such remuneration violated the AKS.

173. The physicians to whom Defendants provided illegal remuneration and kickbacks and with whom Defendants entered into illegal financial relationships referred Medicare patients to NR in violation of federal law. Defendants, in turn, submitted or caused to be submitted claims to Medicare for services provided to those patients and obtained substantial payments from the United States as a result. Under the FCA, such claims were false and/or fraudulent because Defendants had no entitlement to payment for services provided on referrals from such physicians.

174.    Defendants falsely certified, in violation of the FCA, that the services identified in their annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the government, were part of Defendants' unlawful scheme to defraud Medicare.

**COUNT I:    FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1) (January 1, 2004 to May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A) (May 20, 2009 to present)**

<u>**All Defendants**</u>

175.    The United States restates and incorporates by reference paragraphs 1 through 174 of the Complaint as if fully set forth herein.

176.    NR knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for home health services provided to patients who did not meet Medicare's eligibility rules for the home health benefit; claims for payment in amounts that were falsely inflated or exaggerated; and claims for payment for services rendered to patients unlawfully referred to NR by physicians and others to whom NR provided kickbacks and/or illegal remuneration and/or with whom NR entered into prohibited financial relationships, in violation of the AKS and Stark Law.

177.    Mr. House knowingly caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for home health services provided to patients who did not meet Medicare's eligibility rules for the home health benefit; claims for payment in amounts that were falsely inflated or exaggerated; and claims for payment for services rendered to patients unlawfully referred to NR by physicians and others to

44

whom Mr. House and NR provided kickbacks and/or illegal remuneration and/or with whom NR entered into prohibited financial relationships, in violation of the AKS and Stark Law.

178.     Mrs. House knowingly caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for home health services rendered to patients unlawfully referred to NR by physicians and others to whom Mrs. House and NR provided kickbacks and/or illegal remuneration and/or with whom NR entered into prohibited financial relationships, in violation of the AKS and Stark Law.

179.     By virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, the United States suffered damages.

180.     Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## COUNT II:     FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)

### All Defendants

181.     The United States restates and incorporates by reference paragraphs 1 through 174 of the Complaint as if fully set forth herein.

182.     At all times relevant to this Complaint, NR and Mr. House knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid.  Such false material records and statements include, but are not limited to, the false certifications made on NR's cost reports and the false entries in OASIS reports and other medical records.

183.     Mrs. House knowingly made, used, or caused to be made or used, false records or

statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid. Such false material records and statements include the false certification made on NR's cost report for the year 2005.

184.    By virtue of the false or fraudulent records and statements made, used, and caused to be made and used by the Defendants, the United States suffered damages.

185.    Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT III:    FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)

### NR and Mr. House

186.    The United States restates and incorporates by reference paragraphs 1 through 174 of the Complaint as if fully set forth herein.

187.    From in or around November 2009 to the present, NR and Mr. House knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the United States by failing to repay amounts received from Medicare for home health services that NR and Mr. House knew were not eligible for payment by Medicare under the applicable rules and regulations. NR and Mr. House knew that NR was not entitled to moneys paid by Medicare for services provided to patients who did not qualify for Medicare's home health benefit, and knew that the services NR had provided and billed to Medicare were in fact not properly payable by Medicare, but concealed and avoided NR's obligation to repay such amounts.

188.    By virtue of the NR and Mr. House's knowing concealment and avoidance of NR's obligation to pay money to the United States, the United States suffered damages.

189. NR and Mr. House are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IV:    COMMON LAW FRAUD

### All Defendants

190. The United States restates and incorporates by reference paragraphs 1 through 174 of the Complaint as if fully set forth herein.

191. NR intentionally presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for home health services provided to patients who did not meet Medicare's eligibility rules for the home health benefit; claims for payment in amounts that were falsely inflated or exaggerated; and claims for payment for services rendered to patients unlawfully referred to NR by physicians and others to whom NR provided kickbacks and/or illegal remuneration and/or with whom NR entered into prohibited financial relationships, in violation of the AKS and Stark Law.

