UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON
CIVIL ACTION NO. 08-145-KKC

UNITED STATES OF AMERICA  PLAINTIFFS
ex rel. ALISIA ROBINSON-HILL and
DAVID A. PRICE

v.  **AFFIDAVIT OF PAT ALLRED, RN**

NURSES' REGISTRY AND HOME  DEFENDANTS
HEALTH CORP., LENNIE G. HOUSE,
VICKI S. HOUSE

_____

Comes the Affiant, Pat Allred, RN, and after being duly sworn, states as follows:

1. I am more than 18 years of age and am fully competent to make this affidavit.

2. In this affidavit, when I refer to the "Response" or an "Exhibit to the Response," I am referring to Defendants' Joint Response to Motion for Partial Summary Judgment, and the Exhibits attached thereto.

3. I hereby attest to the accuracy of the factual information in Exhibit 4 to the Response. I hereby further attest that Exhibits 9 and 10 to the Response are true and accurate data compilations based on and drawn from data maintained in the Nurses' Registry and Home Health Corporation ("NRHH") database in the regular course of business.

4. I am a Registered Nurse holding a nursing license in the Commonwealth of Kentucky. I have been a Registered Nurse since 1992.

5. I am employed as the Chief Operating Officer of NRHH. I have served in that capacity since 2013.

6. I have been employed at NRHH since 2006. I served as a Case Manager at NRHH from 2006 to 2009, and as the Director of Nursing from 2009 to 2013.

7. In my capacity as Chief Operating Officer for NRHH, I am very familiar with the types of data which NRHH collects. I work closely with the Information Technology staff at NRHH concerning the data collected and maintained by NRHH. I frequently request the Information Technology staff at NRHH to query our databases for particular information. In addition, I am very familiar with NRHH's Community Education staff. As Chief Operating Officer, I oversee the Information Technology and the Community Education staff.

8. As a result of my experience in the home health industry, I am very familiar with how home health agencies receive "referrals" of patients for home health services. The choice as to which home health agency will provide services to the patient in the home is ultimately the decision of the patient. At times, however, patients are uninformed and rely upon their physicians or other health care professionals concerning which home health agency to select. Common "referral" sources for home health agencies are physicians, hospital discharge planners, nursing home discharge planners, and other friends or family members who have had a good experience with a particular home health agency.

9. The Community Education staff provide the link between NRHH and the physician community. They are responsible for seeing and educating physicians and their staff members, as well as hospital and nursing home discharge planners, about NRHH and its services. They are the "marketing" arm of the business. However, it is solely the

patient's choice as to which home health agency to use. The only limitation on patient choice in Kentucky is whether the patient-preferred home health agency is licensed to provide services in the county where the patient resides.

10. I am aware that the government has filed a Motion for Partial Summary Judgment (Doc. # 157) against NRHH, as well as Lennie and Vicki House, in the above-styled litigation. In particular, I have reviewed the affidavit of Kathy G. Rutledge ("Rutledge Affidavit") (Doc. # 157-23), and the affidavit of Diana Barany (Doc. # 157-71), both of which are attached as exhibits to the government's Motion for Partial Summary Judgment.

11. Through my experience in the home health industry, and in particular through my experience in providing services to patients receiving Medicare's home health benefit, I am familiar with the National Provider Identifier ("NPI") referenced in paragraph 8 of the Rutledge Affidavit.

12. As paragraphs 8 and 9 of the Rutledge Affidavit demonstrate, any physician who signs orders for a patient to receive Medicare's home health benefit is assigned what the Rutledge Affidavit refers to as an "NPI Provider" number. For instance, as noted in paragraph 5(a) of the Rutledge Affidavit, the NPI Provider Number for Dr. Ralph Alvarado is 1881640621.

13. According to paragraph 9 of the Rutledge Affidavit, Ms. Rutledge was asked "to analyze the NRHH claims data provided . . . by TrustSolutions and identify the number of referrals made by certain physicians in certain years, and the amount of Medicare reimbursements resulting therefrom." According to paragraph 9 of the Rutledge Affidavit, Ms. Rutledge performed this function for the 24 physicians listed

in the 24 subparagraphs (9(a) – (x)).[1] However, merely because a claim filed by NRHH with Medicare for home health services provided to a patient lists a particular physician and that physician's NPI Provider Number, does not mean that the patient was "referred" to NRHH by that particular physician. The Medicare claim form – known as a UB-04 – includes a section to list the patient's "Attending," "Operating," or "Other" physician and that physician's NPI Provider Number. For purposes of claims made to Medicare for home health services, it is usually the "Attending" (*i.e.*, primary care) physician and that physician's NIP Provider Number that is shown on the UB-04 because it is usually the primary care physician who will ultimately sign the patient's Plan of Care that will govern the home health services to be provided. This, however, does not mean that the "attending"/primary care physician is the "referral" source. The patient may have actually been "referred" to NRHH by a hospital discharge planner, a nursing home discharge planner, a physician other than the physician corresponding to the NPI Provider Number, etc.

