## DECLARATION OF KEVIN G. McANANEY

I, Kevin G. McAnaney, an attorney-at-law, pursuant to 28 U.S.C. § 1746, do hereby make this declaration, and state as follows:

### I. Introduction

I have been asked to provide a declaration as an expert based on the government's motion for partial summary judgment and exhibits in the case of United States ex rel. Robinson-Hill v. Nurses Registry and Home Health Corp., et al., CA No. 08:145-KKC, now pending in the United States District Court for the Eastern District of Kentucky. I am thoroughly familiar with the federal health care fraud and abuse laws and served as the Chief, Industry Guidance Branch, Office of Counsel to the Inspector General of the U. S. Department of Health and Human Services from January 1997 until May 2003. I have been asked for my opinions as to whether the evidence produced by the United States in its motion for partial summary judgment demonstrates that in the time period from approximately 2006 to 2010, Nurses Registry and Home Health Corp. ("NRHHC") unlawfully provided certain business gratuities and certain other payments to potential and actual referral sources. For the reasons discussed below, NRHHC's understanding that such practices were lawful was consistent with the consensus view among experienced health care counsel and industry participants during the relevant time period.

### II. Background and Qualifications

1. I specialize in federal health care fraud and abuse laws and have over 35 years of experience in health law, including substantial experience working in the federal government on the regulatory framework upon which I am opining. My practice for the past 17 years has focused virtually exclusively in the application of the federal health care anti-kickback statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and the physician self-referral law ("Stark law"), 42 U.S.C. § 1395nn, to healthcare transactions.

2. I was the Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General of the United States Department of Health and Human Services ("HHS") from 1997 until 2003. In that position, I was responsible for issuing formal guidance to the regulated community through advisory opinions, fraud alerts and special bulletins, compliance program guidance, and regulations related to the fraud and abuse statutes and regulations enforced by the Office of Inspector General ("OIG"), including the AKS, 42 U.S.C. § 1320a-7(b) and the physician self-referral law, 42 U.S.C. § 1395nn (commonly known as the "Stark law").

3. I was the principal author of the Stark II Phase I and Phase II rulemakings, 66 Fed. Reg. 856 (January 4, 2001); 69 Fed. Reg. 16054 (March 26, 2004). Those rulemakings established the non-monetary compensation, personal services, and isolated transaction regulatory exceptions.

4. In addition, I worked closely with the United States Department of Justice ("DOJ") in developing cases involving the AKS and Stark law, including the use of such claims as predicates for False Claims Act litigation.

5. Since May 2003, I have specialized my practice on the regulation of Medicare fraud and abuse. I regularly counsel health care entities on the Stark law and AKS and regulations, including how to structure arrangements to comply with those laws. Clients have included the Centers for Medicare and Medicaid, the Office of the Assistant Secretary for Planning and Development in HHS, and the Medicare Payment Advisory Commission, an independent

1

Congressional agency. I regularly counsel clients on compliance issues related to the AKS and Stark Law.

6. Prior to joining the OIG, I practiced health and regulatory law in the Dewey Ballantine law firm for 13 years, including 10 years as a partner. During that time I counseled clients on compliance with the federal anti-kickback statute.

7. I served from 1981 to 1983 as Assistant Counsel to New York Governor Hugh Carey with principal responsibility for legislation and litigation affecting the health and human services agencies, including the Medicaid program, and from 1980 to 1981 as the Director of Legal Affairs for the New York Hospital.

8. I graduated from the University of North Carolina at Chapel Hill in 1971 and from the Columbia University Law School in 1977.

9. I am a member of the Advisory Board for the Bureau of National Affairs' Health Care Fraud Reporter, and a frequent speaker on health care fraud issues, including numerous presentations relating to the Stark law and the federal anti-kickback statute. I was an adjunct professor of law at the University of Maryland School of Law from 2001 to 2013. I am a past member of the Board of Directors of the American Health Lawyers Association. I have been a member of the Program Committee for the American Health Lawyers Association/Health Care Compliance Association's Health Care Fraud and Compliance Forum for the past six years and co-chair of the program committee for the past two years. A copy of my current curriculum vitae is attached hereto.

