# EXPERT REPORT OF KEVIN G. McANANEY

## I.   Introduction

I have been asked to provide a report as an expert witness in the case of United States ex rel. Robinson-Hill v. Nurses Registry and Home Health Corp., et al., CA No. 08:145-KKC, now pending in the United States District Court for the Eastern District of Kentucky. I am thoroughly familiar with the federal health care fraud and abuse laws and served as the Chief, Industry Guidance Branch, Office of Counsel to the Inspector General of the U. S. Department of Health and Human Services from January 1997 until May 2003. I have been asked for my opinions as to whether experienced health care counsel and experienced health care industry participants would reasonably would have believed that Nurses Registry and Home Health Corp. ("NRHHC") provision of business gratuities and certain other payments to potential and actual referral sources was lawful. For the reasons discussed below, NRHHC's practices were consistent with the consensus view among experienced health care counsel and industry participants during the relevant time period concerning lawful conduct.

## II. Background and Qualifications

1.  I specialize in federal health care fraud and abuse laws and have over 35 years of experience in health law, including substantial experience working in the federal government on the regulatory framework upon which I am opining. My practice for the past 17 years has focused virtually exclusively in the application of the federal health care anti-kickback statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and the physician self-referral law ("Stark law"), 42 U.S.C. § 1395nn, to healthcare transactions.

2.  I was the Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General of the United States Department of Health and Human Services ("HHS") from 1997 until 2003. In that position, I was responsible for issuing formal guidance to the regulated community through advisory opinions, fraud alerts and special bulletins, compliance program guidance, and regulations related to the fraud and abuse statutes and regulations enforced by the Office of Inspector General ("OIG"), including the AKS and the Stark Law.

3.  I also was the principal author of the Stark Phase I and Phase II rulemakings, 66 Fed. Reg. 856 (January 4, 2001); 69 Fed. Reg. 16054 (March 26, 2004). Those rulemakings established the non-monetary compensation, personal services, and isolated transaction regulatory exceptions.

4.  In addition, I worked closely with the United States Department of Justice ("DOJ") in developing cases involving the AKS and Stark law, including the use of such claims as predicates for False Claims Act litigation.

5.  Since May 2003, I have specialized my practice on the regulation of Medicare fraud and abuse. I regularly counsel health care entities on the Stark and AKS and related regulations, including how to structure arrangements to comply with those laws. Clients

1

have included the Centers for Medicare and Medicaid, the Office of the Assistant Secretary for Planning and Development in HHS, and the Medicare Payment Advisory Commission, an independent Congressional agency. I regularly counsel clients on compliance issues related to the AKS and Stark Law.

6. Prior to joining the OIG, I practiced health and regulatory law in the Dewey Ballantine law firm for 13 years, including 10 years as a partner. During that time I counseled clients on compliance with the federal anti-kickback statute, including the statutory and regulatory discount exception.

7. I served from 1981 to 1983 as Assistant Counsel to New York Governor Hugh Carey with principal responsibility for legislation and litigation affecting the health and human services agencies, including the Medicaid program, and from 1980 to 1981 as the Director of Legal Affairs for the New York Hospital.

8. I graduated from the University of North Carolina at Chapel Hill in 1971 and from the Columbia University Law School in 1977.

9. I am a member of the Advisory Board for the Bureau of National Affairs' Health Care Fraud Reporter, and a frequent speaker on health care fraud issues, including numerous presentations relating to various discounting practices and the federal anti-kickback statute. I was an adjunct professor of law at the University of Maryland School of Law from 2001 to 2013. I am a past member of the Board of Directors of the American Health Lawyers Association. I have been a member of the Program Committee for the American Health Lawyers Association/Health Care Compliance Association's Health Care Fraud and Compliance Forum for the past six years and co-chair of the program committee for the past two years. A copy of my current curriculum vitae is attached at Exhibit 1 hereto.