192. Mr. House intentionally caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for home health services provided to patients who did not meet Medicare's eligibility rules for the home health benefit; claims for payment in amounts that were falsely inflated or exaggerated; and claims for payment for services rendered to patients unlawfully referred to NR by physicians and others to whom Mr. House and NR provided kickbacks and/or illegal remuneration and/or with whom NR entered into prohibited financial relationships, in violation of the AKS and Stark Law.

193. Mrs. House intentionally caused to be presented, directly or indirectly, false and

fraudulent claims for payment or approval to the United States, including claims for home health services rendered to patients unlawfully referred to NR by physicians and others to whom Mrs. House and NR provided kickbacks and/or illegal remuneration and/or with whom NR entered into prohibited financial relationships, in violation of the AKS and Stark Law.

194.    NR represented that the claims were true and correct and that the services identified in the claim were provided in compliance with applicable laws and regulations.  Mr. House and Mrs. House caused NR to make such representations.

195.    The Defendants knew that the claims were materially false and the Defendants intended to deceive Medicare through the submission of those claims.

196.    Medicare reasonably relied upon the representations made by the Defendants and took action in reliance upon those claims, including payment of the claims.

197.    As a result, the United States is entitled to compensatory damages consisting of the total amount paid by Medicare for the fraudulent claims, plus interest, and other compensatory and punitive damages to be determined at trial.

## COUNT V:    UNJUST ENRICHMENT

### All Defendants

198.    The United States restates and incorporates by reference paragraphs 1 through 174 of the Complaint as if fully set forth herein.

199.    Defendants received and retained the benefit of federal monies paid from Medicare and intended to compensate NR for home health care provided to NR patients who met the eligibility rules for Medicare's home health benefit.

200.    The services for which Medicare paid NR were not provided to patients who met the eligibility rules for Medicare's home health benefit.

201.    Defendants have been unjustly enriched with federal monies from Medicare, in an amount to be determined at trial, which they should not in equity and good conscience be permitted to retain.

## COUNT VI:    PAYMENT BY MISTAKE

### All Defendants

202.    The United States restates and incorporates by reference paragraphs 1 through 174 of the Complaint as if fully set forth herein.

203.    This is a claim for the recovery of monies paid by the United States to NR as a result of mistaken understandings of  fact.  Mr. House received and retained the benefit of some of those monies as NR's owner; his wife, Mrs. House, also benefitted from those monies.

204.    The  false claims which Defendants submitted or caused to be submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

205.     The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants, and Mr. House and Mrs. House's certifications and representations, paid NR certain sums of money to which NR was not entitled, some of which was passed on to Mr. House as NR's owner, and by extension to Mrs. House as Mr. House's wife. Defendants are thus liable to account for and to pay such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, requests that judgment be entered in its favor and against Defendants, jointly and severally, as follows:

1.      On the First, Second, and Third Counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.      On the Fourth Count, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

3.      On the Fifth and Sixth Counts, for unjust enrichment and payment by mistake, for the amounts by which the Defendants were unjustly enriched or by which the Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper in an amount to be determined.

4.      With respect to each Count, interest, attorney's fees and costs as allowed by law, and any and all further relief as the Court deems just and proper.

Respectfully submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL

KERRY B. HARVEY
UNITED STATES ATTORNEY

By:     /s/ Paul McCaffrey
        Paul McCaffrey
        Valorie D. Smith
        Assistant United States Attorneys
        260 W. Vine St., Suite 300
        Lexington, KY 40507
        Tel:  (859) 233-2661
        Fax:  (859) 233-2533
        Paul.Mccaffrey@usdoj.gov
        Valorie.Smith@usdoj.gov

        Joyce R. Branda
        Sara McLean
        Richard S. Nicholson
        Attorneys
        Civil Division
        Commercial Litigation Branch
        601 D Street, N.W., Room 1209
        Washington, DC 20004
        (202) 616-0345
        Richard.Nicholson@usdoj.gov

Date: September 2, 2011