14. I will provide an example: Patient X is a Medicare recipient. Dr. James Goodcare is Patient X's primary care physician. Patient X goes into the hospital due to an exacerbation of her Chronic Obstructive Pulmonary Disease ("COPD"). Patient X is discharged from the hospital with a discharge order from the hospitalist for home health to manage Patient X's COPD. The hospital discharge planner contacts NRHH and arranges for NRHH to provide the home health services. Even though home health was "ordered" by the hospitalist and Patient X was "referred" to NRHH by the

---

[1] These 24 physicians are Dr. Ralph Alvarado, Dr. Richard Arnold, Sr., Dr. Kenneth Brodsky, Dr. Gus Bynum, Dr. Ramon Caballero, Dr. Julian Castillo, Dr. William Childers, Dr. Danilo Corales, Dr. Robert Davenport, Dr. Bradford Fine, Dr. John Gilbert, Dr. Gregory Grau, Dr. Michael Heilig, Dr. Michael Huang, Dr. David Keedy, Dr. Hammad Malik, Dr. Michael Noble, Dr. George Pittman, Dr. Stella Staley, Dr. Thomas Von Unrug, Dr. Thuy Vo, Dr. Christopher Weiting, Dr. Michelle Welling, and Dr. William Wittman.

hospital discharge planner, the patient will return to Dr. Goodcare for her post-hospital follow-up care and Dr. Goodcare, as the patient's primary care physician, will have to sign the Plan of Care controlling the home health services to be provided. As a result, when NRHH files a UB-04 for the home health services provided to Patient X, NRHH is required to place Dr. Goodcare's name and NPI Provider Number on the claim form as the "Attending" physician of Patient X. As shown, however, Dr. Goodcare would have, in this example, had nothing to do with "referring" Patient X to NRHH.[2] Thus, the assumption in the Rutledge Affidavit that "the number of *referrals* made by certain physicians in certain years" can be gleaned from the "NRHH claims data" maintained by Medicare is not accurate.

15. In paragraph 9(a) – (x) of the Rutledge Affidavit, the government is addressing the "total number of episodes referred" in particular years (from 2006 through 2010) for the 24 identified physicians. However, each of these calculations (in paragraph 9(a) – (x)) inaccurately assumes that simply because that particular physician's NPI Provider Number (*i.e.*, Dr. Alvarado's in paragraph 9(a), Dr. Arnold's in paragraph 9(b), etc.) appears on a particular claim that it necessarily means the patient for whom the claim was submitted was "referred" by that physician. In fact, as noted above, the patient may have been "referred" by a hospital discharge planner, a nursing home discharge planner, or a different physician. As a result, the information in paragraph 9(a) – (x) of the Rutledge Affidavit is based on an inaccurate assumption and is not correct.

16. Moreover, paragraph 9(a) – (x) of the Rutledge Affidavit purports to reflect the "total number of episodes referred" by each of the 24 physicians only for the years in which

---

[2] And NRHH would not reflect, in its own records, that Dr. Goodcare "referred" Patient X.

the physician allegedly received "remuneration" from NRHH.[3] For instance, paragraph 9(a) only shows the "total number of episodes referred" for Dr. Alvarado for the years 2006 and 2010 because those are the years in which he allegedly received "remuneration" from NRHH.

17. NRHH maintains a database that records the <u>actual</u> referral source of its patients. For instance, NRHH's database records every referral actually made by Dr. Alvarado or his office for each year. The Rutledge Affidavit focuses on the years 2006, 2007, 2008, 2009, and 2010. The NRHH database includes <u>all</u> of the referrals from <u>each</u> of the 24 physicians listed in paragraph 9 of the Rutledge Affidavit for <u>each</u> of those years (2006 through 2010). As a result, NRHH has data showing the actual number of referrals from each of the 24 physicians referenced in paragraph 9(a) – (x) of the Rutledge Affidavit for every year 2006 through 2010.