### III. Summary of Opinions

10. Experienced health care counsel during the period from 2006 to 2010 would not have reasonably believed that the government's motion papers establish violations of the Physician Self-Referral Law (commonly known as the Stark Law), 42 U.S.C. § 1395nn.

   a. Experienced health care counsel during the relevant time period (2006-2010) would reasonably have understood that the Stark Law is not implicated by gratuities or remuneration to anyone other than a referring physician or an immediate family member.

   b. Experienced health care counsel during the relevant time period (2006-2010) would reasonably have understood that the provision of non-monetary gratuities to referring physicians and their immediate family members does not necessarily trigger the self-referral prohibition in the Stark Law. Many of the instances in the government's papers appear to qualify for the exception for non-monetary compensation, 42 C.F.R. § 411.357(k).

   c. Experienced health care counsel during the relevant time period (2006-2010) would reasonably believe that the government has not established what the applicable period of disallowance might be for a non-monetary business gratuity during which referrals would have been prohibited.

11. Experienced health care counsel during the relevant time period (2006-2010) would understand that the government's motion papers do not establish violations of the federal health care program's anti-kickback statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

2

a. Experienced health care counsel during the relevant time period (2006-2010) would have reasonably believed that the AKS did not prohibit the provision of modest business gratuities to physicians or other referral sources.

b. Experienced health care counsel during the relevant time period (2006-2010) would have understood that the provision of such gratuities was, and continues to be, a common business practice in the health care industry.

c. Experienced health care counsel during the relevant period (2006-2010) would not have reasonably believed that the occasional provision of business gratuities of modest value to physicians or other referral sources violated the AKS.

### IV. Statement of and Bases for Opinion 1

12. As a threshold matter, it is important to understand and appreciate that the Stark Law is not a fraud statute; and does not necessarily involve any wrongdoing. In the initial rulemaking for the Stark Law, CMS stated:

> [S]ection 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of FFP under the Medicaid program) for certain DHS [Designated Health Services] when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions. Significantly, *no wrongful intent or culpable conduct is required. The primary remedy is simply nonpayment by the program, without penalties. In other words, the basic remedy is recoupment of overpayments by the program.*

66 Fed. Reg. 856, 859 (January 4, 2001) (emphasis added).

13. The Stark regulations are very technical, voluminous and complicated, with an emphasis on legal formalities such as signed written contracts in advance of any services. Small providers, without sophisticated in house counsel or dedicated compliance staff, are particularly prone to making inadvertent violations of the Stark Law. For example, agreements sealed with a handshake violate Stark, regardless of whether the services were performed as agreed and payment was at fair market value.

14. Technical Stark violations are ubiquitous throughout the health care industry. In order to address the voluminous violations and the unfair draconian liability from innocent mistakes, Congress directed CMS to establish a self-disclosure protocol to permit fair resolution. Three of the settlements to date have involved the provision of non-monetary remuneration to physicians and have resulted in settlements of between $4,500 and $6,800, the latter of which involved gifts to two physicians over three years.[2] In other words, neither the industry nor CMS view most violations of the non-monetary compensation exception as culpable wrongdoing.

15. Many of the government's alleged Stark Law violations involve the provision of <u>various business gratuities to the office staff of physicians, including food baskets, personal care items,</u>

---

[2] See, http://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Self-Referral-Disclosure-Protocol-Settlements-Items/CMS1255544.html?DLPage=1&DLSort=0&DLSortDir=ascending; http://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Self-Referral-Disclosure-Protocol-Settlements-Items/CMS1255545.html?DLPage=1&DLSort=0&DLSortDir=ascending; http://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Self-Referral-Disclosure-Protocol-Settlements-Items/040512-Settlement.html?DLPage=1&DLSort=0&DLSortDir=ascending

3

*and tickets to various events. Nothing in the Stark Law regulates financial relationships between a provider of Designated Health Services such as NRHHC, and non-physicians (other than immediate family members of a physician).* In such circumstances, experienced health care counsel reasonably believe that there is no "remuneration" to the physician. The physician does not receive the financial benefit of the gratuity since the gratuity does not substitute for any expenditure he or she might otherwise have to make or incur. Simply put, a gift to a member of the physician's staff is not a financial benefit to the physician. Six of the persons receiving alleged gratuities listed on Exhibit 61 (Doc. # 157-63)[3] are neither physicians nor the family member of physicians.