10. My past testimonial experience is listed in the attached Exhibit 2. I have two publications within the last 10 years.[1] I based my opinions on my extensive experience and the matters described below. I have reviewed and relied on the materials cited herein, as well as the materials in the attached Exhibit 3. I am being compensated at the rate of $600 per hour.

### III. Summary of Opinions

11. My opinions address whether experienced health care counsel and experienced health care industry participants reasonably would have understood that the practices of NRHHC during the period 2004-2011 did not violate the Stark Law or the AKS

---

[1] "Permissibility of Pharmaceutical Copayment Coupon Programs Under ACA," BNA's Health Care Fraud Report, August 21, 2013; "Discounts, Bundling, and Swapping: What Do the Fraud and Abuse Laws Really Prohibit?" (presented at various conferences, including conferences sponsored by the American Bar Association and the American Health Lawyers Association).

2

12. Experienced health care counsel and health care industry participants during the period from 2004 to 2011 would have reasonably believed that the NRHC's arrangements with physicians as alleged by the government generally did not trigger the self-referral prohibition provision of the Stark Law.

    a. Experienced health care counsel and experienced industry participants during the relevant time period (2004-2011) would reasonably have understood that the Stark Law is not implicated by the provision of business courtesy gratuities or remuneration to anyone other than a referring physician or an immediate family member.

    b. Experienced health care counsel and experienced industry participants during the relevant time period (2004-2011) would reasonably have understood that the provision of non-monetary business courtesy gratuities to potential and actual referring physicians and their immediate family members does not necessarily trigger the self-referral prohibition in the Stark Law.

13. Experienced health care counsel and experienced industry participants during the relevant time period (2004-2011) would reasonably have understand that the conduct involving physician remuneration allegedly engaged in by NRHHC would not establish violations of the federal health care program's anti-kickback statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

    c. Experienced health care counsel and experienced industry participants during the relevant time period (2004-2011) would have reasonably believed that the AKS did not prohibit the provision of modest business gratuities to physicians or other referral sources.

    d. Experienced health care counsel and experienced industry participants during the relevant time period (2004-2011) would reasonably have believed that the provision of modest business gratuities was, and continues to be, a common business practice in the health care industry.

    e. Experienced health care counsel and experienced industry participants during the relevant period (2004-2011) would reasonably have believed that the occasional provision of business gratuities of modest value to physicians or other referral sources did not violate the AKS.

## V.    Statement of and Bases for Opinion 1

14. As a threshold matter, it is important to understand and appreciate that the Stark Law is a highly technical payment regulation. The Stark Law regulates financial arrangements between certain health care businesses and physicians that referred Medicare patients to those businesses and was intended to restrict arrangements pursuant to which the physician received more compensation when he or she referred more Medicare patients to the entity. As a payment regulation, the Stark Law has no intent element; unless the arrangement complies, no payment can be made. In the initial rulemaking for the Stark Law, the Centers for Medicare and Medicaid Services ("CMS") stated:

3

> [S]ection 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of FFP under the Medicaid program) for certain DHS [Designated Health Services] when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions. Significantly, *no wrongful intent or culpable conduct is required. The primary remedy is simply nonpayment by the program, without penalties. In other words, the basic remedy is recoupment of overpayments by the program.*

66 Fed. Reg. 856, 859 (January 4, 2001) (emphasis added).

15. Conversely, the Stark Law is not a "fraud" statute. It has no requirement of unlawful intent or implication of wrongful conduct.

16. The Stark regulations are very technical, voluminous and complicated, with an emphasis on legal formalities such as signed written contracts in advance of any services. Small providers, without in house counsel or dedicated compliance staff, are particularly prone to making inadvertent violations of the Stark Law. For example, agreements sealed with a handshake violate Stark, regardless of whether the services were performed as agreed and payment was at fair market value.