18. I had the NRHH Information Technology staff query the database for the referrals for all 24 physicians referenced in paragraph 9 of the Rutledge Affidavit for each of the years 2006, 2007, 2008, 2009, and 2010. This data from the NRHH database is reflected in <u>Exhibit 9</u> to the Response. <u>Exhibit 9</u> to the Response also shows a comparison of the NRHH data to the data from paragraph 9(a) – (x) of the Rutledge Affidavit for each of the 24 physicians. <u>Exhibit 9</u> shows (a) that there is a factual dispute as to the number of referrals from the 24 physicians and the Medicare dollars received by NRHH as a result of those referrals, and (b) that the "referrals" received from these 24 physicians are essentially the same in years in which they <u>did not</u> receive remuneration as in years in which they allegedly <u>did</u> receive remuneration. In

---

[3] By "remuneration" I am referring to a football ticket, a basketball ticket, a ticket to a charity or cultural event, a gift basket, etc.

other words, the data in Exhibit 9 indicates that the alleged "remuneration" did not influence physicians to make referrals to NRHH.

19. I also had the NRHH Information Technology staff query the database for the number of referrals from all physicians who referred patients to NRHH during the years 2006 through 2010 (the 24 physicians listed in the Rutledge Affidavit plus the hundreds of physicians who never received any remuneration from NRHH during the years 2006 – 2010). Those results are reflected in Exhibit 10 to the Response (the 24 physicians in the Rutledge Affidavit are highlighted in this exhibit). These results show that the hundreds of doctors who did not receive remuneration nevertheless referred large volumes of patients to NRHH. By way of example, Exhibit 10 to the Response shows the following:

- Dr. James Henderson was credited with 16 "referrals" in 2006, resulting in 44 billed episodes[4] and $148,943 to NRHH, but received no remuneration.

- Dr. August Ott was credited with 16 "referrals" in 2006, resulting in 39 billed episodes and $121,352 to NRHH, but received no remuneration.

- Dr. Bennett Asher was credited with 12 "referrals" in 2007, resulting in 42 billed episodes and $112,529 to NRHH, but received no remuneration.

- Dr. August Ott was credited with 20 "referrals" in 2007, resulting in 43 billed episodes and $137,339 to NRHH, but received no remuneration.

---

[4] An "episode" is a 60-day billing period utilized by Medicare as its capitated method of paying for home health services.

- Dr. Ott was again credited with 11 "referrals" in 2008, resulting in 30 billed episodes and $117,572 to NRHH, but received no remuneration.

- Dr. Steven Green was credited with 9 "referrals" in 2008, resulting in 27 billed episodes and $51,805 to NRHH, but received no remuneration.

- Dr. Green was credited with 9 "referrals" in 2009, resulting in 23 billed episodes and $72,144 to NRHH, but received no remuneration.

- Dr. Ott was credited with 13 "referrals" in 2009, resulting in 32 billed episodes and $119,109 to NRHH, but received no remuneration.

- Dr. Ott was again credited with 19 "referrals" in 2010, resulting in 48 billed episodes and $166,728 to NRHH, but received no remuneration.

- Dr. Green was credited with 7 "referrals" in 2010, resulting in 20 billed episodes and $80,785 to NRHH, but received no remuneration.

During the period 2006 to 2010, NRHH received referrals from a total of 698 physicians.

20. When the data reflected in Exhibits 9 and 10 is considered, it is clear that (a) the "total number of episodes referred" and the dollar value of those episodes as reflected in paragraph 9(a) – (x) of the Rutledge Affidavit is incorrect, (b) the 24 doctors listed in paragraph 9 of the Rutledge Affidavit referred patients to NRHH at generally the same rate in years when they did not receive remuneration as in years when they allegedly did receive remuneration, and (c) doctors who never received any remuneration at all referred patients in substantial volumes to NRHH.

21. I am familiar with Dr. William Childers. I am familiar with the fact that Dr. Childers performed services for NRHH during the period March 2006 through March 2007, and was paid $1000 per month over a period of 13 months for those services. We

(NRHH, its principals, and its officers) were under the belief that a written contract was executed between NRHH and Dr. Childers for these services, but so far we have been unable to locate a written contract. NRHH has produced in discovery numerous documents which reflect the work performed by Dr. Childers for NRHH during the period March 2006 through March 2007, in accordance with the agreement between NRHH and Dr. Childers. Those documents are bates stamped GOVREQ02 00001 - 00217.

Further the Affiant sayeth not.

*Pat Allred RN COO*
Pat Allred, RN

STATE OF KENTUCKY )
                               ) ss
COUNTY OF FAYETTE )

Subscribed, acknowledged and sworn to me by Pat Allred, RN, on this 5th day of September, 2014.

*Rashonda Laye Kennedy, # 450578*
NOTARY PUBLIC
My Commission Expires: Sept 7, 2015