16. Even with respect to gratuities that were made to physicians or their immediate family members, experienced health care counsel understand that such payments do not necessarily violate the Stark Law. The Centers for Medicare and Medicaid Services ("CMS") created a regulatory exception, the non-monetary compensation exception, to permit Designated Health Service entities to provide such occasional business gratuities, provided the annual aggregate value of such gratuities was less than $338 in 2008 (currently $385), was not based on the value or volume of the recipient's referrals, was not solicited by the physician or his staff, and does not otherwise violate the AKS. 42 C.F.R. § 411.357(k). The Stark Law non-monetary compensation limit was $322 in 2006, $329 in 2007, $338 in 2008, and $355 in 2009 and 2010.

17. Experienced health care counsel would reasonably believe that many of the alleged violations as listed in Exhibit 61, (Doc. # 157-63), qualify, or at least potentially qualify, for the non-monetary compensation exception. Most of the physicians only appear to receive event tickets one or two times in a calendar year, and most of the tickets appear to be University of Kentucky football or basketball tickets which cost NRHHC approximately $35 each based on the documentation in the government's exhibits. In other words, the aggregate value of the gratuities given to most physicians appears well below the annual limit. Moreover, there is no evidence that the gratuities themselves varied with or were apportioned based on the value or volume of referrals. Most of the alleged gratuities were basketball and football tickets with a fixed cost and physicians received one or two tickets regardless of the number of their alleged referrals. The testimony of most community educators was that the tickets were given to major referring physicians, some insignificant referring physicians, and some physicians who did not refer at all. While there are allegations that physicians (or their staff) may have solicited tickets for specific events, the government has not identified that limited subset.

18. Based on my review of the physicians listed in the government's Exhibit 61, it alleges that a total of 16 physicians received non-monetary compensation. (Two other physicians allegedly received cash and six were non-physicians.) Thirteen of the physicians received non-monetary compensation that was less than the Stark limit of approximately $350 in any one year.[4] One other physician (Corales) appears to be under the limit in two of the three years he is alleged to have received gratuities. Simply stated, experienced health care counsel would reasonably conclude that the government has not shown these physicians violated Stark for any of these years.

---

[3] Exhibit 61 (Doc. # 157-63), purports to summarize "[a]ll of the remuneration detailed" in the government's motion. (Doc. # 157-1 at 34).

[4] Drs. Alvarado, Arnold, Brodsky, Castillo, Davenport, Fine, Huang, Noble, Pittman, Staley, Von Unrug, Welling, and Wittman.

4

19. The goal of the Stark statute was to eliminate or regulate investment and compensation arrangements between Designated Health Service providers and referring physicians in which the physician's compensation varied with his or her referrals to the Designated Health Service entity and thereby incentivized overutilization. In the case of a discrete business gratuity, the amount of such gratuity does not vary with the physician's referrals and is, in fact, wholly independent of such referrals. In such arrangements, it is unclear how the "financial relationship" affects subsequent referrals.

20. Conceptually, a one time gift is difficult to analyze, since the statute was intended to regulate ongoing financial relationships, such as a physician's ownership interest in a Designated Health Service entity or an ongoing employment or services arrangement. Simply put, in the case of a one-time gift the financial relationship begins and ends with the delivery of the gratuity. Accordingly, even assuming that the gratuity triggered the prohibition, experienced health care counsel would reasonably conclude that the only referrals that would be prohibited would have to occur <u>subsequent</u> to the receipt of the gratuity and, contrary to the government's position, would not taint referrals for the entire calendar year.