17. The Stark Law regulatory scheme often triggers draconian financial consequences for trivial violations. The Stark Law is unusual in that it prohibits physicians from referring any Medicare enrollees to health care entities for designated health services ("DHS entity) if the physician has any financial arrangement with the DHS entity unless the arrangement fits squarely in one of the specifically enumerated exceptions. As a result, an inadvertent violation involving an unsigned contract or a ten or twenty dollar exceedence of the non-monetary compensation exception can potentially trigger denial of claims for millions and tens of millions of dollars. As CMS stated:

> The effect of this statutory scheme is that failure to comply with section 1877 of the Act can have a substantial financial result. For example, if a hospital has a $5,000 consulting contract with a surgeon and the contract does not fit in an exception, every claim submitted by the hospital for Medicare beneficiaries admitted or referred by that surgeon is not payable, since all inpatient and outpatient hospital services are DHS.

Id.

18. Technical Stark violations are ubiquitous throughout the health care industry. In order to address the voluminous violations and the unfair draconian liability from innocent mistakes, Congress directed CMS to establish a self-disclosure protocol to permit fair resolution. Three of the settlements to date have involved the provision of non-monetary remuneration to physicians and have resulted in settlements of between $4,500 and $6,800, the latter of which involved gifts to two physicians over three years.[2]

---

[2] See, http://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Self-Referral-Disclosure-Protocol-Settlements-Items/CMS1255544.html?DLPage=1&DLSort=0&DLSortDir=ascending; http://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Self-Referral-Disclosure-Protocol-Settlements-Items/CMS1255545.html?DLPage=1&DLSort=0&DLSortDir=ascending;

4

In other words, neither the industry nor CMS view most violations of the non-monetary compensation exception as seriously culpable wrongdoing.

19.    Experienced health care counsel and experienced health care industry participants reasonably understood and understand that the Stark Law only regulates remuneration that is provided by a DHS entity to a referring physician or an immediate family member of a physician. Many of the government's alleged Stark Law violations involve the provision of various modest business gratuities to the office staff of physicians, including food baskets, personal care items, and tickets to various local sporting events. In such circumstances, experienced health care counsel and experienced health care industry participants reasonably would have believed that there is no "remuneration" to the physician. The physician does not receive the financial benefit of the gratuity since the gratuity does not substitute for any expenditure he or she might otherwise have to make or incur. Simply put, experienced health care counsel and experienced health care industry participants would reasonably have understood that a gift to a member of the physician's staff is not a financial benefit to the physician. For example, six of the persons receiving alleged gratuities listed on Exhibit 61 (Doc. # 157-63)[3] are neither physicians nor the family member of physicians.

20.    Even with respect to modest business gratuities that were made to physicians or their immediate family members, experienced health care counsel and experienced health care industry participants reasonably would have understood that such payments do not necessarily violate the Stark Law. CMS created a regulatory exception, the non-monetary compensation exception, to permit DHS entities to provide such occasional business gratuities, provided the annual aggregate value of such gratuities was less than $338 in 2008 (currently $385), was not based on the value or volume of the recipient's referrals, was not solicited by the physician or his staff, and does not otherwise violate the AKS. 42 C.F.R. § 411.357(k). The Stark Law non-monetary compensation limit was $322 in 2006, $329 in 2007, $338 in 2008, and $355 in 2009 and 2010, and $359 in 2011.

21.    Experienced health care counsel and experienced health care industry participants would reasonably believe that many of the business gratuities listed in Exhibit 61 to the partial summary judgment motion, (Doc. # 157-63), qualify, or at least potentially qualify, for the non-monetary compensation exception. Most of the physicians only appear to receive event tickets one or two times in a calendar year, and most of the tickets appear to be University of Kentucky football or basketball tickets which cost NRHHC

---

http://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/Self-Referral-Disclosure-Protocol-Settlements-Items/040512-Settlement.html?DLPage=1&DLSort=0&DLSortDir=ascending