21. Importantly, CMS has not specified how long the period of disallowance for a business gratuity might be. In fact, CMS has stated that it depends on the specific facts of a case. See, 73 Fed. Reg. 48434, 48700 (August 19, 2008)("Our proposals were intended to place an *outside* limit on the period of disallowance in certain circumstances.") (Emphasis added.) In the case of a relatively small and discrete gratuity, experienced health care counsel would conclude that the period in which a physician's referrals would be expected to be disallowed might be no more than a matter of days. The government has not even attempted to define or delineate the appropriate period of disallowance, if any. Moreover, with the commencement of a new calendar year, the "excess" compensation would roll over into the new year's allotment for non-monetary compensation and end the disallowance, depending on the amount of the overage.

22. Experienced health care counsel would reasonably believe that the government's alleged Stark damages are patently incorrect. Only referrals for Designated Health Services would be subject to disallowance and only after the financial relationship commences or, where an exception applies, after the relationship falls outside of the exception. In other words, non-monetary compensation would not normally trigger the prohibition until the monetary cap of approximately $350 was exceeded and resets with the start of the new calendar year. Given that the timing of many of the alleged gratuities is late fall, experienced health care counsel would reasonably conclude that the government's calculation of improper claims is clearly overstated.

23. Aside from the business gratuities, the government alleges NRHHC made cash payments to two physicians: (i) approximately $13,000 to Dr. Childers for services he provided to NRHHC in 2006-2007 and (ii) a one time payment of $1,000 to Dr. Keedy for services he provided in appearing in an advertisement for NRHCC. Both physicians have submitted affidavits that the payments were for services actually provided. Accordingly, the alleged Stark violation is the failure to have a written agreement signed in advance.

24. By definition, technical violations like these for failure to have signed written agreement are always inadvertent. Simply put, if the parties realized the failure to have the agreement in writing would cause all claims to be disallowed, they surely would have put the agreement in writing. Experienced health care counsel understant that these types of hypertechnical violations are routinely settled by CMS for pennies on the dollar. In any event, they hardly constitute a "knowing" submission of a false claim.

25. In sum, the government's exhibits do not begin to demonstrate that the defendants have violated the Stark Law.

V.  Statement and Bases of Opinion 2

26. Experienced health care counsel would reasonably conclude that the government's motion papers do not establish violations of the federal health care program's anti-kickback statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

27. Experienced health care counsel understand that the AKS is a criminal, not a civil, statute. The courts have held, however, that if an AKS violation can be established such a violation can be a basis for civil liability under the False Claims Act. That concept has been adopted into statute by the Affordable Care Act for AKS violations occurring after March 23, 2010, the effective date of the Affordable Care Act. However, experienced health care counsel reasonably believe that the AKS does not prohibit or criminalize the routine provision of isolated business gratuities, including tickets to events, to a health care provider's referral sources. The provision of such gratuities was, and continues to be, a common business practice in the health care industry.

28. The AKS was originally enacted in 1972 and adopted in its current form in 1977. When the industry complained that the language of the statute was overly broad, Congress added the heightened scienter element, requiring that violations required knowing and willful conduct. That intent element means that not only must the person know something is unlawful, but proceed notwithstanding that knowledge.

29. In light of the affidavits from Drs. Childers and Keedy, the payments to those physicians were for services provided by them to NRHHC. Experienced health care counsel understand that such payments for services rendered are commonplace and routine. The government has provided no evidence that such payments were anything but what the physicians have stated. The government has certainly not provided any evidence that the payments were knowingly and willfully made with the intent to induce or in exchange for referrals.

30. All the other alleged "kickbacks" consist of business gratuities. At all times prior to and since the enactment of the AKS, business gratuities such as gifts of fruit and other edibles, liquor, sports and other event tickets, meals and entertainment have been widespread and common throughout the health care industry as in any other industry. Such practices have been open and ubiquitous for the past fifty years.

31. During that time through to the present, experienced health care counsel have never understood an occasional modest business gratuity given to potential or actual referral sources in order to cultivate a better business relationship to constitute a violation of the AKS.

32. Interestingly, the restrictions on business gratuities to health care professionals was first established by the Pharmaceutical Research and Manufacturers of America ("PhRMA") as part of its voluntary Code on Interactions with Health Care Professionals in 2002 – 40 years after the enactment of the AKS. Nowhere in the Code is there any indication that any member believed the provision of such gratuities was unlawful under the AKS.