[3] Exhibit 61 (Doc. # 157-63), purports to summarize "[a]ll of the remuneration detailed" in the government's motion for partial summary judgment. (Doc. # 157-1 at 34). The government's motion for partial summary judgment provides the most complete detail concerning its claims of alleged illegal remuneration of physicians or their offices. The motion provides more detail on these allegations and concern more physicians than the government's earlier discovery responses. As a result, this report refers frequently to the partial summary judgment motion and its exhibits.

sums less than the applicable non-monetary compensation limits based on the documentation from the government. In other words, the aggregate value of the gratuities given to most physicians appears well below the annual limit. Moreover, there is no evidence that the gratuities themselves varied with or were apportioned based on the value or volume of referrals. Most of the alleged gratuities were basketball and football tickets with a fixed cost and physicians received one or two tickets regardless of the number of their alleged referrals. The testimony of most community educators was that the tickets were given to some major referring physicians, some insignificant referring physicians, and some physicians who did not refer at all. While there are allegations that physicians (or their staff) may have solicited tickets for specific events, the circumstances where this may have occurred were limited.

22. The government's Exhibit 61 to the partial summary judgment motion indicates that a total of 16 physicians received non-monetary compensation. (Two other physicians allegedly received cash and six were non-physicians.) Thirteen of the physicians received non-monetary compensation that was less than the Stark limit of approximately $350 in any one year.[4] Experienced health care counsel and experienced health care industry participants would reasonably conclude that the government has not shown these physicians violated Stark for any of these years.

23. The goal of the Stark statute was to eliminate or regulate investment and compensation arrangements between DHS entities and referring physicians in which the physician's compensation varied with his or her referrals to the DHS entity and thereby incentivized overutilization. In the case of a discrete business gratuity, the amount of such gratuity does not vary with the physician's referrals and is, in fact, wholly independent of such referrals.

24. Conceptually, a one time gift is difficult to analyze, since the statute was intended to regulate ongoing financial relationships, such as a physician's ownership interest in a DHS entity or an ongoing employment or services arrangement. Simply put, in the case of a one-time gift the financial relationship begins and ends with the delivery of the gratuity. Accordingly, even assuming that the gratuity triggered the prohibition, experienced health care counsel and experienced health care industry participants reasonably would conclude that the only referrals that would be prohibited would have to occur <u>subsequent</u> to the receipt of the gratuity and would not taint referrals that occurred prior to the non-compliant gratuity. In reaching that conclusion, experienced health care counsel and experienced health care industry participants would have been aware that CMS regulations specify that the period of disallowance for a Stark violation "begins at the time the financial relationship fails to satisfy the requirements of an applicable exception... ." 42 C.F.R. § 411.353(c). The non-monetary compensation exception would be satisfied at all times until the compensation actually exceeded the annual limit.

25. Importantly, CMS has not specified how long the period of disallowance for a business gratuity might be. In fact, CMS has stated that it depends on the specific facts of a case. See, 73 Fed. Reg. 48434, 48700 (August 19, 2008) ("Our proposals were intended to place an *outside* limit on the period of disallowance in certain

---

[4] Drs. Alvarado, Arnold, Brodsky, Castillo, Davenport, Fine, Huang, Noble, Pittman, Staley, Von Unrug, Welling, and Wittman.

circumstances.") (Emphasis added.) In the case of a relatively small and discrete gratuity, experienced health care counsel and experienced health care industry participants reasonably would conclude that the period in which a physician's referrals would be expected to be disallowed might be no more than a matter of days. Moreover, experienced health care counsel and experienced health care industry participants reasonably would have concluded that with the commencement of a new calendar year, the period of disallowance for minor exceedances would end and a new allotment begin.

26. Aside from the business gratuities, the government alleges NRHHC made cash payments to two physicians: (i) approximately $13,000 to Dr. Childers for services he provided to NRHHC in 2006-2007 and (ii) a one time payment of $1,000 to Dr. Keedy for services he provided in appearing in an advertisement for NRHC. Both physicians have submitted affidavits that the payments were for services actually provided. Accordingly, the alleged Stark violation is the failure to have a written agreement signed in advance and, in the case of Dr. Keedy, the isolated transaction exception, 42 C.F.R. § 411.357(f), does not require a written agreement.