33. Even after the PhRMA Code, the industry did not understand gratuities to physicians and other referral sources were unlawful. The Advanced Medical Technology Association ("AdvaMed") comprised of the large medical device manufacturers adopted a Code of Ethics on Interactions with Health Care Professionals in 2003. That Code contained no prohibition on the provision of entertainment or event tickets. Again, the absence of a prohibition even after the PhRMA code's adoption demonstrates that industry participants did not understand that such activities violated the AKS.

34. Experienced health care counsel understand that a modest business gratuity does not become a felony simply because the giver <u>hopes</u> that the gratuity might lead to more business

6

from the recipient or simply because the giver has an intent to show the giver's appreciation for the recipient's past patronage. If the hope for future business makes business gratuities unlawful, all gratuities would be unlawful. Experienced health care counsel have reasonably understood that such a position is not the law.

35.  That common understanding among experienced health care counsel is also consistent with the Stark Law. The Stark Law permits non-cash gifts and gratuities up to a value of approximately $355 to a referring physician and an additional $355 to their spouse. If all business gratuities were already illegal, the Stark Law would not have established a specific exception to permit them.

36.  Experienced health care counsel reasonably believe that the AKS is intended to prohibit kickbacks – payments that while perhaps not explicit quid pro quos, are clearly intended to directly cause the recipient to refer. The statute has two separate prohibition sections. The first, 42 USC § 1320a-7b(b)(1), prohibits soliciting or receiving any remuneration "in return for referring a individual" or "in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item" payable by a federal health care program. In other words, the prohibition requires a payment "in return for" a referral or purchase. This prohibition applies to the person *receiving* the remuneration.

37.  The second prohibition in § 1320a-7b(b)(2) applies to persons *offering* the remuneration. The section prohibits offering or paying remuneration "to induce" the referral of patients or the purchase of services payable by federal health care programs. Since the prohibitions are obviously related, and the recipient must receive the payment "in return for" the referral of federal business, the correlative meaning of "induce" must mean "cause." Simply put, it has the same meaning as in the phrase "to induce labor" in a pregnant woman.

38.  Experienced health care counsel understand that the courts and HHS have repeatedly rejected government's oft proferred definition of "induce" to mean encourage. Rather, HHS and the courts have defined it to mean "an intent to exercise influence over the reason or judgment of another in an effort *to cause referral of program-related business.*" *Hanlester v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (citing HHS Secretary's definition of "to induce") (Emphasis added).

39.  No reasonable person, especially an experienced health care attorney, would understand or believe that an occasional modest business gratuity will cause the recipient to refer business to the giver. Rather, common sense and common practice evidence that such gratuities may foster good feelings on the part of the recipient toward the giver that might increase the likelihood of future business, but it will not cause such referrals itself.

## VI.  Review of Government Affidavit and Defense Affidavit/Exhibits

40.  I have reviewed that Affidavit of Kathy G. Rutledge (Doc. # 157-23) ("Rutledge Affidavit") attached as an exhibit to the government's motion for partial summary judgment. That affidavit, and the government's motion, address referrals from 24 specific physicians. It infers that 24 specific physicians received illegal remuneration in particular years between 2006 and 2010, and as a result the claims submitted for episodes of care rendered to patients "referred" to NRHHC during those specific years are tainted as being either Stark Law violations, AKS violations, or both.

7

41. I have also reviewed the Affidavit of Pat Allred, R.N. ("Allred Affidavit"), attached as an exhibit to the Defendants' Joint Response to Motion for Partial Summary Judgment, as well as the exhibits referenced therein. I have noted that these evidence the following:

(a) The referrals from the 24 physicians are generally the same in both years when the physicians supposedly received remuneration from NRHHC and in years in which they did not receive remuneration from NRHHC. Based on my training and experience in the area of health care fraud and enforcement this would tend to refute any notion that remuneration was offered with the intent to influence referrals from these 24 physicians; and likewise, tend to refute any notion that the remuneration actually influenced any of the 24 physicians to refer patients to NRHHC. This underscores the government's lack of evidence that the gratuities were offered with any intent to induce referrals or that such business gratuities actually have the effect of influencing referrals.