27. By definition, technical violations like these for failure to have signed written agreement are always inadvertent. Simply put, if the parties realized the failure to have the agreement in writing would cause all claims to be disallowed, they surely would have put the agreement in writing. Experienced health care counsel and experienced health care industry participants understand that these types of hyper-technical violations are routinely settled by CMS for pennies on the dollar. In any event, experienced health care counsel and experienced health care industry participants reasonably would have understood that the inadvertent failure to reduce an arrangement to writing would not constitute a "knowing" submission of a false claim.

## VI. Statement and Bases of Opinion 2

28. Experienced health care counsel and experienced health care industry participants reasonably would have concluded that provision of modest business gratuities to referring physicians and to physician office staff did not violate the AKS.

29. Experienced health care counsel and experienced health care industry participants reasonably would have believed that the enactment of the AKS in 1977 did not prohibit or criminalize the routine provision of isolated business gratuities, including tickets to events, to a health care provider's referral sources. The provision of such gratuities was, and continues to be, a common business practice in the health care industry.

30. At all times prior to and since the enactment of the AKS, the provision of modest business gratuities such as gifts of fruit and other edibles, liquor, sports and other event tickets, meals and entertainment to business sources has been widespread and common throughout the health care industry as in any other industry. Such practices have been open and ubiquitous for the past fifty years.

31. During that time through to the present, experienced health care counsel and experienced health care industry participants reasonably have understood that the provision of an occasional, modest business gratuity to an actual or potential referral source in order to cultivate goodwill and a business relationship does not violate the AKS.

32. For example, the restrictions on business gratuities to health care professionals was first established by the Pharmaceutical Research and Manufacturers of America ("PhRMA") as part of its voluntary Code on Interactions with Health Care Professionals in 2002 – 40 years after the enactment of the AKS. Nowhere in the Code is there any indication that any member believed the provision of such gratuities was unlawful under the AKS.

33. Even after the PhRMA Code, the industry did not understand gratuities to physicians and other referral sources were unlawful. The Advanced Medical Technology Association ("AdvaMed') comprised of the large medical device manufacturers adopted a Code of Ethics on Interactions with Health Care Professionals in 2003. That Code contained no prohibition on the provision of entertainment or event tickets. Again, the absence of a prohibition even after the PhRMA code's adoption demonstrates that experienced health care counsel and experienced health care industry participants did not understand that such activities violated the AKS.

34. Experienced health care counsel and experienced health care industry participants reasonably would have understood that a modest business gratuity does not become an AKS violation because the giver <u>hopes</u> that the gratuity might lead to more business from the recipient or because the giver has an intent to show the giver's appreciation for the recipient's past patronage. If the hope for future business makes business gratuities unlawful, all gratuities would be unlawful. Experienced health care counsel and experienced health care industry participants reasonably have understood that such is not the law.

35. That common understanding among experienced health care counsel and experienced health care industry participants is also supported by the Stark Law. The Stark Law permits non-cash gifts and gratuities up to a value of approximately $355 to a referring physician and an additional $355 to their spouse. If modest business gratuities were already illegal, the Stark Law would not have established a specific exception to permit them.

36. Experienced health care counsel and experienced health care industry participants reasonably would have understood that an occasional modest business gratuity will not cause the recipient to refer business to the giver. Rather, common sense and common practice evidence that such gratuities may foster good feelings on the part of the recipient toward the giver that might increase the likelihood of future business, but it will not cause such referrals itself.

8

37. In light of the affidavits from Drs. Childers and Keedy, the payments to those physicians were for services provided by them to NRHHC. Experienced health care counsel understand that such payments for services rendered are commonplace and routine. The government has provided no evidence that such payments were anything but what the physicians have stated. The government has certainly not provided any evidence that the payments were knowingly and willfully made with the intent to induce or in exchange for referrals.