(b) Numerous physicians who did not receive any remuneration from NRHHC nevertheless referred substantial numbers of patients to NRHHC from which NRHHC received significant reimbursement from Medicare, year after year. This further underscores the government's lack of evidence that the business gratuities provided by NRHHC are offered with any intent to induce referrals or that such business gratuities actually have the effect of influencing referrals.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 3d day of September, 2014.

_____
KEVIN G. McANANEY

8

**KEVIN G. MCANANEY**
1800 K Street, NW, Suite 720
Washington, D.C. 20006
Office: (202) 457-0494

**2003 – Present**

**LAW OFFICES OF KEVIN G. MCANANEY**
Washington, D.C.

Established boutique health care law practice, focusing on the regulation of fraud and abuse.

**1997 - 2003**

**CHIEF, INDUSTRY GUIDANCE BRANCH**
Office of Counsel to The Inspector General
U.S. Department of Health And Human Services
Washington, D.C.

Joined government after fourteen years in private law practice to set up new IG function to coordinate and issue guidance to the health care industry related to health care fraud and abuse, including advisory opinions, special fraud alerts, and regulatory "safe harbors" to the federal anti-kickback statute. Recruited and supervised four experienced health care lawyers from private sector. Worked closely with HCFA ( now CMS) and Department of Justice in developing and issuing guidance through advisory opinions, special fraud alerts, informal letters and rulemaking. Developed final rule implementing the Ethics in Patient Referrals Act (also known as "Stark II"), published January 2001. Worked closely with DoJ on criminal and civil prosecutions involving the anti-kickback statute and other fraud and abuse laws. Frequent speaker at industry conferences.

**1986 -1997**

**PARTNER, DEWEY BALLANTINE**
Washington, D.C.

Developed general regulatory and transactional practice in the health care, food and drug, and environmental areas. Represented various clients, including physicians, medical device and pharmaceutical manufacturers, hospital and health care companies, health care trade associations and investment companies underwriting health care companies' public offerings. Developed and headed firm's environmental practice, primarily in Superfund litigation. Worked closely with Joseph Califano, the former Secretary of the Department of Health, Education and Welfare, and head of the firm's Washington, D.C. office.

1983 - 1986

### ASSOCIATE, DEWEY BALLANTINE
Washington, D.C.

Worked as associate on various regulatory and transactional matters in the health care, food and drug, and environmental areas.

1981 - 1983

### ASSISTANT COUNSEL TO GOVERNOR HUGH CAREY
Albany, New York

Responsible for developing, coordinating and negotiating the Governor's legislative program in the health and human services areas, including the passage of legislation establishing the nation's first all payer hospital prospective payment system and securing waiver from the U.S. Department of Health, Education and Welfare to include Medicare and Medicaid participation in the reimbursement system. Responsible for coordinating the legislative programs of the State's health and human services agencies. Represented and advised the Governor with respect to other legislation in the health and human services areas. Coordinated activities of State health and human services agencies that affected more than one agency. Developed proposal that resulted in creation of the Governor's Task Force on Life and the Law, a panel consisting of industry, religious and political leaders to develop consensus on medico-legal issues, such as withdrawal of treatment and the definition of death.

1980 - 1981

### ASSOCIATE, KELLEY DRYE & WARREN
**Director of Legal Affairs, The New York Hospital**
New York, New York

Staffed the Office of Legal Affairs for The New York Hospital, one of the largest teaching hospitals in the country. Responsible for the initial intake, evaluation and coordination of all legal matters affecting the Hospital on a daily basis. Provided general advice relating to medical malpractice, medical staff relations, informed consent, State regulatory matters, and other miscellaneous legal issues.

1977 - 1980

### ASSOCIATE, KELLEY DRYE & WARREN
New York, New York

Litigation Associate. Researched and drafted legal memoranda, briefs and pleadings.

**EDUCATION:**   Phillips Exeter Academy (diploma, 1967)

B.A., University of North Carolina at Chapel Hill, 1971
J.D., Columbia University School of Law, 1977