This 2ⁿᵈ day of December, 2014.

KEVIN G. McANANEY

**EXHIBIT 1**

**KEVIN G. MCANANEY**
1800 K Street, NW, Suite 720
Washington, D.C. 20006
Office: (202) 457-0494

**2003 – Present**

**LAW OFFICES OF KEVIN G. MCANANEY**
Washington, D.C.

Established boutique health care law practice, focusing on the regulation of fraud and abuse.

**1997 - 2003**

**CHIEF, INDUSTRY GUIDANCE BRANCH**
Office of Counsel to The Inspector General
U.S. Department of Health And Human Services
Washington, D.C.

Joined government after fourteen years in private law practice to set up new IG function to coordinate and issue guidance to the health care industry related to health care fraud and abuse, including advisory opinions, special fraud alerts, and regulatory "safe harbors" to the federal anti-kickback statute. Recruited and supervised four experienced health care lawyers from private sector. Worked closely with HCFA ( now CMS) and Department of Justice in developing and issuing guidance through advisory opinions, special fraud alerts, informal letters and rulemaking. Developed final rule implementing the Ethics in Patient Referrals Act (also known as "Stark II"), published January 2001. Worked closely with DoJ on criminal and civil prosecutions involving the anti-kickback statute and other fraud and abuse laws. Frequent speaker at industry conferences.

**1986 -1997**

**PARTNER, DEWEY BALLANTINE**
Washington, D.C.

Developed general regulatory and transactional practice in the health care, food and drug, and environmental areas. Represented various clients, including physicians, medical device and pharmaceutical manufacturers, hospital and health care companies, health care trade associations and investment companies underwriting health care companies' public offerings. Developed and headed firm's environmental practice, primarily in Superfund litigation. Worked closely with Joseph Califano, the former Secretary of the Department of Health, Education and Welfare, and head of the firm's Washington, D.C. office.

**1983 - 1986**
## ASSOCIATE, DEWEY BALLANTINE
Washington, D.C.

Worked as associate on various regulatory and transactional matters in the health care, food and drug, and environmental areas.

**1981 - 1983**
## ASSISTANT COUNSEL TO GOVERNOR HUGH CAREY
Albany, New York

Responsible for developing, coordinating and negotiating the Governor's legislative program in the health and human services areas, including the passage of legislation establishing the nation's first all payer hospital prospective payment system and securing waiver from the U.S. Department of Health, Education and Welfare to include Medicare and Medicaid participation in the reimbursement system.  Responsible for coordinating the legislative programs of the State's health and human services agencies.  Represented and advised the Governor with respect to other legislation in the health and human services areas.  Coordinated activities of State health and human services agencies that affected more than one agency.  Developed proposal that resulted in creation of the Governor's Task Force on Life and the Law, a panel consisting of industry, religious and political leaders to develop consensus on medico-legal issues, such as withdrawal of treatment and the definition of death.

**1980 - 1981**
## ASSOCIATE, KELLEY DRYE & WARREN
### Director of Legal Affairs, The New York Hospital
New York, New York

Staffed the Office of Legal Affairs for The New York Hospital, one of the largest teaching hospitals in the country.  Responsible for the initial intake, evaluation and coordination of all legal matters affecting the Hospital on a daily basis.  Provided general advice relating to medical malpractice, medical staff relations, informed consent, State regulatory matters, and other miscellaneous legal issues.

**1977 - 1980**
## ASSOCIATE, KELLEY DRYE & WARREN
New York, New York

Litigation Associate.  Researched and drafted legal memoranda, briefs and pleadings.

**EDUCATION:**   Phillips Exeter Academy (diploma, 1967)
B.A., University of North Carolina at Chapel Hill, 1971
J.D., Columbia University School of Law, 1977