1

```
          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF KENTUCKY
           CENTRAL DIVISION, LEXINGTON


----------------------------:

UNITED STATES OF AMERICA,      :
ex rel. ALISIA ROBINSON-HILL   :
and DAVID A. PRICE,            :
                               :
             Plaintiffs,       :
                               :
     vs.                       : Civil Action No.
                               :
NURSES' REGISTRY and HOME      : 08-145-KKC
HEALTH CORP., et al.,          :
                               :
             Defendants.       :
----------------------------:
```

Washington, D.C.

Friday, January 16, 2015

Deposition of:

KEVIN McANANEY,

Called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the law offices

of Hogan Lovells, 555 13th Street, Northwest,

Washington, D.C., before Denise M. Brunet, RPR, of

Capital Reporting Company, a Notary Public in and

for the District of Columbia, beginning at

9:16 a.m., when were present on behalf of the

respective parties:

Capital Reporting Company
McAnaney, Kevin  01-16-2015

2

1               A P P E A R A N C E S

2  On behalf of the Plaintiff:

3          PAUL McCAFFREY, ESQUIRE
           United States Attorney's Office
4          260 West Vine Street
           Suite 300
5          Lexington, Kentucky  40507
           (859) 685-4820
6          Paul.mccaffrey@usdoj.gov

7  On behalf of the Defendants Nurses' Registry and
   Lennie G. House:
8
           J. GUTHRIE TRUE, ESQUIRE
9          True Guarnieri Ayer, LLP
           124 West Clinton Street
10         Frankfort, Kentucky  40601
           (502) 605-9900
11         Gtrue@truelawky.com

12

13

14

15

16

17

18

19

20

21

22  (Appearances continued on the next page.)

Capital Reporting Company
McAnaney, Kevin  01-16-2015

3

```
 1   APPEARANCES (continued):


 2


 3   On behalf of the Defendant Vicki S. House:

 4          DAVID J. GUARNIERI, ESQUIRE
            McBrayer, McGinnis, Leslie & Kirkland,
 5            PLLC
            201 East Main Street
 6          Suite 900
            Lexington, Kentucky  40507
 7          (859) 231-8780
            Dguarnieri@mmlk.com
 8
            MASTEN CHILDERS, II, ESQUIRE
 9          Childers Law Office
            562 West Short Street
10          Lexington, Kentucky  40507
            (859) 231-1071
11          Childerslaw@aol.com

12

13

14

15

16

17

18

19

20

21

22
```

Capital Reporting Company
McAnaney, Kevin  01-16-2015

4

1                C O N T E N T S

2  EXAMINATION BY:                      PAGE:

3       Counsel for Plaintiff          5

4       Counsel for Defendant Nurses' Registry  150

5       Counsel for Defendant Vicki House      169

6

7                E X H I B I T S

8  McANANEY DEPOSITION EXHIBITS:        PAGE

9  1 - Expert report of Kevin McAnaney       7

10 2 - PhRMA code on interactions with health
       care professions              98
11

   3 - AdvaMed code of ethics on interactions
12     with health care professionals      107

13 4 - Declaration of Kevin McAnaney        142

14

15

16      (*Exhibits attached to the transcript.)

17

18

19

20

21

22

Capital Reporting Company
McAnaney, Kevin  01-16-2015

5

1                    P R O C E E D I N G S

2    WHEREUPON,

3                        KEVIN McANANEY,

4    called as a witness, and after having been first

5    duly sworn, was examined and testified as follows:

6            EXAMINATION BY COUNSEL FOR PLAINTIFFS

7    BY MR. McCAFFREY:

8        Q    Good morning, Mr. McAnaney.  We just met,

9    but for the record, my number is Paul McCaffrey.

10   I represent the United States in its case against

11   Nurses' Registry and Vicki House and Lennie House.

12           Could you state your name for the record,

13   please.

14       A    Kevin McAnaney.

15       Q    Could you spell your last name.

16       A    M-C capital A-N-A-N-E-Y.

17       Q    What's your address?

18       A    7203 Denton Road, Bethesda, Maryland.

19       Q    I understand you've given a deposition in

20   a federal case before?

21       A    Yes, I have.

22       Q    When was the most recent time that you

Capital Reporting Company
McAnaney, Kevin  01-16-2015

6

1  did that?

2       A    I actually can't -- I can't recall.  I

3  mean, probably -- I can't recall.  Probably within

4  last six months or so.

5       Q    Okay.  Let me just go through a couple of

6  basic rules here that I assume you're familiar

7  with, but we'll just make sure we're on the same

8  page.  All of my questions and all of your answers

9  are being taken down by the court reporter and,

10 for the record, it's important that you verbalize

11 your answers.  Can you agree to do that?

12      A    Yes.

13      Q    If you don't understand any question that

14 I ask, just tell me, okay, and I'll try to clarify

15 it.

16      A    I will.

17      Q    If you don't ask me to clarify, I'm just

18 going to presume that you understood the question.

19 Okay?

20      A    Yes, sir.

21      Q    Do you understand that you are under oath

22 today?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

7

1      A    I do.

2      Q    And you understand that you must answer

3 these questions truthfully?

4      A    I do.

5      Q    Is there any reason that you could not

6 give complete and accurate testimony under oath

7 here today?

8      A    No.

9      Q    Did you write a report in this case?

10      A    I did.

11      Q    And on whose behalf did you write that

12 report?

13      A    On behalf of -- well, I was -- for

14 Nurses' Registry.

15      Q    I'm going to show you what we'll mark as

16 Exhibit 1 to your deposition and ask you if you

17 recognize this as a copy of your report.

18           (McAnaney Deposition Exhibit Number 1 was

19 marked for identification.)

20           MR. TRUE:  Just for the record, I think

21 when we served the report, we made it clear that

22 the report was being provided on behalf of all

Capital Reporting Company
McAnaney, Kevin  01-16-2015

8

1    three defendants.

2            THE WITNESS:  Yes.

3    BY MR. McCAFFREY:

4        Q    This is a copy of the report that you

5    wrote in this case?

6        A    Yes.

7        Q    Does this report contain all of the

8    opinions that you intend to offer in this case?

9        A    Yes, with the exception that, I guess, if

10   there's new evidence that's discovered and asked,

11   that might be, but I don't -- except for that.

12       Q    Have you been shown any new evidence

13   since the time that you submitted this report?

14       A    What was the date of the report?  There

15   were several.  I don't -- I don't believe so.  I

16   mean, I saw some depositions, but I think they

17   were -- I think before this.

18       Q    Does this report contain all of the bases

19   for the opinions that you intend to offer in this

20   case?

21       A    I think so, yes.

22       Q    Does the report and its attachments

Capital Reporting Company
McAnaney, Kevin  01-16-2015

9

1  identify all of the materials that you reviewed

2  and relied upon in forming your opinions in this

3  case?

4      A    Well, it -- it includes all of the -- all

5  of the materials I reviewed except for, I would

6  say, the -- the regulatory -- the statutory and

7  regulatory materials that deal with the Stark

8  regulations and the preambles and the statutes and

9  case law.

10     Q    Do you believe that the relevant Stark

11 statutes, regulations, case law, et cetera, are

12 all cited within your report, within the body of

13 your report?

14     A    I would think so.  I mean, I -- it's been

15 some time, but I believe I cited what I thought

16 were the relevant materials that would support the

17 opinions.

18     Q    And I take it you were paid to write this

19 report?

20     A    I was.

21     Q    What is your hourly rate?

22     A    I am not -- I'm not sure -- did I not

Capital Reporting Company
McAnaney, Kevin  01-16-2015

10

1    say?  $600 an hour.  The reason I hesitate is I

2    changed it January 1st last year.

3        Q    January 1st of 2014?

4        A    Yes, for -- for matters that came after

5    that.  For things that were before that, I kept

6    the old rate.  So I have sometimes two different

7    rates.

8        Q    Does that rate apply to any consulting

9    you might have done with the defendants?

10       A    Yes.

11       Q    How did you collect the materials that

12   you reviewed in forming the opinions in this case?

13       A    Well, I think the initial materials

14   were -- were provided to me by counsel, and then I

15   think if I thought there were things that I saw

16   that I saw references to, I would ask for it,

17   which I think is mainly exhibits.

18       Q    What were the initial materials that were

19   provided to you by counsel?

20       A    I think the initial materials were, I

21   think, primarily the government complaint with the

22   exhibits, if that's the one I'm thinking of.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

11

1  There was -- I think that's it.  And then maybe

2  there was a -- maybe the motion for partial

3  summary judgment and the exhibits.  I think those

4  were the -- the materials I reviewed first.

5      Q    Do you remember what materials you then

6  went back and asked for?

7      A    Well, I think at that point, it was the

8  depositions, and then the deposition exhibits.

9  And those came in -- I think they were done over

10  time.  So I think they came in sort of in -- in

11  several different transmissions.

12      Q    Did you read all of each of the

13  depositions that you cite here in Exhibit 3 to

14  your report?

15      A    Yes, although I would say I may not have

16  read them all with the same -- read them all

17  closely throughout, but I believe, yes, I read

18  them all.

19      Q    Were you focused on particular parts of

20  the depositions?

21      A    Well, I -- I could have paid more

22  attention to the discussions when they were

Capital Reporting Company
McAnaney, Kevin  01-16-2015

12

1   dealing with what I thought were the issues that

2   was the subject of my testimony -- of my expert

3   opinions, which were mainly the tickets and the

4   arrangements with physicians.  So primarily the --

5   I forget what they called them.  The -- but the

6   sales force.

7       Q    The community educators?

8       A    Yes.

9       Q    I take it you relied on the text of the

10  anti-kickback statute and its regulations in

11  forming your opinion?

12      A    Yes.  And the advisory opinions and other

13  guidance.

14      Q    And did you rely on the text of the Stark

15  law and its regulations in forming your opinion?

16      A    Yes, and the preambles in the regulatory

17  materials, the rulemaking.

18      Q    Which advisory opinions that relate to

19  the anti-kickback statute did you rely upon?

20      A    I'm not -- let me see.  I don't believe I

21  particularly relied on any particular advisory

22  opinion.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

13

1      Q     Just for the record, what is an advisory

2   opinion?  What do you mean when you say that?

3      A     Well, the advisory opinion process is --

4   basically, in 1996, when HIPAA was passed,

5   Congress gave increased funding to the health care

6   fraud activities of the Justice Department and the

7   OIG, strengthened a lot of the fraud and abuse

8   laws, but also required OI -- the office of the

9   inspector general to issue advisory opinions on

10  the application of the kickback statute and their

11  other sanctions to the general public, which they

12  had resisted for a substantial period of time, the

13  idea being that the industry might need

14  clarification.

15     Q     Are these opinions sought by industry?

16     A     Well, I think increasingly they're sought

17  by competitors trying to get negative opinions

18  against other people.  But, yeah, they're --

19  they're sought by the public.  I mean, they have

20  certain rules.  It has to be of -- a specific

21  arrangement that the party is either engaging in

22  or proposes to engage in.  And it can't be a

Capital Reporting Company
McAnaney, Kevin  01-16-2015

14

1   theoretical.  It has to be an actual party.  It

2   can't be a trade association.

3          So -- but within those constraints -- I

4   mean, you -- I mean, there are general rules, but

5   anyone can seek it.  And they are -- I mean,

6   generally, most of the opinions are sought by

7   people in the health care industry in various

8   spots.

9      Q    Are you aware of any advisory opinions

10  that speak to the provision of non-monetary

11  remuneration?

12     A    Well, I think generally that it's -- I

13  mean, it's generally accepted that the kickback

14  statute can include -- well, the term

15  "remuneration" has been defined to mean anything

16  of value.  So it basically is anything that has a

17  monetary value, whether it's actual money or not,

18  to another party can constitute remuneration

19  within the meaning of the kickback statute.

20     Q    But to your knowledge, are there any

21  advisory opinions that specifically address the

22  parameters of providing non-monetary remuneration,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

15

1  either under Stark or under the anti-kickback

2  statute?

3      A    I mean, they're not under the -- they're

4  not under the kickback statute, I mean, beyond

5  that there are opinions that deal with giving

6  people things other than money, services,

7  et cetera.  But there is no -- I mean,

8  non-monetary -- I mean, that's -- the non-monetary

9  compensation is really an exception in the Stark

10  law.

11          And whether there are advisory opinions,

12  I don't think so.  There are not very many

13  advisory opinions on it under the Stark law.  I

14  mean, those are done not by OIG, but by CMS.  It's

15  a separate process.

16      Q    We might come back to that issue of

17  advisory opinions.  Did you consult with counsel

18  for the defendants in writing this report?

19      A    I mean -- did I speak to them?  Yes, I

20  would say, I did.

21      Q    Did you consult with the defendants

22  themselves in writing your report?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1      A      No.

2      Q      Does that mean you did not speak to any

3  employee or officer of Nurses' Registry in writing

4  this report?

5      A      That's correct.

6      Q      Did you work with anyone else in writing

7  this report?

8      A      No.

9      Q      Did you perform any interviews in

10  preparation for writing your report?

11      A      No.

12      Q      Did you consult with anyone in the health

13  care industry in writing your report?

14      A      No.

15      Q      Other than counsel for the defendants,

16  did you consult with any health care lawyers or

17  counsel in writing your report?

18      A      No.

19      Q      What did you do to prepare for your

20  deposition in this matter?

21      A      I reread my report and I reviewed some

22  motion papers.  I'm trying to think.  I think the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1  government's brief in -- well, not -- I think the

2  defendants' response to the summary judgment

3  motion, your -- and their reply, your -- I think

4  the government's motion to -- I don't know --

5  strike my deposition or strike my report.  I

6  forget exactly what the names of the pleadings

7  were, but those.  And then I met with counsel

8  yesterday.

9      Q    Did you review any of the underlying

10 depositions or exhibits that are referenced on

11 Exhibit 3 to your report?

12     A    No.

13     Q    Other than counsel for the defendants,

14 did you work with anyone else to prepare for your

15 deposition today?

16     A    No.

17     Q    I talked to you a little bit about your

18 employment and some of your background.  I gather

19 that you're currently employed by the Law Offices

20 of Kevin McAnaney?

21     A    I'm self-employed, yes.

22     Q    How long have you been self-employed?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

18

1      A     Since May of 2003.

2      Q     Are your offices here in Washington,

3  D.C.?

4      A     Actually, right now, they're in flux.

5  I've given up my office.  I'm in the process of

6  moving to New York City.  So, currently, I'm

7  practicing out of my home in Bethesda, Maryland.

8      Q     Your report describes your work in your

9  self-employment capacity as being focused on the

10  regulation of fraud and abuse.  What does that

11  mean?

12      A     Well, my practice is -- effectively it

13  specializes in the Stark and -- the Stark and

14  anti-kickback statutes.  I mean, that's virtually

15  my practice.  And then, I mean, gets involved not

16  infrequently in False Claims Act cases that are --

17  in which violations of the Stark or kickback

18  statute are alleged to be predicates to the false

19  claim.

20      Q     Are you asked to serve as an expert

21  witness in those cases?

22      A     I have been.  I mean, that's not my

Capital Reporting Company
McAnaney, Kevin  01-16-2015

19

1  exclusive -- I mean, that's not my practice, but

2  yes, from time to time I've served as an expert

3  witness.

4      Q    How many times have you served as an

5  expert witness in False Claims Act cases?

6      A    I would need to go back and look.  I

7  would say maybe a dozen.  Let me just clarify.

8  I've served as an expert -- I mean, I've not --

9  they haven't gone to trial.

10     Q    That's what I meant.  I suppose I should

11 have clarified that.  How many times have you been

12 retained as an expert witness in a False Claims

13 Act case?

14     A    Probably -- probably a dozen, or maybe a

15 little less.  I'd say somewhere...

16     Q    And in those dozen or so times, was it

17 the health care provider that was retaining you?

18     A    I -- I've been retained both by -- mostly

19 by defendants, but I also would represent and do

20 represent relator's counsel.

21     Q    Since leaving the employment of the

22 federal government, have you ever served as an

Capital Reporting Company
McAnaney, Kevin  01-16-2015

20

1  expert witness for the Department of Justice or

2  for HHS OIG?

3      A    No.  I've testified as a fact witness for

4  the government.

5      Q    Was that in the Tuomey case?

6      A    Yes.

7      Q    Prior to offering your opinions in this

8  case, had you ever counseled any of the defendants

9  on health care law issues?

10     A    No.

11     Q    Prior to providing your opinions in this

12  case, have you ever counseled a home health

13  company on the Stark law or the anti-kickback

14  statute?

15     A    Yes, I sure -- I am sure I have, but, I

16  mean, I don't know if I could actually name one.

17     Q    When do you remember that advice

18  occurring?

19     A    Oh, I mean, off and on, through the --

20  the last 12 years.  I mean, I represent -- I

21  counsel a large number of virtually every kind of

22  provider.  I mean, some of them have -- I mean,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

21

1   are in multiple industries, including home health

2   care.

3        Q    Is there anything unique about home

4   health care in terms of the application of the

5   Stark law or the anti-kickback statute?

6        A    No.  I mean, I don't -- I don't think so.

7        Q    Prior to working for yourself, the Law

8   Offices of Kevin McAnaney, you worked for the

9   office of counsel to the inspector general for

10  HHS?

11       A    Yes.

12       Q    And you worked there from '97 to 2003?

13       A    Yes.

14       Q    What did your work there consist of?

15       A    Well, I -- as I said, the HIPAA had

16  directed the OIG to issue advisory opinions, and I

17  was basically engaged to do that, to put together

18  that shop and that function.  So I was -- they

19  formed a group called the industry guidance

20  branch, which was tasked with issuing advisory

21  opinions, fraud alerts, the safe harbor

22  regulations, and other general guidance.  And I

Capital Reporting Company
McAnaney, Kevin  01-16-2015

22

1  was made -- I was the head of that branch, and

2  then I got to hire my -- the staff.  And that's

3  what I did the entire time.

4      Q    Was there some particular reason that you

5  left the employment of the federal government and

6  went to start your own firm?

7      A    Yes.  I was bored with what I was doing,

8  and there were a lot of other jobs that were

9  interesting, but there were people in them who

10  didn't seem to want to go anywhere.  So after

11  looking around for about a year, I just decided to

12  go out on my own.

13      Q    Have you ever worked at a home health

14  company?

15      A    No.

16      Q    What year did you obtain your JD?

17      A    1977.

18      Q    And I think your resume indicated that

19  your BA was obtained from Chapel Hill in 1971?

20      A    Yes.

21      Q    What was your area of study there at

22  Chapel Hill?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

23

1    A    I was a double major in history and what

2  they called international studies, with a

3  concentration in Slavic studies, mainly Russian

4  studies.

5    Q    Prior to providing your opinions in this

6  case, had you worked with Guthrie True before?

7    A    No.

8    Q    Had you worked with David Guarnieri

9  before?

10    A    No.

11    Q    What about Masten Childers?

12    A    No.

13    Q    How about Robert Liles?

14    A    I have -- I've known Robert for many

15  years, I mean, since I was in the government.  And

16  so, over the years we've -- I mean, we're friends.

17  We have lunch from time to time.  I'm not -- I

18  don't believe I've ever -- I worked with him

19  during that time for -- I mean, in any

20  representation.

21    Q    How about Paul Weidenfeld?

22    A    Again, Paul is a -- Paul is a -- he's a

Capital Reporting Company
McAnaney, Kevin  01-16-2015

24

1   personal friend.  I was a good friend of his --

2   well, I am a good friend of his wife as well.  She

3   was in the government while I was there, and we

4   worked on a lot of matters and issues together.

5        Q    If you look at your CV -- well, I'm not

6   sure if it's part of your CV.  It's Exhibit 2 to

7   your report.

8        A    Yes.

9        Q    This lists 11 cases in which you

10  testified as an expert during the last four years,

11  correct?

12       A    Yes.

13       Q    Have you given any additional expert

14  testimony that's more recent than any of the cases

15  that are listed here?

16       A    I -- I don't -- I don't think so.  I

17  think this is -- the report is dated

18  December 12th.  I'm sure it was current as of

19  then, and I haven't -- and now that I see, I think

20  this is the -- Valley Baptist I think is the most

21  recent deposition, or report, I mean, yes.

22       Q    Okay.  So number 11 on your list?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

25

1    A    Yes.  Yeah, I think these are in reverse

2  chronological order.

3    Q    Are there additional matters in which

4  you've provided expert testimony that are not

5  listed on Exhibit 2 because they occurred, you

6  know, outside of the last four years?

7    A    Yes.

8    Q    About how many times since 2003 do you

9  think you've given expert testimony in a case?

10    A    I think there might be -- I would think

11  maybe four others going back before then.

12         MR. GUARNIERI:  Paul, just so that we're

13  all on the same page, are you talking about trial

14  testimony, deposition testimony, issuing written

15  opinions and conclusions?  All of the above?

16         MR. McCAFFREY:  No.  I mean expert

17  testimony in the sense of either a deposition or a

18  trial.

19  BY MR. McCAFFREY:

20    Q    That's what this list --

21    A    Yes.

22    Q    -- purports to represent, correct?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

26

 1     A    Yes.  Yes.

 2     Q    There may be other cases in which you

 3 authored a report but did not testify, and those

 4 are not included here; is that right?

 5     A    That's correct.

 6     Q    In any of those roughly 15 cases, have

 7 there been Daubert challenges to your opinion on

 8 the basis that you are offering legal conclusions?

 9     A    Well, I don't know exactly what the

10 basis -- but, yes, there have been Daubert

11 challenges, and I assume that's probably the

12 basis.

13     Q    Have you ever had your testimony limited

14 or excluded on that basis?

15     A    No.

16          MR. TRUE:  On the basis that he's

17 offering legal conclusions?

18          MR. McCAFFREY:  Yes.

19 BY MR. McCAFFREY:

20     Q    Have you ever had your testimony limited

21 or excluded on any other basis?

22     A    Not that I'm aware of, no.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

27

1     Q     In which of the cases identified on

2   Exhibit 2 did you represent the relator?

3     A     Well, none in here, although I

4   represented several plaintiffs in -- in these.

5   Some of them are not False Claims Act cases.  But

6   none -- none in these cases.

7         MR. TRUE:  Just note my objection in that

8   the list that's Exhibit 2 is not a list of

9   representations; it's a list of expert testimony.

10  So I don't know if you want to clarify your

11  question.  You said represented relators in your

12  question.

13  BY MR. McCAFFREY:

14     Q     In which of these cases did you provide

15  expert testimony on behalf of a relator?

16     A     In none of these.  I have -- I provided

17  testimony on behalf of plaintiffs in some of these

18  cases, but not -- but those aren't False Claims

19  Act cases.

20     Q     Okay.  Let's talk a little bit about the

21  opinions that you did reach in this case.  What

22  did defendants ask you to do here?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

28

1    A    Well, they asked me to review the

2  complaint and the things, and to give my opinion

3  as to whether, based on my experience, that --

4  whether experienced health care counsel and

5  industry people thought these -- I mean, believed

6  these were violations during a period covered by

7  the complaint.

8    Q    Violations of the Stark law and the

9  anti-kickback statute?

10   A    Yes.

11   Q    Would you agree that a determination of

12 whether a health care provider's conduct violated

13 the Stark law or the anti-kickback statute is

14 highly fact-specific?

15   A    Certainly for the kickback statute.  The

16 Stark law is sort of -- I mean, it should be less

17 specific.  I mean, it's fact-specific as to the

18 remuneration, but it's meant to a payment statute,

19 which is sort of fairly bright line.

20       But both laws depend ultimately -- I

21 mean, you have to look at the facts, yes.

22   Q    So what were your opinions, then, in this

Capital Reporting Company
McAnaney, Kevin  01-16-2015

29

1   case?

2       A    They're set out at paragraphs 12 and 13.

3   Do you want me -- shall I -- do you want me to

4   read them?

5       Q    Sure.  Why don't you just read -- let's

6   start with paragraph 12.

7       A    Okay.  "Experienced health care counsel

8   and health care industry participants during the

9   period from 2004 to 2011 would have reasonably

10  believed that NRHC's arrangements with physicians,

11  as alleged by the government, generally did not

12  trigger the self-referral prohibition provision of

13  the Stark law."

14          And that has sort of two sub-opinions.

15  "Experienced health care counsel and experienced

16  industry participants during the relevant period

17  (2004 to 2011) would reasonably have understood

18  the Stark law is not implicated by the provision

19  of business courtesy gratuities or remuneration to

20  anyone other than a referring physician or an

21  immediate family member."

22          And then second sub-opinion was,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

30

1   "Experienced health care counsel and experienced

2   industry participants during the relevant period

3   would reasonably have understood that the

4   provision of non-monetary business courtesy

5   gratuities to potential and actual referring

6   physicians and their immediate family members does

7   not necessarily trigger the self-referral

8   prohibition."

9       Q    Okay.  Let me ask you just a couple of

10  follow-ups.  In the opinion that you read that's

11  set out in paragraph 12b of your report, you used

12  the phrase "business courtesy gratuities."  Is

13  that a phrase that's defined somewhere in the

14  Stark law?

15      A    No.

16      Q    Is that phrase defined in any law or

17  regulation that's applicable to this case?

18      A    No.

19      Q    What did you mean by that phrase?

20      A    I mean, business gratuities is commonly

21  used to mean the business -- things like taking

22  customers or prospective customers to lunch,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

31

1    inviting them to a show, to -- to a sports event,

2    the kinds of things that -- those kinds of things,

3    buying them lunch.

4        Q    Is there a difference --

5        A    Business entertain -- I mean, it's

6    business entertainment gratuity.  That's what was

7    intended by the phrase.

8        Q    Is there a difference in your mind

9    between a business courtesy gratuity and just a

10   gratuity?

11       A    Well, I think it's -- it is -- I think a

12   business gratuity is one done in -- I mean, has a

13   commercial overlay to it.  It's being provided as

14   part of the -- as part of a -- an ongoing or

15   prospective business relationship where it's a --

16   I mean, a gratuity could to be anybody.

17       Q    And what about your use of the word

18   "courtesy"?  What do you mean by that?

19       A    Well, that's sort of what these -- these

20   things are, so I think a courtesy -- I mean, it's

21   basically the same as a gratuity.  You know,

22   flowers, fruit basket, gift basket, gift at

Capital Reporting Company
McAnaney, Kevin  01-16-2015

32

1  Christmas, picking up the tab.

2      Q    Is it your opinion that the defendants'

3  conduct in this case complied with the Stark law?

4      A    I believe -- with respect to the

5  majority -- I mean, most of the physician

6  relationships, yes, there were some that do not.

7      Q    And is that the opinion that's set out in

8  this report and that you would offer at trial?

9      A    I -- I believe I -- at the time, I think,

10  with this, I was only aware of -- I believe -- I

11  believe so.  I believe the report says there were

12  some that exceeded the limit and also some that

13  did not comply -- that were not -- that were

14  monetary arrangements that did not comply with the

15  technical formalities.

16      Q    Is it also your opinion that the

17  defendants' conduct in this case did not violate

18  the anti-kickback statute?

19      A    I think -- I think most people -- I think

20  it generally probably did not in most cases.  I

21  didn't see evidence of unlawful intent or -- and

22  given what was the conduct, I don't think it --

Capital Reporting Company
McAnaney, Kevin  01-16-2015

33

1  probably most experienced health care people would

2  not think it was a kickback.

3     Q    And is that opinion set out in the

4  report?

5     A    I believe it is.  What was my second

6  opinion?

7        MR. TRUE:  Just note for the record when

8  he was being asked to read paragraphs 12 and 13 of

9  his opinion, he only finished reading

10 paragraph 12.  He did not read paragraph 13 which

11 sets out other opinions that he will be offering

12 in the case.

13       MR. McCAFFREY:  Yeah.

14 BY MR. McCAFFREY:

15    Q    I'm just trying to get to a general

16 understanding of what your opinion is.  We'll

17 certainly be going through every paragraph in

18 excruciating detail.  So don't worry, we'll get to

19 it.

20    A    Right.

21    Q    So is it your opinion that the

22 defendants' conduct did not violate the

34

1  anti-kickback statute?

2      A    I am not sure I actually had an opinion

3  as to whether the defendants' conduct violated the

4  anti-kickback statute.

5  BY MR. McCAFFREY:

6      Q    So, then, what was your opinion vis-a-vis

7  the anti-kickback statute?

8      A    Well, I think that -- I think the -- my

9  opinion generally is that -- and I could read them

10 here exactly, but I think, in general, is that

11 experienced health care counsel at the time and in

12 the industry during the period did not think that

13 reasonable business gratuities, modest business

14 gratuities, violated the statute.  And I think

15 that's what most of these were, or many of -- so

16 those allegations, which is what I was asked to

17 address.

18     Q    How did you determine the understanding

19 and belief of experienced health care counsel

20 regarding the specific facts of this case?

21     A    Based on my general experience in the

22 industry and my daily interactions with counsel

Capital Reporting Company
McAnaney, Kevin  01-16-2015

35

1   and speeches.  I mean, this is a field I've been

2   involved in virtually exclusively for -- at least

3   since 1996.  And I -- on a daily basis I talk to

4   counsel around the country about these issues.

5       Q    Well, you testified, didn't you, that

6   other than counsel for the defendants, you didn't

7   consult with any health care counsel about these

8   opinions in this report?

9       A    No, because I was talking about -- I

10  mean, this is my opinion based on my experience in

11  the industry and conversations I had with people

12  at that time and during the time, and still do.  I

13  did not specifically ask anyone about -- give the

14  facts of this case, no.

15      Q    Is it fair to say that your opinion is

16  sort of your best guess as to what other attorneys

17  would think about the facts of this case if they

18  had the opportunity to review and understand those

19  facts?

20          MR. TRUE:  Object to the form of the

21  question.

22          THE WITNESS:  No.  I think it is based

Capital Reporting Company
McAnaney, Kevin  01-16-2015

36

1  on -- it was the understanding of experienced

2  health care lawyers at the time.  I -- I know what

3  they thought.  I talked to them at that time.  I

4  had a wide experience of contacts.  So, no, it is

5  my -- it is my opinion that that is -- that was

6  the consensus view, and I think it still is the

7  consensus view.

8  BY MR. McCAFFREY:

9       Q    Did you show any other attorney, other

10  than counsel for the defendants, the specific

11  facts of this case?

12      A    No.

13      Q    And you agreed with me earlier that

14  whether something is or is not an anti-kickback

15  statute -- kickback statute violation is

16  fact-specific.  Is that still your testimony?

17      A    Well, it can be, but there are general

18  facts that -- that I think people understand.  If

19  you're saying have I discussed this -- the general

20  facts of this case with other counsel, yes.

21      Q    What other counsel have you discussed the

22  general facts of this case with?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

37

1    A    Being that is a case that is based on

2    somebody giving college basketball and football

3    tickets, onesies and twosies, to a number of

4    physicians.

5    Q    What attorneys did you have that

6    discussion with?

7    A    Well, I've had it with Vicki Robinson at

8    the OIG.  I've had it with Jonathan Diesenhaus,

9    who is a partner here at Hogan Lovells.

10    Q    How do you spell Jonathan's last name?

11    A    D-I-E-S-E-N-H-A-U-S.

12         I think I mentioned it to Craig Holden at

13    Ober Kaler.  Again, not in detail, but just what

14    the case involved primarily, this aspect of the

15    case.

16    Q    Were you seeking their input or their

17    views as to those allegations when you talked to

18    them generally about the facts of the case?

19    A    Well, just beyond "could you believe it?"

20    Q    And so you told them, I take it, that the

21    home health agency was providing basketball

22    tickets and football tickets to physicians.  Did

Capital Reporting Company
McAnaney, Kevin  01-16-2015

38

1  you identify any of the other non-monetary

2  remuneration that had been given to out referral

3  sources?

4      A    Well, I mean, I -- not specifically, no.

5  I don't think I mentioned fruit baskets or --

6      Q    Kentucky Derby tickets or --

7      A    Liquor -- bottle of liquor.

8      Q    Did you talk to them about the deposition

9  testimony of the community educators, you know,

10  what they intended or believed that the gifts were

11  for?

12      A    That they hoped to get business?  Yeah.

13      Q    Did you tell these other attorneys that

14  some of those educators testified that they

15  intended to influence referral decisions by giving

16  out these gifts?

17          MR. TRUE:  Objection to form of the

18  question.

19          MR. GUARNIERI:  Object to the form.

20          THE WITNESS:  I'm not sure that is the

21  testimony, so no, I did not.  I said certainly

22  that they hoped to get referrals.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

39

1  BY MR. McCAFFREY:

2      Q    And then how did you determine the

3  understanding and belief of health care industry

4  participants regarding the specific facts of this

5  case?

6      A    Well, the facts are not -- I mean, the

7  topic of business courtesies and business

8  entertainment had been around, I mean, for -- they

9  recur commonly and they've been a subject of -- of

10  much discussion.  And as I said, I've been a

11  participant in those discussions, listening to

12  people throughout the years.  So that's my -- I

13  determine my opinion based on my experience with

14  widespread discussions with both industry

15  participants and experienced health care lawyers.

16      Q    Did you have any particular industry

17  participants in mind?

18      A    No.  I mean, I -- again, this is -- this

19  is -- as you can imagine, this is a question that

20  comes up repeatedly by all -- by anybody who is

21  trying to find customers for a business.

22      Q    Were there any industry participants that

Capital Reporting Company
McAnaney, Kevin  01-16-2015

40

1  you discussed the specific facts of this case

2  with?

3      A    No.

4      Q    With respect to your opinions regarding

5  the understanding and belief of health care

6  counsel, is it your testimony that some

7  experienced health care counsel advised Nurses'

8  Registry on the legality or illegality of its

9  gifts to referral sources?

10         MR. TRUE:  Could you repeat the question?

11  I'm sorry, I got distracted.

12  BY MR. McCAFFREY:

13      Q    Is it your testimony that some

14  experienced health care counsel advised Nurses'

15  Registry or the individual defendants on the

16  legality of giving gifts or other remuneration to

17  referral sources?

18      A    No.  That's not my testimony.

19      Q    What is the relevance, then, of some

20  generalized understanding or belief of health care

21  counsel?

22      A    Well, because I -- I -- I believe it's

Capital Reporting Company
McAnaney, Kevin  01-16-2015

41

1   consistent with the testimony of -- and I can't --

2   several of the people at Nurses' Registry,

3   especially -- I'm trying to think of -- who had

4   previously been at different other agencies, and

5   they understood that they were doing it too and

6   that that -- that that was fine.

7           So I think that's -- the basis is that

8   people in the industry and experienced counsel, no

9   one believed that occasional modest business

10  gratuities or entertainment were illegal under the

11  kickback statute.

12          MR. TRUE:  Were illegal or were not

13  illegal?

14          THE WITNESS:  They did not think they

15  were.

16          MR. TRUE:  Okay.  I'm sorry.

17          THE WITNESS:  Oh, yeah.  They thought

18  they were legal.

19  BY MR. McCAFFREY:

20     Q   Are you going to offer -- are you going

21  to offer an opinion that Nurses' Registry thought

22  its conduct was legal?

Capital Reporting Company
McAnaney, Kevin 01-16-2015

42

1    A    No.

2    Q    And what is the relevance of your opinion

3  to the company or the defendants' liability in

4  this case?

5       MR. TRUE:  Object to form of the

6  question.

7       MR. GUARNIERI:  Object to form.

8       THE WITNESS:  I think the relevance is --

9  is their conduct was consistent with what people

10  thought was lawful at the time and they thought it

11  was lawful and, therefore, they did not -- it's

12  unlikely that they were knowingly violating the

13  law.  I assume that's the relevance.

14  BY MR. McCAFFREY:

15    Q    I mean, are you really saying that

16  because, in your opinion, experienced counsel or

17  industry participants would not understand this

18  conduct to violate the Stark or kickback statute,

19  that the court should reach the same conclusion in

20  this case?

21       MR. TRUE:  Object to the form of the

22  question.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

43

1            THE WITNESS:  No.  I believe if it's --

2    the relevance goes to the likelihood that the

3    defendants had the requisite intent to violate

4    either the underlying statute, in the case of the

5    kickback statute, or the False Claims Act case.

6    BY MR. McCAFFREY:

7        Q    Are you going to offer an opinion that,

8    based on the facts that you've seen, that the

9    defendants did not have the requisite intent?

10            MR. TRUE:  Object to form of the

11   question.

12            THE WITNESS:  No, I'm not.

13   BY MR. McCAFFREY:

14       Q    Let's get back into your report,

15   paragraph 12a.  What were the bases for your

16   opinion that's expressed there in paragraph 12a?

17       A    Well, I think that is the general --

18   that's the general understanding by experienced

19   health care industry that the Stark law only deals

20   with remuneration that is provided to a physician

21   or to a family member.  It does not implicate

22   gratuities that are given to a physician's staff

Capital Reporting Company
McAnaney, Kevin  01-16-2015

44

1    or anybody other than a physician.

2              It is -- that's -- the point of the law

3    was to go towards things given to physicians,

4    compensation arrangements with physician and their

5    immediate family members because that's -- in case

6    that's a surrogate, that in many cases -- here, it

7    appeared that they were being given to office

8    staff.

9        Q    The Stark statute explicitly says that it

10   applies to physicians and immediate family members

11   only, right?

12       A    Yes.

13       Q    So this isn't necessarily an

14   understanding of the industry.  It's literally

15   right in the statute itself?

16       A    Well, it may be different, but that's how

17   people read the statute, yes.

18       Q    And do you understand the government to

19   be alleging that there were Stark law violations

20   because remuneration was provided to someone other

21   than a physician or his immediate family member?

22       A    I believe the original -- I mean, I do

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1  think that the original paper did, or at least

2  implied that.

3      Q    Where have you seen that explicit

4  allegation?

5      A    Well, I think -- I mean, that's how I

6  read it.  I believe some of the complaint and

7  intervention initially and/or the motion for

8  partial summary judgment at first.  I forget

9  what -- chart 61 or -- I mean, there was some

10  table.

11      Q    What about paragraph 12b?  What are the

12  bases for your opinion there?

13      A    Well, the bases for my opinion there is

14  that, again, people that were familiar with the

15  law and the regulations realized that at least

16  beginning in -- in 2004 when the Stark phase 2

17  regulations came out, that there was an exception

18  for non-monetary compensation.  And I think people

19  generally understood that to mean you could give

20  it up to 3 -- the -- to the limit in the statute.

21  I think the first one may have been $300, and then

22  it's geared towards inflation and it has gone up

Capital Reporting Company
McAnaney, Kevin  01-16-2015

46

1  since.  I think it's currently 360 or something

2  like that, somewhere in that range.

3        MR. TRUE:  Just note my objection for the

4  record to all of these types of questions because

5  his report, in paragraphs 14 through 37, set out

6  various bases for the opinions, plural, that

7  Mr. McAnaney will be offering.  So I just -- I

8  don't want his summarization by testimony to be

9  confused with a full and complete statement of his

10  opinions.

11  BY MR. McCAFFREY:

12    Q    Would you agree, Mr. McAnaney, that what

13  you call business gratuities, non-monetary

14  business gratuities, can violate the Stark law?

15    A    Well, yes.  I mean, in -- in some

16  circumstances, yes.

17    Q    Would you agree that the provision of

18  what you call modest gratuities to a physician or

19  anybody could also violate the anti-kickback

20  statute?

21    A    Theoretically.

22    Q    Why do you say that?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

47

1     A     Well, I think -- I think the general

2  understanding in the industry is that the kickback

3  statute is incredibly broad language and vague

4  language.  Because of that, Congress put in the

5  "knowing and willful" language, which requires

6  both that you know what you're doing is unlawful

7  and you go ahead and do it otherwise, not specific

8  intent, but you have to have -- I mean, specific

9  intent to violate the kickback statute, but you

10  have to know something is -- you have to know it's

11  illegal, it's a crime, and go ahead and do it.

12          And I think that from the beginning cases

13  that's been held to be at least what is -- makes

14  the law constitutional, because that narrows

15  significantly the possibility that it's void for

16  vagueness.

17          So I think you have to really know

18  something is illegal.  I think that, in the case

19  of modest business entertainment, which is

20  commonly done, common -- has been done ever since

21  the law was passed, and no one has said anything

22  until fairly recently -- people understood that

Capital Reporting Company
McAnaney, Kevin  01-16-2015

48

1  those -- that that kind of a modest business (sic)

2  is not a big thing.

3          Do I think in theory it could be if you

4  said, I'm not going to take you to lunch until --

5  unless you send me a referral, have an express

6  quid pro quo?  I guess maybe then -- I mean,

7  people know that's illegal.  But if you're just

8  going in the -- to hope and talk up the business

9  and get someone to give you -- that I think most

10  people I think -- I think it's pretty hard to

11  believe that that would violate the statute.

12     Q    Does the statute require an express quid

13  pro quo?

14     A    It doesn't require an express quid pro

15  quo.  But it requires more than a mere hope.  I

16  think the word "induce" generally means -- has

17  generally been interpreted to mean basically like

18  cause.  I mean, it's getting close to cause.  You

19  have to think that what you're doing is going to

20  have a major, if not the, causative effect in

21  getting business.

22     Q    Is that consistent with the majority

Capital Reporting Company
McAnaney, Kevin  01-16-2015

49

1  opinion of the circuit courts that say that if any

2  one purpose of the gift is to induce or reward a

3  referral, that the anti-kickback statute is

4  violated?

5     A    No.  I think that's consistent -- I mean,

6  it's -- I mean, yes, it's one purpose, but the one

7  purpose has to be that you know you're doing

8  something unlawfully to induce business.  And I

9  think -- you still have to have that.  You can

10  have other purposes, but I think that's consistent

11  with -- I think it's consistent with the

12  McClatchey decision, with most of the decisions.

13     Q    Does the anti-kickback statute contain

14  some de minimis exception, for instance,

15  gratuities of a hundred dollars or less don't

16  count?

17     A    Well, I mean -- this is -- yes, I mean --

18  no, the statute does not.  What I do think is

19  the -- the minimum amounts makes it less --

20  extremely unlikely that, A -- the more a practice

21  is common and widespread in the industry and

22  throughout business, the less likely it is that

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1  someone knowingly thinks it is unlawful and is

2  going ahead and violating the law.

3        And I think that's pretty -- I think that

4  the decision -- I'm trying to remember the case,

5  but -- well, I think that -- so I don't think

6  there is a -- but there's -- clearly, there's no

7  statutory exception, but I think in the real world

8  there is a very practical de minimis exception,

9  with the exception of something that I think -- I

10  mean, were it an express quid pro quo, I think

11  everyone understands that that is -- so you could

12  have a minimal amount with an express quid pro

13  quo, and I think that might violate the statute.

14    Q    That's your understanding of the statute,

15  not actually what the statute says, right?

16    A    Well, I mean, the statute says you have

17  to have a knowing and willful -- so, yeah, I mean,

18  that's my -- that's my understanding of how it

19  applies in real life factual situations that

20  involve minimal amounts of remuneration.

21    Q    What do you consider to be a minimal

22  amount of remuneration?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

51

1      A    I think it depends on what things are,

2 but I think certainly the kinds of modest business

3 entertainment and expenses, the tickets to a

4 Kentucky football game or basketball game, I think

5 those qualify.  The kinds of normal business

6 entertainment that people routinely engage in

7 throughout the country.  I mean, those kinds of --

8 I mean, I think that's generally it.

9      Q    So tickets to concerts or entertainment

10 events, would fit in your definition of minimal

11 gratuities?

12      A    I think they can -- I mean, it depends on

13 the venue and -- and what it is and what the --

14 what the price is.  I mean, I think that...

15      Q    Yeah.  So in your --

16      A    Those are factual -- factual

17 circumstances that you would obviously take into

18 account.

19      Q    In your opinion, is there a dollar

20 threshold below which some gift could almost never

21 constitute a violation of the anti-kickback

22 statute?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

52

1     A     Well, for -- for non-monetary?  I mean,

2  for business entertainment we're talking about?

3  Or --

4     Q     For anything.  I mean, the statute speaks

5  in terms of remuneration which is tangible,

6  intangible, monetary, non-monetary.  So if you had

7  to assign a dollar value to it, is there some

8  threshold, in your mind, below which those types

9  of remuneration could never constitute an

10  anti-kickback statute violation?

11          MR. TRUE:  Note my objection to the form

12  of the question.

13          THE WITNESS:  I don't think that was my

14  testimony.  I said I do think that even small -- I

15  mean, in theory, a small amount, if it's tied to

16  an express quid pro quo, could violate the

17  statute.

18  BY MR. McCAFFREY:

19     Q     And what if it's not?  What if there is

20  not an express quid pro quo?  In your mind, is

21  there some minimal (sic) dollar value that you

22  have to have assigned to the remuneration?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

53

1          MR. TRUE:  Same objection.

2          THE WITNESS:  No, not -- you know, I

3  don't think -- like I said, I think it would be --

4  depends on the facts you look at.

5  BY MR. McCAFFREY:

6     Q    Back to your report.  You do have an

7  opinion, as Mr. True noted, set out in

8  paragraph 13 and it's three subparts.  What is

9  that opinion?

10    A    That experienced counsel -- experienced

11  health care counsel and experienced industry

12  participants during the relevant time period (2004

13  to 2011) would reasonably have understood that the

14  conduct involving physician remuneration allegedly

15  engaged in by Nurses' Registry would not establish

16  violations of the anti-kickback statute.

17    Q    And then you have some subparts there?

18    A    Yes.  And that is, "Experienced health

19  care counsel and experienced industry participants

20  during the relevant period would have reasonably

21  believed that the anti-kickback statute did not

22  prohibit the provision of modest business

Capital Reporting Company
McAnaney, Kevin  01-16-2015

54

1   gratuities to physicians or other referral

2   sources."

3          The next sub-opinion is, "Experienced

4   health care counsel and experienced industry

5   participants during the relevant time period would

6   reasonably have believed that the provision of

7   modest business gratuities was, and continues to

8   be, a common business practice in the health care

9   industry."

10          And, lastly, that "experienced health

11   care counsel and experienced industry participants

12   during the relevant period would reasonably have

13   believed that the occasional provision of business

14   gratuities of modest value to physicians or other

15   referral sources did not violate the anti-kickback

16   statute."

17     Q    All right.  With respect to Stark --

18   we'll just kind of walk through your report here.

19   With respect to Stark, I take it you agree there's

20   no intent element there?

21     A    For the -- for the pure payment

22   disallowance, that's correct.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1      Q     And experienced health care counsel

2  during this time period would have understood

3  that?

4      A     Yes.  It's -- it's strict liability for

5  payment disallowance.  That's the principal

6  sanction, denial of payment.

7      Q     Would experienced health care industry

8  participants during this time period have

9  understood that Stark is a strict liability

10  statute with no intent element?

11      A     I think it would -- I think it probably

12  changed over the time period with how much it --

13  it seeped in.  I think most industry participants

14  still find it hard to believe that there's no

15  intent that you can make it.  But I think

16  certainly in 2004, which was really when the

17  statute first starts, it's the second round of

18  regulations that flesh out the exceptions.  From

19  that point on, people have a growing awareness of

20  it in the industry and what it requires.

21          I will tell you if, even today, you go to

22  a hospital and say, because you made a mistake in

Capital Reporting Company
McAnaney, Kevin  01-16-2015

56

1   paying the physician, you have a possible

2   disallowance of hundreds of -- I mean, tens of

3   millions of dollars, they'd look at you like

4   you're cuckoo.

5       Q     The payment disallowance that you

6   reference, what do you mean by that?

7       A     Well, the Stark law is not a fraud law.

8   It was never, never intended to be and never was.

9   It's a -- it's a -- basically, it's a condition of

10  payment, I mean, for the Medicare program.

11          The -- the genesis for the law was that a

12  lot of physicians started owning and buying into

13  ancillary businesses, primarily labs and imaging.

14  And studies showed that if you had a financial

15  interest in an entity, those physicians tended to

16  refer for those services more frequently than

17  physicians that didn't.

18          So there was never -- and all of the

19  studies were very clear.  They never looked at

20  whether that utilization was proper or improper.

21  It just was a fact.  Many people said that the

22  reason they would invest is because they -- they

Capital Reporting Company
McAnaney, Kevin  01-16-2015

57

1   use those facilities more and it was bigger than

2   their practice.

3          So the statute was aimed at financial

4   relationships where the -- the compensation to the

5   physician would vary based on their referrals,

6   provided an incentive to the referral.  So what

7   the statute said was that if you have a financial

8   relationship, it must -- you cannot refer for

9   these certain designated health services unless it

10  fits into one of these exceptions.

11         So the statute -- you may not refer and

12  the entity may not submit a claim.  And so that's

13  what it was was it's a payment -- it's a payment

14  regulation.  So, therefore, if you've got a Stark

15  violation, the penalty was disallowance of any

16  claims referred by that physician to that entity.

17     Q    Such that the entity would need to pay

18  that money back to the Medicare program; is that

19  right?

20     A    Yeah.  Yes.  I mean -- well, at first, it

21  was disallowance.  Now, since the Affordable Care

22  Act, there's an overpayment obligation.  There's a

58

1    clear overpayment obligation that, if you discover

2    it, you must repay any overpayment.

3        Q    I take it that payment disallowance

4    applies when the Stark law is violated regardless

5    of whether or not services were provided or

6    whether or not the services were billed

7    accurately, all that stuff?

8        A    That's -- that's -- that is correct.

9    It's a very heavy penalty.

10       Q    Your report at paragraph 18 references

11   some self-disclosure protocol.

12       A    Yes.

13       Q    Is the self-disclosure protocol something

14   that experienced health care counsel during the

15   time period of 2004 to 2011 would be aware of?

16       A    No, because -- I'm -- I'm not sure -- the

17   self-disclosure protocol was established after --

18   basically pursuant to provisions in the Affordable

19   Care Act.  I don't -- I think that probably

20   towards the end of that period, or maybe after.

21       Q    So how is your paragraph here,

22   paragraph 18, about the self-disclosure protocol,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

59

1    relevant to the defendants' conduct in this case?

2         A    Well, it's relevant in that these

3    technical violations occurred throughout this

4    period.  Most people -- at the time, there was no

5    overpayment obligation.  If they discovered one of

6    these technical violations, they fixed it and went

7    forward.  Because the reasoning was, at the

8    time -- was no one -- that it wasn't a knowing

9    violation because, clearly, if one had known about

10   it, one would have fixed the statute.

11            I mean, these were very technical -- I

12   mean, we're talking about a technical violation,

13   failure to have a writing, failure to have a

14   signature.  But the services were performed, the

15   services that were rendered were fair market

16   value.

17            So almost by definition these were

18   inadvertent mistakes.  They were not knowing

19   mistakes.  At the time, it was unclear whether

20   there was an over -- I mean, I think most people

21   thought there was no overpayment obligation.  So

22   people fixed it and went forwards.  They thought

Capital Reporting Company
McAnaney, Kevin  01-16-2015

60

1  prior claims had been submitted, but they -- they

2  were not false claims because no one knew them.

3  There was no clear overpayment obligation.  So fix

4  them and move forward.

5           That became -- once FIRREA was passed and

6  then the Affordable Care Act which mandated

7  overpayment, then people -- the industry demanded,

8  and Congress provided the self-disclosure protocol

9  which allowed people to come in and avoid these

10 sort of draconian penalties.

11     Q    If CMS identifies a Stark law violation,

12 they can go and recover monies paid out -- you

13 know, under that violation from the provider,

14 right?

15     A    Yes, if they establish the violation,

16 yes.

17     Q    And if the Department of Justice

18 establishes a violation, that money can be

19 recouped from the provider, right?

20     A    Well, I mean, clearly, now it can.  I'm

21 not sure -- I mean, pre -- pre-2011, I'm not sure.

22 I know the government routinely seeks it.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

61

1      Q     I'm just trying to understand your

2  testimony.  Is it that -- is it your testimony

3  that if there were a Stark law violation

4  identified after the fact, that pre-Affordable

5  Care Act, the government couldn't recover that

6  money?

7      A     Well, I am not sure that they had -- I

8  mean, what -- what the law was.  CMS did not have

9  an overpayment requirement at the time.

10     Q     Doesn't the Stark law explicitly say that

11  if money is paid out in violation of its terms,

12  that a refund is required?

13     A     Actually, the language says -- it reads

14  as if the repayment is only repaying to patients.

15  I mean, I'm not here to defend that, I mean, but

16  that is -- but the point of it here is that

17  these -- the violations that I was talking about

18  here are generally considered very technical, and

19  people do not take the penalty amount, the full

20  penalty amount, including CMS today.

21     Q     And those are in cases where the provider

22  voluntarily comes forward and says, look, I messed

Capital Reporting Company
McAnaney, Kevin  01-16-2015

62

1    up, I violated the Stark law, here are all the

2    facts, and CMS agrees to settle it for less than

3    the true measure of legal damages, right?

4        A    Yes.  That's correct.

5        Q    The defendants didn't voluntarily

6    disclose any of their actions in this case, did

7    they?

8        A    I don't know that they knew of them until

9    the discovery of -- in this case.

10       Q    In paragraph 19, you flesh out that your

11   earlier opinion that the Stark law only applies to

12   remuneration given to a physician or his or her

13   immediate family member -- and you reference

14   Exhibit 61 of the government's motion for partial

15   summary judgment.  Let me give you a copy of that,

16   if I have it here.  Maybe I won't.

17           What physicians were you referring to

18   that you felt -- what individuals were you

19   referring to there when you say, in the last

20   sentence of paragraph 19, that there are people

21   listed who were not physicians or family members

22   of physicians?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

63

1     A    Well, without the document in front of

2    me, I can't quite tell, but as I recall -- and I

3    have to say, I did not review it prior to coming,

4    but one column, it would have physician's name

5    specifically, then a cross-reference to the

6    documents, and then in a number of them they

7    simply said, referral source, or something like

8    that.  And when you looked at the documents, those

9    were office staff.

10           So, I mean, that's -- that's what I was

11    referring to.

12     Q    And if the government was not seeking

13    Stark law damages because of those provisions of

14    remuneration, you would agree that that's the

15    proper approach?

16     A    Yes.

17     Q    If we can talk about this non-monetary

18    compensation exception for a minute.  This is in

19    paragraph 20 of your report, right?

20           MR. TRUE:  Just let me note an objection

21    to the form of the last question.  I guess that's

22    enough said.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

64

1          MR. McCAFFREY:  It is.

2          MR. TRUE:  Well, I'll guess be the

3  decider as to whether it's enough said, but I

4  decided it's enough said.

5          MR. McCAFFREY:  Point being I'm not going

6  to dispute that your objection, whatever it is, is

7  preserved for the record.

8          MR. TRUE:  Got you.

9  BY MR. McCAFFREY:

10     Q    Does paragraph 20 of your report identify

11  the non-monetary compensation exception that you

12  referenced earlier?

13     A    Yes, it does.

14     Q    Is this exception something that

15  experienced health care counsel and experienced

16  industry participants would have understood during

17  the time period of 2004 to 2011?

18          MR. TRUE:  Is what?

19          MR. McCAFFREY:  The non-monetary

20  compensation exception.

21          THE WITNESS:  I would say they would have

22  known about it generally.  Whether they were --

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1  certainly whether industry participants would know

2  every -- its specifics in all respects, I would

3  think not.  I mean, they would know there was a --

4  basically I think the industry knew there was a

5  non-monetary comp, that you could give things to

6  referral sources, non-monetary, up to a certain

7  amount.  I think that's probably what they

8  understood.

9  BY MR. McCAFFREY:

10     Q    So your testimony is that industry

11 participants understood part of the non-monetary

12 compensation exception, but not all of it?  Is

13 that your testimony?

14     A    No.  I think they -- they -- industry

15 participants were generally aware of the general

16 contours of it and not necessarily the specifics.

17     Q    So is that what you mean in paragraph 12b

18 when you say that experienced health care counsel

19 and experienced industry participants during the

20 relevant time period would reasonably have

21 understood that the provision of non-monetary

22 business courtesy gratuities to potential and

Capital Reporting Company
McAnaney, Kevin  01-16-2015

66

1   actual referring physicians and their immediate

2   family members does not necessarily trigger the

3   self-referral prohibition in the Stark law?

4        A    Yes.

5        Q    That those participants and counsel had a

6   vague understanding that there was some exception

7   out there that might permit their conduct?

8            MR. TRUE:  Object to the form of the

9   question.  Your earlier question was strictly

10  limited to industry participants.  Now you've

11  changed your question to counsel and industry

12  participants.

13  BY MR. McCAFFREY:

14       Q    Is it your testimony that industry

15  participants had some vague understanding that

16  there was this exception that permitted the

17  provision of non-monetary compensation to

18  referring physicians?

19           MR. TRUE:  Object to the form of the

20  question.  I don't think he's testified any vague

21  understanding.  I think he's testified to what he

22  believes the industry's understanding of the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

67

1  non-compensation (sic) exception was.  But that

2  being said, I'll let him answer best he can.

3          THE WITNESS:  What I think is they knew

4  there was a specific exception and they knew it

5  allowed you to -- I mean, it covered business

6  entertainment, business things up to 357 -- well,

7  up to some monetary amount.  I think that's

8  probably most of -- I mean, that's probably what

9  they knew.

10 BY MR. McCAFFREY:

11      Q    And what's the basis for that opinion

12 that industry participants probably knew part of

13 the exception, but not all of it?

14      A    Because -- because in my experience and

15 in that of other experienced health care counsel,

16 the Stark law is very detailed, very specific that

17 the industry has certainly varying levels of

18 interest.  There might be a greater knowledge of

19 the exact parameters of the exception by the HCAs

20 of the world or the -- the pharmaceutical

21 companies.

22          I think as you get into other industry

Capital Reporting Company
McAnaney, Kevin  01-16-2015

68

1    participants, such as the ones we're talking about

2    here, small home health agencies, small

3    pharmacies, that they have -- they don't have

4    sophisticated counsel.  They have only -- they

5    basically get their information from industry

6    trade sheets and rags, and it's generally fairly

7    general.

8           So I think that's what my testimony would

9    be.

10   Q    Do you agree that if a health care

11   provider is going to avail itself of some Stark

12   law exception in order to provide gratuities and

13   non-monetary compensation to referral sources,

14   that it has an obligation to educate itself about

15   the parameters of that Stark law exception?

16   A    No, I don't think it -- I mean, the only

17   question is, does the conduct fit in or not fit in

18   the statute?  And I don't think that health care

19   providers have an obligation -- every health care

20   provider has an obligation to know everything

21   about the Stark law.  I mean, it would be nice,

22   but it's not going to happen.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

69

1      Q      Even if they are using or pointing to

2   that exception as a reason why their provision of

3   this compensation is lawful?

4           MR. TRUE:  Object to the form of the

5   question.

6           THE WITNESS:  Well, I think that whether

7   it -- I think we're confusing -- I think your

8   question has two points as to whether they

9   complied and what their intent was.  I think

10  whether they comply or not doesn't really matter,

11  ultimately.  It's a question of, did their conduct

12  comply -- did they fit with the exception or did

13  they not?  As to what they understood generally, I

14  think it goes to whether or not they were acting

15  with intent or not.

16           So I think they didn't act -- it's --

17  that they didn't have specific -- I don't think

18  that they have an obligation that -- to educate

19  themselves such that the failure to do so would

20  constitute reckless or knowing conduct.  I guess

21  that's how -- I'm not quite sure how you use the

22  question, but that would be my response.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

70

1  BY MR. McCAFFREY:

2      Q    I guess I wasn't really seeking your

3  opinion about whether or not Nurses' Registry

4  violated the False Claims Act.  I was just asking

5  you --

6      A    No, no.  I'm not talking about that.  I'm

7  talking about what industry -- what industry

8  participants, whether they had an obligation, is

9  what I understood, to educate themselves if they

10  were claiming the exception.  I think they only

11  claim the exception after the fact if there's been

12  a problem.  So that's what matters.

13      Q    What does a provider have to do in order

14  to fit within this exception?

15          MR. TRUE:  Object to the form of the

16  question.

17          THE WITNESS:  You have to -- I mean, it's

18  set out in the regulation.  I think, generally, it

19  can't violate the kickback statute and it can't be

20  soliciting.

21          MR. TRUE:  You're talking about the

22  non-compensation exception?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

71

1          MR. McCAFFREY:  Yeah, that's the

2   exception we're talking about.

3   BY MR. McCAFFREY:

4       Q    I mean, first, the aggregate value on an

5   annual basis has to be less than the dollar amount

6   specified in the regulation, right?

7       A    Yes.  Yes.

8       Q    And then the compensation cannot be

9   solicited by the referring physician or his staff,

10  correct?

11      A    That's correct.

12      Q    So even if the value of the gift is less

13  than the annual dollar limit, if it's solicited,

14  then you're outside of the exception?

15      A    Yes.

16      Q    Likewise, the gift cannot be based on the

17  volume or value of referrals, correct?

18      A    The non-monetary compensation -- I'm not

19  exactly sure how it's phrased.

20          MR. TRUE:  Can you repeat that question?

21  BY MR. McCAFFREY:

22      Q    In order to fit within the non-monetary

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1   compensation exception, it's my understanding that

2   the gift or the compensation cannot be based on

3   the value or volume of the recipient's referrals.

4   Is that your understanding?

5       A    I would -- I defer to the text.  I think

6   it's -- usually it's phrased like the amount of

7   the compensation can't be determined in a manner

8   that takes into account the volume or value of

9   referrals or other business.  But I'm not sure

10  exactly what the text is.

11      Q    Would experienced health care counsel

12  understand that the compensation has to meet all

13  of those requirements in order for it to be

14  permissible under this exception to the Stark law?

15      A    Yes.

16          MR. TRUE:  We've been going about an hour

17  and a half.  Let's take a break.

18          MR. McCAFFREY:  Okay.

19          (Whereupon, a short recess was taken.)

20  BY MR. McCAFFREY:

21      Q    Mr. McAnaney, why don't you look at

22  paragraph 21 of your report, if you would.  You

Capital Reporting Company
McAnaney, Kevin  01-16-2015

73

1  say here that "experienced health care counsel and

2  experienced health care industry participants

3  would reasonably believe that many of the business

4  gratuities listed in Exhibit 61 to the partial

5  summary judgment motion qualify, or at least

6  potentially qualify, for the non-monetary

7  compensation exception."

8           Were there any business gratuities that

9  you identified in this case as not qualifying for

10 the exception?

11     A    Well, yes, I think I -- I think I

12 mentioned it -- and I'm not sure I said -- if you

13 look at 22 -- that there were 16 that received

14 non -- 13 were less than the amount.  And so I

15 assumed three were over the amount, at least in

16 some years.

17     Q    And which three were those?

18     A    I can't tell, but they're the ones that

19 aren't on -- in footnote 4.  I think it's -- I

20 think it would be Bynum and -- is it Castillo

21 or --

22     Q    Dr. Corales?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1     A     Yeah, I think -- those names are not

2     there, so I assume those -- those two would have

3     exceeded it.  I don't know -- I can't recall who

4     the other one was.

5          Q     Was it Dr. Gilbert.

6          A     Well, I thought Gilbert was -- I thought

7     Gilbert received monetary compensation.  Is that

8     right or am I wrong?  It depends on what they got.

9     I thought there were some physicians who got

10    monetary compensation.  So those were not and

11    so -- I forgot if it's -- what did Gilbert get?

12         Q     A $500 gift certificate, he got some

13    other non-monetary compensation in another year

14    that the government believes exceeded the cap.

15         A     Okay.  Well, I mean, certainly the $500

16    would, because that's arguably monetary comp.  I

17    don't recall whether he's the third one here.

18         Q     Do you recall the years in which you

19    found Dr. Corales' non-monetary compensation to

20    exceed the Stark law limit?

21         A     Let me see.  Do I say how many?  Let me

22    see if I -- I can't recall.  It would be if I -- I

Capital Reporting Company
McAnaney, Kevin  01-16-2015

75

1  don't recall, but I think that Dr. Corales would

2  have been -- there was one year in which, as I

3  recall, there was a number of tickets to concerts,

4  and I think that was the year, but I can't recall

5  what year it was or whether it was in more than

6  one year.

7       Q    And with respect to Dr. Bynum, are you

8  thinking of the Kentucky Derby tickets?

9       A    Yes.

10      Q    Did you identify, in your review of the

11 evidence, any compensation that was solicited by a

12 physician or his staff and it went to a referring

13 physician?

14      A    Well, I think -- I'm trying to recall.  I

15 don't think I saw anything that was clear evidence

16 of it other than -- I believe it -- Dr. Bynum's

17 affidavit.  I think it was a physician affidavit,

18 or maybe it was Corales -- that said they had

19 solicited.  So I assume that's the case.

20      Q    Did you see in the deposition transcripts

21 that you read any testimony from community

22 educators about tickets or other gifts being

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1   solicited?

2        A    Well, I mean, it was very unclear what

3   exactly was done.  I'm not sure that that's -- I

4   think that there -- there was a lot of testimony

5   that Piper (phonetic) somebody -- I think

6   Dr. Corales -- solicited a fair bit of stuff, but

7   I'm not sure.  There were several that said,

8   doctors asked, but it's unclear whether they were

9   offered first and then asked.  So I -- I don't

10  think there was anything definitive that I saw in

11  the depositions.  Maybe one or two times, but I

12  don't think so.

13       Q    Does it make a difference if a physician

14  is offered tickets and then later comes back and

15  asks for them?

16       A    Well, I would argue, yes, I would argue

17  that's not solicitation; that was just taking you

18  up on the offer.  I mean, it was first offered and

19  then done.  I think it is -- I think the idea of

20  the solicitation is it's -- it's not being done

21  and you particularly say, I want this.

22            I mean, the idea is that that's not part

Capital Reporting Company
McAnaney, Kevin  01-16-2015

77

1   of the -- that you can offer it.  I think the reg

2   says you can.  I think the fact that if you offer

3   and then someone comes back and takes you up on

4   it, I don't think that's necessarily a

5   solicitation.

6        Q    Are you able to speak to the purpose

7   behind the solicitation requirement and why is

8   that not allowed?

9        A    Well, obviously, I can't speak for the

10  government, although I drafted it.  I mean, it

11  was -- it was put in there to prevent people, I

12  mean, demanding -- demanding kickbacks.  I mean,

13  that was -- I mean, basically, it was sort of the

14  kickback theory that, yes, we said you could go

15  out, you can go entertain, you can take people to

16  lunch, business prospects, but it shouldn't be --

17  it should be the provider initiating it as part of

18  their normal business commercial development as

19  opposed to being asked for by the physician.

20       Q    Did you view solicitation by a physician

21  as being sort of a red flag that there could be a

22  kickback later?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

78

1     A     No, not --

2           MR. GUARNIERI:  Hold on.  Time period?

3           MR. McCAFFREY:  He claims to have drafted

4  this regulation.

5           MR. GUARNIERI:  So you're saying --

6           MR. McCAFFREY:  So I'm asking him when he

7  wrote this into the law --

8  BY MR. McCAFFREY:

9     Q     When you wrote that into the law, did

10  you -- I think you just testified that

11  solicitations, you know, are sometimes associated

12  with kickbacks.  Is that fair to say?

13     A     Yes.  I mean, I think that -- I mean, the

14  idea was that that was a -- that was sort of --

15  that was a scenario we didn't want to promote

16  because we thought once it was 357 you're entitled

17  to get, every physician would be out there

18  demanding their 357 worth of non-monetary

19  compensation.  That was clearly not what we wanted

20  to do.  So that's what the -- the solicitation was

21  to sort of prevent that.

22  BY MR. McCAFFREY:

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1    Q    Were there other Stark law violations

2  that you identified in the facts of this case?

3    A    Yes.  As alleged.  I mean, I'm not sure

4  what -- I mean, there was clearly, as I said,

5  several what I would call technical violations.  I

6  think there was an arrangement with one physician

7  over I think about 13 months where he basically

8  provided services to Nurses' Registry and was paid

9  a thousand dollars per month, but it was not in

10  writing, so it doesn't -- it did not -- I mean,

11  it's clearly monetary compensation and it didn't

12  fit in any of the exceptions because all of the

13  other exceptions require a written agreement.  So

14  that was one.

15          I think the -- there was another

16  physician that got a gift card, again, I

17  think as -- as compensation for services provided,

18  but again, there was no writing.

19          I think -- I'm trying to think if there

20  were -- those are the two I recall where people

21  got monetary compensation.  And I'm -- let me see

22  if -- I know I mentioned it in here, how many were

Capital Reporting Company
McAnaney, Kevin  01-16-2015

80

1   on the exhibit and how many got monetary comp.

2          I think those were the two that were

3   on -- again, on Exhibit 61 that were identified as

4   having monetary compensation.

5          MR. TRUE:  Paragraph 26.  You make some

6   reference -- I don't know if that's what you're

7   looking for.

8          THE WITNESS:  Oh, yes.  That's right.  It

9   was Dr. Keedy was the other one.  I'm not sure --

10  I'm not sure if the -- if the gift card was noted

11  on that sheet.

12         So those two.  I mean, neither the 13,000

13  nor the 1,000 had written agreements.  So they

14  would be -- they would have violated Stark.

15  Although I guess -- I did say that Dr. Keedy

16  might -- may have qualified for the isolated

17  transaction.

18  BY MR. McCAFFREY:

19      Q    The isolated transaction exception?

20      A    Yes.

21      Q    In order for that to apply, the

22  remuneration has to be fair market value for the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

81

1  services provided, right?

2      A    That's correct.

3      Q    Did you analyze the fair market value of

4  the services that Dr. Keedy provided to Nurses'

5  Registry?

6      A    I think I -- I believe it was in an

7  affidavit or -- by Dr. Keedy that seemed to -- I

8  mean, one couldn't judge.  I'm not a valuation

9  (sic), but it seemed -- it seemed an appropriate

10  payment.

11      Q    Are you judging or not judging?  I mean,

12  do you have --

13      A    Well, as a --

14      Q    Let me ask you this.  Hang on.  Hang on.

15  Do you have any expertise in valuing endorsement

16  services that a physician might provide to a

17  health care provider?

18          MR. TRUE:  Object to the form of the

19  question.

20          THE WITNESS:  Not as a valuator, but as a

21  lawyer looking at it from a -- just a sort of a

22  red face test.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

82

1  BY MR. McCAFFREY:

2     Q    Do you plan to testify at trial that the

3  services -- that the compensation provided to

4  Dr. Keedy in exchange for his service was fair

5  market value?

6          MR. TRUE:  Object to the form of the

7  question.  There's a specific reference to Keedy

8  and Childers in paragraph 37 of his opinions.  And

9  we've already said he's going to provide the

10  opinions in the report.  So...

11  BY MR. McCAFFREY:

12     Q    Let's just confirm.  Are you going to

13  testify at trial that the compensation that

14  Nurses' Registry paid to Dr. Keedy was fair market

15  value compensation?

16     A    No.  I might testify, if asked, that it

17  appears to.

18     Q    So your testimony may be that the

19  compensation appears to be fair market value, but

20  not necessarily that it is fair market value?

21          MR. TRUE:  Object to the form of the

22  question.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

83

1          THE WITNESS:  Yes.  That it -- that it

2    certainly could be.

3    BY MR. McCAFFREY:

4       Q    I'm not sure I understand the distinction

5    that you're drawing, but we can leave it at that.

6          In paragraph 16 of your report, you make

7    a statement as follows:  "Small providers, without

8    in-house counsel or dedicated compliance staff,

9    are particularly prone to making inadvertent

10   violations of the Stark law."

11         Is it your testimony that Nurses'

12   Registry was particularly prone to inadvertent

13   Stark law violations?

14         MR. GUARNIERI:  Object to the form.

15         MR. TRUE:  Object to the form.

16         THE WITNESS:  No.  I mean, my -- my

17   testimony is that, in my experience -- and

18   experienced health care lawyers will tell you that

19   small providers are prone to make Stark law

20   mistakes.  And I would say, if someone asked me,

21   Nurses' Registry is a small provider, would fit in

22   that category.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

84

1  BY MR. McCAFFREY:

2      Q    Based on what?  What metric are you using

3  to describe it or define it as a small provider?

4      A    I mean, it was a small business.  I mean,

5  at least as it comes through from the depositions,

6  it was a relatively small operation.  I mean,

7  it's -- it's got a main office of -- I don't

8  know -- looks like half a dozen people or

9  something.  It's got a lot of turnover, and they

10  don't have regular counsel.  I mean, they're not

11  big enough to have a regular counsel.  So -- I

12  mean, that's a fairly typical sort of small

13  provider.

14      Q    Do you know whether or not Nurses'

15  Registry had a dedicated compliance staff?

16      A    I believe they did not.  They did not

17  have a dedicated -- I think they had someone

18  charged with compliance, along with other

19  activities, fairly typical of small -- small

20  operations.

21      Q    Do you know whether or not Nurses'

22  Registry was operating under a corporate integrity

Capital Reporting Company
McAnaney, Kevin  01-16-2015

85

1  agreement during some of the time period relevant

2  to your opinion?

3      A    Yes.  I mean, I've -- I've seen

4  references to it in the depositions and papers.

5      Q    Have you reviewed the corporate integrity

6  agreement?

7      A    I think I did at some point, but I can't

8  recall it particularly.

9      Q    In your experience, don't corporate

10 integrity agreements typically require the

11 provider to have a compliance officer and a

12 compliance staff?

13     A    Well, they -- they require a compliance

14 function.  I mean, again, CIAs depend greatly on

15 the size of the organization.  And so I think they

16 have to have someone who fills the compliance

17 function and -- and does -- I mean, has --

18 typically they have to have -- I mean, they have

19 to provide for training and things like that.

20     Q    But just to be clear, are you going to

21 testify at the trial of this matter that Nurses'

22 Registry was a small provider and, therefore, was

Capital Reporting Company
McAnaney, Kevin  01-16-2015

                                                          86

1  prone to making inadvertent Stark law violations?

2          MR. TRUE:  Object to the form of the

3  question.  Asked and answered.

4          THE WITNESS:  I intend to say that

5  small -- small -- I may say, depending on what I'm

6  asked and what testimony -- that, in my

7  experience, and experienced counsel, small

8  providers tend to make a lot of these and that --

9  and, if asked, I would consider Nurses' Registry a

10 small provider.

11 BY MR. McCAFFREY:

12     Q    Did you find that any of the non-monetary

13 compensation was based on the volume or value of

14 the referrals that the recipient provided?

15     A    No.

16     Q    Did you consider the deposition testimony

17 where the witnesses stated that the number of

18 referrals or the volume of referrals was taken

19 into account in providing for remuneration?

20     A    I thought the testimony was all over.

21 Sometimes it was prospective.  Sometimes it was

22 people that were low referrers.  Sometimes it was

87

1    people that were high referrers.

2           But, more importantly the compensation

3    generally, which was the baseball -- the

4    basketball tickets or the football tickets, that

5    was not determined in a manner that took it into

6    account.  It was a fixed amount.  Everybody got

7    roughly the same things, at least as far as the

8    tickets went.

9           So that's the -- I think when

10   compensation varies with the volume, it's how much

11   you get depends on how much volume you gave.  That

12   was not -- that's not the pattern here.  The

13   pattern here was, we have these tickets, let's

14   give them away to people that can use them.  And

15   everyone got -- and what they got was one ticket,

16   two tickets, four tickets.

17       Q    What about the circumstances where the

18   company did not have the tickets and had to go out

19   and acquire them in response to a marketer's

20   request or a physician's request?

21       A    Well, again, it's not clear to me that it

22   was based on the volume or value.  It was based on

Capital Reporting Company
McAnaney, Kevin  01-16-2015

88

1    the ticket -- the -- the ticket price.  So I mean,

2    that's -- that's all I -- that's all I would say.

3    I don't think that -- it did not look like

4    necessarily -- I mean, I don't see the pattern

5    that -- it seemed to be that who asked for them

6    got them depending on a whole number of factors.

7    But they were given to people who referred, people

8    who didn't refer -- I mean, some people who didn't

9    even remember refer, some people who referred a

10   lot, some people who didn't refer a lot, some

11   people who hadn't referred that they hoped to get

12   referrals from.

13      Q    What about the event at Keeneland, which

14   is a race track in Lexington, where invitations

15   were sent to the company's top 30 referring

16   physicians?  Is that offering or providing

17   remuneration based on the volume of referrals?

18      A    I mean, I think that's arguable.  I don't

19   think so.  The amount that they got wasn't

20   determined or changed.  I mean, I assume those 30

21   people, some -- I mean, they didn't all refer the

22   same amount, but they all got the same thing,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

89

1  which was basically a lunch.

2          So I don't think that's really -- I

3  think, again, what the reg is getting at is you --

4  again, if you go back to the statute, it was

5  looking for where the compensation you got

6  varied -- I mean, it grew and varied, it took into

7  account how much referrals -- you got more the

8  more you referred.  These were basically fixed

9  amounts that they got.

10    Q    Well, the people who didn't refer

11  services to Nurses' Registry weren't invited at

12  all.  So they didn't get --

13          MR. GUARNIERI:  Object to --

14  BY MR. McCAFFREY:

15    Q    -- anything, right?

16          MR. GUARNIERI:  Object to the form of the

17  question.

18          MR. TRUE:  Object to the form of the

19  question.

20          THE WITNESS:  Well, I'm not sure that

21  that's -- I mean, I don't know the guest list

22  particularly, but I don't think there's anything

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1   in the statute that prevents you from giving

2   business gratuities on a somewhat selective basis.

3   I think -- but in this case, I think that's 30 --

4   it was to a function.  I don't think that's

5   particularly -- everybody got the same.

6           So I'm not -- I don't think that takes

7   into account the volume or value of referrals.

8   BY MR. McCAFFREY:

9       Q    Even if the selective basis is the volume

10  of referrals that the recipients provide?

11      A    I don't -- no, I don't think so.  I mean,

12  it was basically -- I mean, you -- it's a fixed

13  amount of people there.  I mean, again, I'd have

14  to go through the entire guest list, but I don't

15  believe that that -- that just because some were

16  selected based on that, that that violates the

17  Stark exception if they got the same thing as

18  everybody -- as people who didn't refer as much.

19      Q    Just say hypothetically -- okay?  This is

20  a hypothetical.  Could a provider go through its

21  referral numbers and pick out its top ten

22  referring physicians and say, because these ten

Capital Reporting Company
McAnaney, Kevin  01-16-2015

91

1  refer the most services to us, we are going to

2  provide them with concert tickets and, if you're

3  not in the top ten, you don't get anything; you

4  don't get those same tickets?  Is that permissible

5  under the non-monetary compensation exception?

6          MR. TRUE:  Object to the form of the

7  question.

8          THE WITNESS:  I mean, I think it's -- I

9  think there is a good argument that, yes, it is.

10  BY MR. McCAFFREY:

11      Q    What cases or law would you cite me?

12      A    I mean, there are no cases -- I mean, I

13  think there are no cases or law -- well, the case

14  would be the fourth circuit says that -- I mean,

15  the fourth circuit in the Tuomey case said that it

16  takes into account -- it has to -- the methodology

17  on its face has to vary with or take into account

18  the volume or value of referrals.

19      Q    That's a completely different Stark

20  exception, though, is it not, that was addressed

21  in Tuomey?

22      A    Well, but it's the same standard.  I

Capital Reporting Company
McAnaney, Kevin  01-16-2015

92

1   mean, I think that that standard -- the amount not

2   determined in a manner that takes into account the

3   volume or value is -- is -- it's found in many

4   Stark exceptions.  And the CMS has said in the reg

5   text that they have a uniform interpretation.  In

6   all places it appears, it's meant to mean the same

7   thing.

8        Q    And you're assuming that the text of the

9   non-monetary compensation exception says that they

10  cannot -- the amount of the compensation cannot

11  vary by the volume or value of the referrals in

12  drawing this analogy, right?

13       A    Well, I think -- whatever the language

14  is, I think it's interpreted the same way.  There

15  are some variations -- minor variations in places,

16  but I think that the agency has -- their position

17  has been it should be interpreted the same way in

18  every place it appears, with the change of some

19  say the volume and value of referrals only, which

20  is only Medicare referrals, and some say referrals

21  or other business generated.

22       Q    So are you going to offer an opinion at

Capital Reporting Company
McAnaney, Kevin  01-16-2015

93

1  the trial of this matter that the Stark law allows

2  Nurses' Registry to base its provision of tickets

3  or other non-monetary compensation on the volume

4  or value of referrals?

5          MR. TRUE:  Objection to the form of the

6  question.

7          MR. GUARNIERI:  Object to the form.

8          THE WITNESS:  No, that's -- that's not my

9  testimony.

10 BY MR. McCAFFREY:

11     Q    Are you going to testify that they can

12 take that into account in deciding who to give

13 tickets to?

14     A    I am going to testify that, with respect

15 to Keeneland, I don't think that was taken into

16 account, the volume and value, just because they

17 had a limited guest list.

18     Q    What about with respect to other

19 transactions?

20     A    Well, as I said, I think that the tickets

21 from the deposition and -- well, and Exhibit 61,

22 which laid it out, it appeared to be -- and the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

94

1   testimony of the community support people, that

2   they were -- that the amount of that -- the ticket

3   did not vary with the volume or value of

4   referrals.  They -- everybody got sort of the same

5   thing.  They got an opportunity -- the community

6   to give tickets to current or prospective

7   physicians, and they all got the same amount.  I

8   mean, it -- it was the amount of the ticket.

9       Q     Is it your understanding that all of the

10  physicians at issue in the case got the same

11  amount of non-monetary compensation?

12      A     No, not the same amount, but, I mean,

13  most of it -- as I said, of the 16, when I went

14  through it, 13 of them seem to have gotten

15  basically approximately the same, whether it was

16  one or two tickets, seemed to be mostly it, in a

17  year, or maybe four tickets in a year.

18           So, I mean, they all seemed to get -- the

19  amounts all seemed to be relatively small amounts

20  and vary just really depending on who took it up,

21  who took up the offer for the tickets and who the

22  community reps got them for.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

95

1          I mean -- let me just -- I mean, the

2    non-monetary comp is clearly -- everyone that is

3    going to get it is a referring physician under

4    the -- because the statute doesn't apply

5    otherwise.  So the mere fact that you're -- you're

6    giving it to referrals, I mean, is sort of implied

7    in the -- I mean, it's implicit in the statute,

8    that those are people that are in a position to

9    refer to you or else you wouldn't need the

10   exception.  That's all.

11      Q    Go back to paragraph 13c.  This is part

12   of your opinion on the anti-kickback statute.

13          MR. TRUE:  Which paragraph?

14          MR. McCAFFREY:  13c.

15   BY MR. McCAFFREY:

16      Q    You say that "experienced health care

17   counsel and experienced industry participants

18   during the relevant time period would have

19   reasonably believed that the AKS" -- or

20   anti-kickback statute -- "did not prohibit the

21   provision of modest business gratuities to

22   physicians or other referral sources."

Capital Reporting Company
McAnaney, Kevin  01-16-2015

96

1          We covered this a bit earlier, but I take

2     it when you say modest business gratuity, you

3     don't have a particular dollar amount in mind?

4     A     No.  I think that the -- I mean, I think

5     that what experienced health care counsel look for

6     and what the government has usually -- has looked

7     at is what you call extravagant gratuities or --

8     obviously, it's in the eye of the beholder, but I

9     think people have a general sense of things

10    certainly that are over the line and things that

11    are close to the line and things that are below

12    the line.

13    Q     And your testimony was that if it's

14    modest, in your opinion, there could not be an

15    anti-kickback statute violation unless there was

16    an express quid pro quo?

17    A     I think it would -- I think it would be

18    just extremely unlikely that one would have the

19    requisite intent, that one would think it was

20    unlawful what you're doing and deliberately going

21    ahead knowing it's unlawful.  So...

22    Q     Even though you acknowledge that the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

97

1  statute does not require any explicit quid pro

2  quo?

3      A    Right.  And I said that because what I --

4  that the more common and widespread a business

5  practice is and ubiquitous it is, the -- the more

6  likely people are going to think it's lawful;

7  everybody is doing it every day and nobody is

8  doing it (sic), and everyone is taking customers

9  and prospective customers out to lunch and taking

10  them to a ball game.  I mean, that's a fairly

11  common experience.  And people have been doing it

12  during the entire 40 years since the kickback

13  statute had been done and no one had come after

14  people and said it was illegal.

15          And as I said, even the big industry

16  players -- I mean, PhRMA and the medical device

17  people of the world, I mean, they all thought it

18  was lawful.  So I just think that it was generally

19  considered -- and I think where -- people started

20  to get concerned when it wasn't modest and it

21  began to be something that's pretty extravagant,

22  that those were the -- or among the factors that

Capital Reporting Company
McAnaney, Kevin  01-16-2015

98

1   people would look at.

2        Q    During what time period did the big

3   players, the pharmaceutical companies and whatnot,

4   believe that this was lawful?

5        A    Well, I think they still believe it's

6   lawful.

7        Q    You referenced some guidelines or code

8   that PhRMA and other medical device manufacturers

9   put out.  Let me show you what I think you were

10  referring to.

11           MR. McCAFFREY:  Mark that as Exhibit 2,

12  please.

13           (McAnaney Deposition Exhibit Number 2 was

14  marked for identification.)

15  BY MR. McCAFFREY:

16       Q    In paragraph 32 of your report, you cite

17  to a code developed by the Pharmaceutical Research

18  and Manufacturers of America.  Why did you cite to

19  that code?

20       A    Well, because I think that was the

21  first -- well, A, I think it was the first code to

22  address these things of any -- in the -- of any of

Capital Reporting Company
McAnaney, Kevin  01-16-2015

99

1  the health care industry.  And so that's -- I

2  mean, that's why I reference where it dealt with

3  interactions with physicians and other health care

4  professionals.

5      Q    Is this code a basis for your opinion

6  that the kickback statute does not prohibit the

7  provision of modest business gratuities to

8  physicians or other referral sources?

9      A    I would say -- I think it's evidence that

10  people in the industry did not believe that the

11  provision of modest business expenses violated the

12  statute.

13     Q    Do you advise any of your own health care

14  clients to rely upon this code?

15     A    I mean, yes.  I think it's a -- I think

16  it's a good code.  It's a prudent business

17  practice.

18     Q    Would experienced health care industry

19  participants be aware of the code?

20     A    I mean, certainly in the larger

21  industries.  I mean, certainly anyone in the

22  pharmaceutical industry, the device industry, your

Capital Reporting Company
McAnaney, Kevin  01-16-2015

100

1  big hospitals.  I mean, I -- I don't know the --

2  as I said, the smaller -- the smaller entities

3  were particularly aware of it, or cognizant of it.

4      Q    If you look at the code there, what I've

5  handed you and what's been marked as Exhibit 2, is

6  this the PhRMA code, the 2002 version, that you

7  reference in your report?

8      A    Yes.  I'm not sure if it's the 2002.  I

9  think it had one revision to it.  I just don't...

10     Q    If you see in the last paragraph of the

11  preamble on the first page, does that help you

12  know whether or not this code --

13     A    Oh, yes.

14     Q    -- was effective in July of 2002?

15     A    Yes.

16     Q    Turn to page 5.  This falls under the

17  heading of educational and practice-related items.

18  In subparagraph A it states, "Items primarily for

19  the benefit of patients may be offered to health

20  care professionals if they are not of substantial

21  value ($100 or less)."

22              Did you consider that in forming your

Capital Reporting Company
McAnaney, Kevin  01-16-2015

101

1   opinions in this case?

2       A    I mean, not particularly.  I'm familiar

3   with the -- generally, the -- what the code says.

4       Q    Would you agree that UK basketball and

5   football tickets are not primarily for the benefit

6   of patients when they're given to referral

7   sources?

8       A    Yes.

9       Q    And tickets to a Keeneland race track

10  event are not primarily for the benefits of

11  patients.

12      A    That's correct.

13      Q    Kentucky Derby tickets, likewise, are not

14  primarily for the benefit of patients, are they?

15      A    No.

16      Q    Tickets to concerts or musical events are

17  not primarily for the benefit of patients.

18      A    No.

19      Q    Bottles of alcohol given to referral

20  sources are not for the benefit of patients, are

21  they?

22      A    I doubt it.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

102

1     Q    If you go down further in that

2  subparagraph to -- or to subparagraph C, excuse

3  me, it says, "Items intended for the personal

4  benefit of health care professionals (such as

5  floral arrangements, artwork, music CDs or tickets

6  to a sporting event) should not be offered."

7     A    That's correct.

8     Q    Did you consider that in forming your

9  opinions about what industry understood concerning

10  business gratuities?

11        MR. CHILDERS:  I'm sorry.  This is -- I

12  object to the extent that this is the

13  Pharmaceutical Research and Manufacturing

14  protocols.  This has nothing to do with home

15  health.

16  BY MR. McCAFFREY:

17     Q    When you made the opinion or offered the

18  opinion that experienced industry participants

19  understood that modest business gratuities were

20  not prohibited by the anti-kickback statute, did

21  you consider this subparagraph of the PhRMA code?

22     A    Yes.  I mean, I know it's there.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

103

1     Q    Did you consider the next paragraph,

2   paragraph 7D, that instructs the pharmaceutical

3   industry not to offer payments in cash or cash

4   equivalents such as gift certificates?

5          MR. GUARNIERI:  Other than for

6   services --

7          THE WITNESS:  I mean, this is a -- I

8   mean, I am --

9          MR. GUARNIERI:  Wait a minute.

10         I'm just noting an objection because he

11   left out the portion of the paragraph that says,

12   "other than for compensation for qualified

13   services."

14         THE WITNESS:  I mean, I understood that,

15   for all these things, that the PhRMA -- the big

16   manufacturers, had voluntarily adopted this as

17   code -- as a voluntary code, not as a statement of

18   what the law was.

19   BY MR. McCAFFREY:

20     Q    Does it reflect what industry understood

21   it should be doing in order to conform to the law?

22         MR. TRUE:  Objection.  What industry?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

104

1        MR. McCAFFREY:  The health care industry.

2        MR. TRUE:  As a whole?

3        MR. McCAFFREY:  Yeah.

4        THE WITNESS:  Clearly, it did not,

5  which -- in my report I said one of the things

6  that is clear is the -- at the same time, AdvaMed

7  put out a code later, which are the major medical

8  device companies, that specifically allowed

9  business gratuities.

10        So, I mean, I think that it was clear

11  that this code was adopted by the pharmaceutical

12  industry because they were trying to clean up

13  their act and ward off potential problems, that

14  they were getting a lot of bad publicity.  And so

15  I think they decided that we ought to clean up our

16  act together, because no one wanted to do it

17  alone, and that's what it was -- that's why they

18  adopted it.

19        But I don't think anyone thought at the

20  time -- certainly, as I said, this is a voluntary

21  code; nothing in it did they ever say violated the

22  statute failing to comply.  And I also think the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1  fact that the big device manufacturers who had

2  very sophisticated counsel continue to permit it.

3        So I don't think -- I think this does not

4  reflect the industry's -- I don't think this

5  reflects at all the industry's understanding that

6  such things were required by the kickback statute.

7  BY MR. McCAFFREY:

8    Q    What is its relevance, then, to your

9  opinion?

10    A    I think it does show that the first --

11  that in 2002 was the first time anyone adopted any

12  code here, and even then it was voluntary.  It

13  wasn't considered to be required by the kickback

14  statute.  And the medical device industry clearly

15  gave subsequent guidance that clearly permitted

16  business entertainment and gratuities.  So I just

17  think it's -- it shows that it was not generally

18  understood that such things violated the statute.

19        MR. McCAFFREY:  Let's mark this as

20  Exhibit 3.  And I'll ask you if this is the

21  guideline from the medical device industry that

22  you just referred to.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

106

1          MR. CHILDERS:  Same objection as to form.

2          MR. McCAFFREY:  Well, let me just note

3  that if he's going to rely on these things as part

4  of his opinion and as a basis for his opinion,

5  we're entitled to ask him questions about it.  And

6  defendants can't have it both ways and say, well,

7  it reflects things that we like, but if it

8  reflects things that we don't like, it doesn't

9  apply to the home health industry.

10         MR. CHILDERS:  That's not what I said.

11         MR. McCAFFREY:  Okay.

12         MR. TRUE:  Let me just note also I don't

13  think anybody has said, nor has he testified, that

14  he was relying on these documents.

15  BY MR. McCAFFREY:

16     Q    I think you did testify that you relied

17  upon the PhRMA code in forming your opinions in

18  this case.

19     A    Well, they are evidence that that was the

20  consensus in the industry, that it didn't violate

21  it.  That's why -- I mean, prior to this, there

22  was no code.  This code was voluntary.  And other

Capital Reporting Company
McAnaney, Kevin  01-16-2015

107

1   people had broader codes.  So I just -- I think it

2   does show that there was no understanding in the

3   industry that modest business dinners and

4   entertainment violated the anti-kickback statute.

5       Q    So that's a yes, you relied upon it?

6            MR. TRUE:  Objection.  It is what --

7            THE WITNESS:  Well, I offered it --

8            MR. TRUE:  -- he said it was.

9            THE WITNESS:  Can we take a quick break?

10           MR. McCAFFREY:  Yes.

11           (Whereupon, a short recess was taken.)

12  BY MR. McCAFFREY:

13      Q    We're back on the record.  Is this

14  document that's been handed to you the medical

15  device industry code that you were referencing

16  earlier in your testimony?

17      A    Yes, although this also has the FAQs.

18  They amended it in 2005.

19           MR. McCAFFREY:  Would you go ahead and

20  mark that as Exhibit 3, please.

21           (McAnaney Deposition Exhibit Number 3 was

22  marked for identification.)

Capital Reporting Company
McAnaney, Kevin  01-16-2015

108

1  BY MR. McCAFFREY:

2      Q    Is this the code that you refer to in

3  paragraph 33 of your report where you say that

4  code contained no prohibition on the provision of

5  entertainment or event tickets?

6      A    Yes.

7      Q    Turn to page 4 of the code, section VI,

8  titled, "Gifts."  Let me know when you're there.

9          MR. CHILDERS:  By the way -- excuse me

10  for interrupting again.  I don't want to make an

11  objection, but I want to note for the record that

12  the highlighted portions of these exhibits that

13  I've objected to are the yellow highlights that

14  have been added by government counsel.  Correct?

15          MR. McCAFFREY:  No.

16          MR. CHILDERS:  The yellow?

17          MR. McCAFFREY:  They were printed that

18  way from the website where they were obtained.  We

19  did not add any highlighting.

20          MR. CHILDERS:  Okay.  All right.  Thank

21  you.

22          MR. McCAFFREY:  I think, just for the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

109

1  record, Masten, as the witness said, additional

2  frequently asked questions were added in

3  April 2005, and I think the highlighted entries

4  reflect --

5          MR. CHILDERS:  Fair enough.

6          MR. McCAFFREY:  -- the additional

7  questions that were added.

8          MR. CHILDERS:  Okay.

9          MR. TRUE:  Well, that's not the case,

10  because they all say, out beside of them, added

11  April 15, 2005.  I mean, are you saying if we went

12  to the website and printed this down, we'd get it

13  with these particular portions highlighted the way

14  it is?

15          MR. McCAFFREY:  Do you mind if I look at

16  your copy?

17          MR. TRUE:  Sure.

18          MR. McCAFFREY:  Because I have my own

19  copy with my own highlighting, but I don't believe

20  it was used to make one of these.

21          MR. CHILDERS:  Talking about Exhibits 2

22  and 3.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

110

 1          MR. McCAFFREY:  Yeah.  My point is that

 2    the highlighting in the copy of the document that

 3    the witness has typically is just a highlighted

 4    notation that the question in the frequently asked

 5    questions section was added in April 2005.  And I

 6    believe that that is what the highlighting

 7    represents.

 8          MR. TRUE:  I don't believe that's what

 9    the highlighting represents because if you look at

10    the document, any question or point that was added

11    in April of 2005 that particularly says right out

12    beside of it in parentheses, added April -- added

13    April 15, 2005.  So I don't think that's what the

14    highlighting represents.

15          MR. McCAFFREY:  All right.  Well, we have

16    a record here.  The government didn't add the

17    highlighting that's reflected in the document.

18    What it represents, I don't know.  The

19    highlighting is available on the website, if you

20    care to go to it.  I can give you the citation, if

21    you like.  We obtained at

22    www.neuromodulation.com/assets/documents/advamed-

111

1  code-of-ethics_33.pdf.  You can look it up for

2  yourself.

3          MR. CHILDERS:  Well, I'm doing that right

4  now.

5  BY MR. McCAFFREY:

6      Q    It is your opinion, right, that the code

7  contains no prohibition on the provision of

8  entertainment or event tickets?  That's what it

9  says in paragraph 33 of your report.

10     A    Well, I think -- I think it provides less

11  prohibition than the other one, I would say.

12     Q    Well, your report says it contains no

13  prohibition.  Is that inaccurate?

14     A    I believe it is inaccurate.

15     Q    Because this code also contains

16  prohibitions on the provision of these event

17  tickets or entertainment tickets, does it not?

18     A    I -- that may be.

19          MR. CHILDERS:  Can we go off the record a

20  moment?  I'm sorry, but -- I guess we'll address

21  on a break, but the --

22          MR. McCAFFREY:  There's a question --

Capital Reporting Company
McAnaney, Kevin  01-16-2015

112

1          MR. CHILDERS:  I asked if we could go off

2     the record.

3          MR. McCAFFREY:  But there's a question

4     pending.

5          MR. CHILDERS:  All right.

6          THE WITNESS:  I am not -- I'm not sure.

7          MR. McCAFFREY:  We can go off the record.

8          (Discussion held off the record.)

9          MR. TRUE:  Let's go back on.  Let me just

10    put an objection on the record here about the

11    questions being asked relative to Exhibits 2 and

12    3, because I think the content and tenor of

13    counsel's questions are intended to imply or

14    infer, or maybe state, that these codes represent

15    the law.  They clearly do not represent the law.

16    As they say and as the witness has indicated,

17    they're voluntary standards.

18          Moreover, the witness' opinions, as

19    reflected in paragraphs 32 and 33 of his report,

20    which are Exhibit 1 to the deposition --

21    paragraph 32, the last sentence of that paragraph,

22    says, "Nowhere in the code is there any indication

113

1    that any member believed the provision of such

2    gratuities was unlawful under the AKS."

3            The end of paragraph 33, that paragraph

4    ends with the last sentence that says, again, "The

5    absence of a prohibition even after the PhRMA

6    code's adoption demonstrates that experienced

7    health care counsel and experienced health care

8    industry participants did not understand that such

9    activities violated the AKS."

10           Those codes have been cited relative to

11   his opinions on the anti-kickback statute, and as

12   he indicated, nothing in either code indicate that

13   any of these activities would violate the

14   anti-kickback statute.

15           So I'm going to object to the extent

16   you're trying to convert these into something that

17   they're -- they were not cited for or represented

18   to be in the opinion.  It doesn't make any

19   difference what these industries voluntarily asked

20   their members to do.

21           As he stated, nowhere in either of these

22   codes does it say these activities, even if you do

## Capital Reporting Company
## McAnaney, Kevin  01-16-2015

114

1   them, even if you do them contrary to the codes or

2   in amounts or circumstances that the code asks you

3   or suggests voluntarily not doing, that that

4   conduct would violate the anti-kickback statute.

5   BY MR. McCAFFREY:

6       Q    Are you ready?

7            MR. TRUE:  Yep.

8            MR. McCAFFREY:  I was asking the witness.

9   BY MR. McCAFFREY:

10      Q    Are you ready, Mr. McAnaney?

11      A    I am.

12      Q    If you turn to page 4 of the code, gifts.

13      A    Yes.

14      Q    It says, "Members occasionally may

15  provide modest gifts to health care professionals,

16  but only if the gifts benefit patients or serve a

17  genuine educational function."

18      A    Yes.

19      Q    You would agree with me that Kentucky

20  Derby tickets don't benefit patients or serve a

21  genuine educational function.

22      A    Well, I -- I think that it depends on

Capital Reporting Company
McAnaney, Kevin  01-16-2015

115

1  whether other people are there, whether they serve

2  an educational function.

3      Q    Well, what did the record say about who

4  went to the Derby in that year?

5      A    I don't know that I ever got a clear

6  picture of who went to the Derby.

7      Q    You didn't understand that from Bynum's

8  declaration?

9      A    I can't recall it if I did.  I don't know

10  specifically.

11      Q    What about concerts tickets?

12      A    Well, if they're done with other people

13  being there, other salespeople, other people from

14  the company, I think it's -- it can be an

15  educational function.

16      Q    So the educators go along with

17  Dr. Corales to a Taylor Swift concert.  While

18  they're there listening to her perform, they teach

19  and educate the doctor about home health services.

20  And that would be okay, in your --

21      A    Before and after, I think it could be,

22  yeah.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

116

1     Q    What about bottles of alcohol?  Does that

2  benefit the patients or serve an educational

3  function?

4     A    Probably not.

5     Q    On page 16 --

6          MR. TRUE:  Is the government -- are you

7  taking the position that this represents the law?

8          MR. McCAFFREY:  No.

9          MR. TRUE:  Okay.

10          MR. McCAFFREY:  I never said that.  And

11  your objection went on and on and on about how

12  that was the government's position.  It's not.

13          I understand the witness to be saying

14  that these codes are reflective of industry

15  understanding regarding what the anti-kickback

16  statute and the Stark law would allow or not

17  allow.

18          MR. TRUE:  No, that's not the witness'

19  statement at all.

20  BY MR. McCAFFREY:

21     Q    Then what is the purpose of your citation

22  to these codes?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

117

1    A    The purpose of the citation was that, A,

2  these are voluntary.  They reflect nothing as to

3  what is or is not allowed under the kickback

4  statute, but, B, the very fact that you had to

5  have a code and that even the top people had

6  differences as to what they can and cannot do

7  voluntarily under the code reflected an industry

8  understanding that, in fact, these things are not

9  prohibited by the kickback statute.

10          MR. CHILDERS:  Do you have a home health

11  association code?

12          MR. McCAFFREY:  The witness didn't cite

13  to a home health industry code.  I'm using the

14  records that he himself relies upon in his report.

15          MR. TRUE:  Did you finish your answer?

16          THE WITNESS:  Yes.

17  BY MR. McCAFFREY:

18    Q    Make sure I understand.  So your

19  testimony is that the absence of a prohibition in

20  the codes is reflective of industry understanding

21  that modest business gratuities would not violate

22  the anti-kickback statute?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

118

1      A     That's -- that's correct.  The statute

2    had been passed, as I said, in '77.  For 30 years

3    there had been no question.  Everyone was engaging

4    in the conduct.  And then in 2002 or 2003, PhRMA

5    came up with this code as a voluntary code.  Many

6    of the restrictions actually -- I mean, on the

7    things you point to -- educational requirements

8    come out of the AMA, actually, the physician ethic

9    ruling.

10          So I think it was basically codifying

11   what they wanted best practices so they could

12   respond to a lot of criticism they were receiving.

13   But even then, they all don't agree.

14          So I think they're just general evidence

15   of the fact that people did not think these things

16   violated the law before or since.

17     Q     What were the criticisms that the

18   industry was trying to respond to?

19     A     Front page stories of -- in the New York

20   Times of -- I mean, PhRMA -- and the reason PhRMA

21   did it is PhRMA used to take physicians and fly

22   them around the country to conferences at big

Capital Reporting Company
McAnaney, Kevin  01-16-2015

119

1  resorts.  Medical device companies would fly

2  people to Europe to inspect the factories where

3  their stuff was, and they would stop in Paris on

4  the way.  Front page stories in the New York Times

5  of PhRMA companies taking physicians to, you know,

6  the top four-star restaurants in New York and

7  ordering thousand-dollar bottles of wine.

8         So I think that was -- that was what they

9  were responding to.

10   Q    To the extent the codes do contain

11  prohibitions on what can be given to a referral

12  source, does that in any way -- strike that.

13        Do the codes contain prohibitions on what

14  can be given to referral sources?

15   A    Yes.  I mean, the code prohibitions.

16  It's a voluntary code of conduct, but yes.

17   Q    And does that reflect, in your opinion,

18  industry understanding about best practices?

19   A    I -- I think for the PhRMA and device

20  company, I think it represented a -- prudent

21  measures if they all held hands and jumped

22  together.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1     Q     I'm sorry, I don't understand the answer.

2   Does it reflect an understanding of what the best

3   practice is vis-a-vis the anti-kickback statute?

4     A     Well, I'm not sure it was best practices

5   vis-a-vis the anti-kickback statute.  I think it

6   was best practices for their industry and their

7   image.

8     Q     I think you testified earlier that you

9   advise your clients to follow these codes; is that

10  right?

11    A     Well, I generally follow them -- they are

12  good markers for a prudent company, yes.  I mean,

13  depending on how big they are and how -- what they

14  have to do.

15    Q     Does the -- do the legal standards of the

16  anti-kickback statute vary depending upon the

17  sides of the health care provider?

18    A     Well, I think they vary -- I mean -- no.

19  I think the -- the knowledge element, the scienter

20  element, probably, I mean, tends to apply

21  differently depending on the size of the company.

22    Q     Why?

Capital Reporting Company
McAnaney, Kevin  01-16-2015

121

1      A     Well, for the reasons I said before.  I

2   mean, the big players have huge in-house legal

3   staffs that follow this stuff and advise, and

4   compliance.  You get down to big hospitals, they

5   have the same.  They're following that.  They're

6   looking at best practices.  As you get down to a

7   community hospital and then even smaller

8   providers, they don't have that staff.  So they're

9   just not as knowledgeable.

10           So if something requires a knowing and

11  willful violation -- basically, the bigger players

12  typically know more and have a better -- I mean,

13  are more aware of things.  I think it plays out

14  that way.

15     Q     The statute doesn't require intent to

16  violate the kickback statute, right?  You don't

17  have to specifically know that your conduct

18  violates that law.

19     A     Right.  You have to know what you're

20  doing is unlawful.  So I think that's the general

21  test.  It's not specific intent, but it's -- you

22  have to know it's generally unlawful, somehow it's

Capital Reporting Company
McAnaney, Kevin  01-16-2015

122

1  unlawful.

2      Q    I'm going to pose another hypothetical to

3  you.  Let's say that a home health agency went to

4  a referring physician with an envelope of $5,000

5  and said, here you go Dr. Jones; we hope we see

6  more referrals from you.  Would that, in your

7  opinion, violate the anti-kickback statute?

8          MR. TRUE:  Object to the form of the

9  question.

10          THE WITNESS:  Well, I think it would

11  depend on -- I mean, it would -- obviously, that's

12  for the judge and jury to decide.  I mean, it is a

13  criminal statute.  I mean, I think if I were

14  advising him, I think that's a -- that's a --

15  there's a good probability that someone would find

16  that.

17          And I think, though, that in part that's

18  because, if you go back to -- I think what it is

19  has to be something that you think is going to

20  induce, cause -- cause referrals, or at least be

21  a -- really make it very likely.  And to go back

22  to what we said, the amount of the money makes a

Capital Reporting Company
McAnaney, Kevin  01-16-2015

123

1  big difference.  So if you are saying $5,000 in

2  cash, that is certainly -- A, it's a lot of money,

3  and B, it's suspicious that you're putting it in

4  cash.  So I think most counsel would conclude that

5  you've got a problem.

6  BY MR. McCAFFREY:

7      Q    What if the evidence in the case showed

8  nothing other than the provider's statement that

9  we hope to see more referrals from you?

10          MR. TRUE:  You mean without cash?

11 Without --

12 BY MR. McCAFFREY:

13     Q    Provision of $5,000 in cash, statement

14 just in itself, we hope to see more referrals from

15 you.

16          MR. TRUE:  That's not different from your

17 hypothetical that you already stated, right?  I

18 mean, that was your hypothetical.

19          MR. McCAFFREY:  I just wanted to make

20 sure that the witness understood that there were

21 no other facts concerning the providers intent.

22          MR. TRUE:  I'm with you.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

124

1          THE WITNESS:  No, I think that the facts,

2     the facts that -- I mean, the amount of money,

3     providing it in cash, I think that the provider

4     regardless -- the person providing the cash,

5     regardless, I think that one could conclude that

6     he or she thought that that's an amount of money

7     that's going to get referrals.

8     BY MR. McCAFFREY:

9          Q    Okay.  So a slightly different

10    hypothetical now.  There's no statement or

11    evidence of a statement by the provider.  The

12    provider simply sends one of its employees out and

13    gives the physician $5,000 in cash.  There's no

14    other services provided by the physician other

15    than his referral of patients.  Would that

16    constitute an anti-kickback statute violation in

17    your opinion?

18          MR. TRUE:  Object to form of the

19    question.

20          THE WITNESS:  Well, again, I can't say it

21    is.  But, again, I think that -- I thinks that

22    the -- the size of the gift, i.e., if you want to

Capital Reporting Company
McAnaney, Kevin  01-16-2015

125

1  call it a gift, I mean, is significant.  So -- and

2  I think that a jury could reasonably conclude that

3  the person thought that would cause the recipient

4  to send referrals.

5  BY MR. McCAFFREY:

6      Q    Let's tweak the hypothetical again and

7  this time assume that what the provider gives the

8  referring physician is not $5,000 in cash, but

9  $5,000 worth of non-monetary compensation.

10         MR. TRUE:  Object to the form of the

11  question.

12         THE WITNESS:  Well, I mean, again, as I

13  think I said before, I think where people -- where

14  counsel and people in the industry tend to draw

15  the line is between what's modest and what's

16  extravagant.  And I would think that 5,000 --

17  $5,000 in a -- in -- I mean, it depends on what it

18  is and over what period of time, but certainly

19  $5,000 in one swoop, such that you're flying

20  someone off for the weekend, something like that,

21  I think that would -- that would be a problem.

22  BY MR. McCAFFREY:

Capital Reporting Company
McAnaney, Kevin  01-16-2015

126

1    Q    Now, what about -- going back to the

2  original hypothetical, a provider sends out one of

3  its employees to a referring physician and said,

4  here's $500 cash, we hope to see more referrals

5  from you.  What's your opinion about whether or

6  not that could constitute an anti-kickback statute

7  violation?

8          MR. TRUE:  Object to the form of the

9  question.

10         THE WITNESS:  I mean, I -- I think it's

11  certainly suspicious.  I mean, it's unusual to

12  give $500 in cash to people for no reason.

13  BY MR. McCAFFREY:

14    Q    What about $100 in cash?

15    A    I think cash is -- tends to be a problem

16  in the absence of any services being provided.

17    Q    What about $100 worth of non-monetary

18  compensation provided to a referring physician

19  along with the statement, I hope to see some more

20  referrals from you?

21    A    I think that's a very -- I think

22  that's -- depending on -- I mean, I don't think

Capital Reporting Company
McAnaney, Kevin  01-16-2015

127

1  that's a -- that's a much closer call.  I'm not

2  sure that that violates the statute.  I mean,

3  again, if you -- I mean, if it's -- you know, $100

4  is getting -- I think if it's once a year, I'm not

5  sure that that's -- dependent on what people give

6  in the industry, I think that's not necessarily

7  extravagant or exorbitant.

8          I mean, clearly $100 in cash is less --

9  if it's a fruit basket or something, I'm not sure

10  that's a -- that that would -- most people would

11  think that necessarily violates the statute.

12    Q    So in your mind, at least, there's a

13  distinction between providing cash on the one hand

14  and non-monetary compensation of the same value on

15  the other hand?

16    A    Yeah, I mean, it can.  It doesn't

17  necessarily, but I think -- people don't give

18  cash.  People give -- I mean, in business, you

19  don't see that.  People do provide entertainment

20  and stuff to people as part of, I mean, business

21  development and business relations.

22          So I think that there is a difference.  I

Capital Reporting Company
McAnaney, Kevin  01-16-2015

128

1  do think -- I mean, there can be a difference.

2      Q    Does the law, the anti-kickback statute,

3  draw any distinction between cash remuneration and

4  non-cash remuneration?

5      A    Well, I think it goes to the intent

6  element, that one is a very unusual event, and I

7  think it is so unusual that one can -- it has a

8  different inference than one that is as part of a

9  commercial business relationship that is similar

10  to other things that people are doing for their

11  customers to develop customer relations, fruit

12  baskets, things like that, a couple of tickets to

13  the local sports arena.

14      Q    I'm not sure that that answered the

15  question.  Does the statute itself, the language

16  of the law, distinguish between monetary and

17  non-monetary remuneration?

18      A    Well, it depends on -- I mean, I'm not --

19  I'm not -- I think that non-monetary compensation

20  is harder to figure out how much it is and what it

21  is, because it's not necessarily -- the financial

22  benefit to the physician is not necessarily

Capital Reporting Company
McAnaney, Kevin  01-16-2015

129

1   commensurate to cash.

2           MR. TRUE:  Let me ask you to clarify the

3   question, if you would, I mean, because you've

4   been kind of all over the place.  You know, you've

5   asked --

6           THE WITNESS:  And --

7           MR. TRUE:  Wait a minute.  Wait a minute.

8           THE WITNESS:  I need to go to the

9   bathroom.

10          MR. TRUE:  Well, just -- wait just a

11  second.

12          You've asked a lot of questions about the

13  non-monetary compensation exception which clearly

14  is dealing with non-monetary compensation, not

15  cash or checks.  Is that what you're asking about?

16  Or are you asking about the Stark statute?  Or are

17  you asking about the anti-kickback statute?  What

18  is it exactly in your question are you asking

19  about?

20          MR. McCAFFREY:  My question was explicit:

21  Does the anti-kickback statute draw some

22  distinction between monetary and non-monetary

Capital Reporting Company
McAnaney, Kevin  01-16-2015

130

1  remuneration?

2          MR. TRUE:  That question was explicit.

3  The one you asked wasn't.

4          But go ahead, if you can answer that.

5          THE WITNESS:  I mean, remuneration can be

6  either monetary or non -- yes, monetary or

7  non-monetary.

8  BY MR. McCAFFREY:

9      Q    Does the statute distinguish between

10  those two in its prohibitionary terms?

11      A    No.  I think I just said that.

12  Remuneration can be monetary or non-monetary.

13          Can I --

14          MR. McCAFFREY:  Yes.

15          (Whereupon, at 12:11 p.m., a luncheon

16  recess was taken.)

17

18

19

20

21

22

Capital Reporting Company
McAnaney, Kevin  01-16-2015

131

1                    AFTERNOON SESSION

2                                    (1:03 p.m.)

3  Whereupon,

4                    KEVIN McANANEY,

5  was called for continued examination, and having

6  been previously duly sworn was examined and

7  testified further as follows:

8       EXAMINATION BY COUNSEL FOR PLAINTIFFS

9  BY MR. McCAFFREY:

10     Q    Mr. McAnaney, we spent some time earlier

11 walking through some of the provisions of the

12 PhRMA code and the AdvaMed code.  And I think we

13 all agree that those codes are not legally

14 binding, right?

15     A    Right.

16     Q    Would you agree that they advise industry

17 participants not to engage in the conduct that

18 Nurses' Registry engaged in and that is at issue

19 in this litigation?

20          MR. TRUE:  Object to form of the

21 question.

22          THE WITNESS:  Well, I think if -- what

Capital Reporting Company
McAnaney, Kevin  01-16-2015

132

1  they say for their members is, yes, I mean, if you

2  want to be in the code, those are activities you

3  shouldn't do.  I don't think they inform the

4  health care industry.  I think that they were

5  rather specific to themselves -- to their

6  particular members.

7  BY MR. McCAFFREY:

8      Q    In your opinion, is it permissible for a

9  provider, a health care provider of any type, to

10  try to influence patient referrals by giving

11  remuneration to a referral source?

12     A    Can you repeat the question?

13     Q    In your opinion, is it okay for a health

14  care provider to try to influence patient

15  referrals by giving remuneration to a referral

16  source?

17     A    I -- I mean, I think it's not -- well, I

18  don't think it is unlawful depending on how.  I

19  think is -- the examples you were giving before, I

20  think giving cash to people is a bit (sic), but if

21  it's done as sort of business gratuities, business

22  lunches, I think it's not -- I mean, to that

133

1  extent, if it might be something of value but it's

2  not really remuneration, or at least not money

3  that people can take in their pocket, I think

4  it -- it can be done, yes.

5      Q    Even if the giver's intent is to try to

6  influence a referral decision with remuneration?

7      A    Yeah, as I think is sort of the -- as the

8  non-monetary comp exception in the Stark law

9  shows, I mean, I think people understand that

10  you're going to -- that it's not illegal to try

11  and develop business relationships with people to

12  increase referrals from customers and that one can

13  do that as part through entertain -- I mean,

14  through entertaining, business lunches, that it's

15  not -- it's not per se illegal.  I think it's sort

16  of normal commercial practice.

17          I think even under the kickback statute,

18  again, I think that the real litmus test is, is

19  this really something that is going to seriously,

20  you think, cause them to make referrals or is it

21  simply ones that you're -- you're trying to do it

22  because you're hoping and trying to get more

Capital Reporting Company
McAnaney, Kevin  01-16-2015

134

1   business?

2           So a lot of it depends on how you say

3   influence referrals.  I mean, I think all business

4   relationships you're trying to influence

5   referrals.

6       Q    And whose point of mind is relevant to

7   the anti-kickback statute inquiry?

8           MR. TRUE:  Object to the form of the

9   question.

10          THE WITNESS:  Well, I think it -- I mean,

11  either side can violate it or only one side can

12  violate it.  So I think that, with respect to the

13  provider, is generally the intent to induce the

14  business.  So the dispute is, what does that

15  really mean?

16  BY MR. McCAFFREY:

17      Q    So if a provider's intent is to attempt

18  to induce a referral, regardless of the value of

19  the remuneration, I take it you agree that's an

20  anti-kickback statute violation?

21      A    Well, as I said before, I mean, the

22  question is, what's -- what do you think is -- is

Capital Reporting Company
McAnaney, Kevin  01-16-2015

135

1   likely to induce them?  I think that clearly -- in

2   that sense, I mean, as I said, I think it's not

3   just to influence them or to hope or to convince

4   them to refer business.

5          It's you have to think whatever that

6   remuneration is is really, you know, something

7   that's going to seal the deal or something like

8   that.  I mean, not quite seal -- but that's the --

9   something that is closer to causation than just

10  normal business, trying to, you know, encourage

11  them to send more business to them.

12     Q    What statute or case would you cite to

13  for the proposition that the remuneration has to

14  be pretty close to sealing the deal or causing a

15  referral in order to trigger liability under the

16  anti-kickback statute?

17     A    Well, I think that's what Hanlester and

18  those -- all that line of cases stands for is that

19  you want to -- it's got to be something that you

20  think is going to exert influence over the will of

21  another to cause business.  I think that's the

22  phrase, along those lines.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

136

1      Q    If the testimony from the community

2    educators is, yes, I was trying to influence their

3    referral decisions by giving them these tickets to

4    concerts and other events, does that satisfy the

5    scienter element of the AKS?

6            MR. TRUE:  Object to the form of the

7    question.

8            THE WITNESS:  No.  I mean, I think you

9    can do it to try to influence.  I think influence,

10   encourage has -- it's not encourage or hope for.

11   I think that's influence.  I think that what you

12   have do is say I think that -- I thought I get

13   (sic) this, I'm going to get -- he'll give me the

14   referral.  I think there has to be something that

15   you think that this is actually going to cause

16   referrals.

17           I don't think that the normal business

18   solicitation -- I mean, all of it is, by

19   definition, trying to influence and encourage

20   referrals.  I mean, that's what people do.

21   BY MR. McCAFFREY:

22      Q    When you advise clients about giving

Capital Reporting Company
McAnaney, Kevin  01-16-2015

137

1   business gratuities, do you offer them any advice

2   on where to draw the line?

3       A    Well, to the extent -- I mean, I

4   generally -- as you said, I use the general

5   guidance that's -- I mean, modest and appropriate.

6   I mean, I think that's the general idea of what

7   might -- what is generally acceptable, something

8   that's modest and appropriate.

9           So I don't think it means taking them

10  to -- I don't know.  It used to be Lutece in New

11  York.  I don't know what the -- what the

12  current -- but it's not necessarily taking them to

13  a four-star restaurant that's a $500 dinner.  It's

14  taking them to -- well, I think you can go better

15  than Applebee's, but somewhere in between.

16      Q    Why would a $500 dinner be problematic?

17  Because I thought you testified that non-monetary

18  remuneration really doesn't have that sort of

19  stigma attached to it that cash does.

20          MR. TRUE:  Object to the form of the

21  question.

22          THE WITNESS:  I think that -- what I said

Capital Reporting Company
McAnaney, Kevin  01-16-2015

138

1  is the conditions change.  I believe I've also

2  said earlier on that I think where people,

3  experienced counsel and industry is -- is a

4  certain amount of what I call exorbitant or

5  extravagant.  And I think that, at least in the

6  health care business, drawing in a four-star

7  restaurant is pretty -- would be in that line

8  where it's -- that's not modest and would,

9  therefore, calls it into question.  Does it

10  violate the statute?  I don't think it necessarily

11  violates it, but I certainly think it's -- that's

12  the kind of thing that you would look at and is

13  clearly much more likely to be problematic.

14  BY MR. McCAFFREY:

15      Q    Did you see any facts in the deposition

16  testimony or otherwise that raised any red flags

17  in your mind about the company's intent to induce

18  referrals?

19      A    The intent -- I don't think so.  I mean,

20  nothing more than the usual -- I mean, what you

21  usually get from this stuff.  I mean, there are

22  clearly references to referrals and hopes, but I

Capital Reporting Company
McAnaney, Kevin  01-16-2015

139

1  don't think I saw anything that was that out of

2  the ordinary in business gratuities kind of

3  things.

4      Q    So for instance, the e-mail concerning

5  Derby tickets to Dr. Bynum where the community

6  educator relays that she told Bynum, we'll see

7  what we can do on Derby tickets, but in return,

8  we're going to need more referrals, that's, in

9  your experience, pretty common in the industry?

10         MR. TRUE:  Object to the form of the

11  question.

12         THE WITNESS:  Well, I think that was

13  hearsay.  I mean, I don't know that she said it.

14  I mean, let's -- I'll be clear.  I mean, I think

15  the -- I think the Derby tickets are different

16  from the others.

17  BY MR. McCAFFREY:

18      Q    In what respects?

19      A    Well, I think they -- I mean, that was

20  clearly more -- I mean, that is -- that was very

21  expensive.  That's far -- that's not what, when

22  you went down Exhibit 61, most of those things

Capital Reporting Company
McAnaney, Kevin  01-16-2015

140

1   consisted of.  I just think the dollar cost was

2   much more expensive, as I understand.

3       Q    Did that make you consider that

4   transaction to be an anti-kickback statute

5   violation?

6       A    No.  I mean, it was clearly -- I mean, it

7   was clearly outside the Stark limit, but I think

8   that that was clearly a more problematic

9   arrangement.  That was a different type of

10  arrangement.

11      Q    Was there anything else, other than the

12  Derby tickets, that you viewed as problematic?

13          MR. GUARNIERI:  Beyond what he's

14  testified about already today.

15          MR. TRUE:  Exactly.

16          THE WITNESS:  I mean, some were clearly

17  Stark violations because of it, but I don't think

18  of the -- of the -- of the non-monetary

19  compensation -- individually, I think that's the

20  case.  I thought -- I mean, there were -- I think

21  the cumulative amounts given to the Corales

22  office, I think that was also, I mean, more

Capital Reporting Company
McAnaney, Kevin  01-16-2015

141

1  problematic than the other arrangements that were

2  generally cited on Exhibit -- whatever it was --

3  61.  And in that, it was just because of the --

4  the cumulation of them.

5  BY MR. McCAFFREY:

6      Q    Do you have your report still in front of

7  you somewhere?

8      A    Yes.

9      Q    Go back to paragraph 13.  Paragraph 13E

10  states that, "Experienced health care counsel and

11  experienced industry participants during the

12  relevant period would reasonably have believed

13  that the occasional provision of business

14  gratuities of modest value to physicians or other

15  referral sources did not violate the AKS."

16          What is the difference between the

17  opinion expressed there and the opinion expressed

18  in paragraph 13C?

19      A    I'm not sure I know.  I mean, obviously,

20  one includes occasional provision.  I don't know

21  what I was necessarily -- the distinction I was

22  drawing.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

142

1     Q     Okay.  Fair enough.

2     A     I had something in mind.  I'm not sure

3 I...

4     Q     You submitted an affidavit in this case,

5 did you not?

6     A     I'm not -- I'm not sure I recall.

7     Q     Let me correct myself.  Do you remember

8 submitting a declaration in this case?

9     A     I believe -- so is that -- was that in

10 support of the -- well, I don't -- let me see it.

11          MR. McCAFFREY:  Let's mark this as

12 Exhibit 4 and I'll ask you if you remember signing

13 this declaration.

14          (McAnaney Deposition Exhibit Number 4 was

15 marked for identification.)

16          THE WITNESS:  Yes, I mean, generally, I

17 now remember doing the.

18 BY MR. McCAFFREY:

19     Q     And why did you sign this declaration?

20     A     I believe it was as part of a response to

21 your motion for partial summary judgment, the

22 government's motion for partial summary judgment.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

143

1     Q    And did I hear you right earlier to say

2 that you did review the government's notice of

3 objection to this declaration?

4     A    Yes, I -- I did.

5     Q    Did you review that prior to completing

6 your expert report that's Exhibit 1?

7     A    I don't recall.  When I referenced it

8 before, yesterday or the day before, I'm not sure

9 when I received it.

10    Q    Did you make any changes between your

11 declaration and your expert report?

12    A    I am sure -- I'm sure there were some.

13    Q    Why did you make changes?

14    A    Because this was an expert report and

15 this was just a dec -- I mean, they just --

16 just -- I was using -- this one was much more

17 specific.

18    Q    This one?  Which one are you referring

19 to?

20    A    Oh.  I mean, the -- the -- I mean, the

21 expert report included more information.  I think

22 I had reviewed more materials.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

144

1     Q    That's what I was going to ask you.  What

2  additional materials did you review between

3  September 3rd of 2014, and December 15, 2014?

4     A    I can't -- I can't tell now, but I

5  believe several depositions.

6          MR. GUARNIERI:  Just for the record,

7  Paul, his expert report is dated 12/12 rather than

8  12/15.

9  BY MR. McCAFFREY:

10    Q    Did you perform any additional research

11 between the drafting of your declaration and the

12 drafting of your expert report?

13    A    I don't believe so.

14    Q    Your report purports to express an

15 opinion of -- strike that.

16         Your report purports to provide opinions

17 on the understandings of experienced health care

18 counsel and experienced health care industry

19 participants; is that right?

20    A    Yes.  I believe -- it says what it says.

21    Q    Your declaration only offers an opinion

22 on the understanding of experienced health care

Capital Reporting Company
McAnaney, Kevin  01-16-2015

                                                              145

1   counsel; is that right?

2       A    Yes.

3       Q    Why did you add some opinion on the

4   understanding of experienced health care industry

5   participants to your report?

6       A    Because I thought that was a fuller

7   explanation.  I want to make sure it wasn't just

8   those, but in this case, it also included industry

9   participants.

10      Q    And did you do any additional interviews

11  or have any additional discussions with industry

12  participants in order to come to your conclusions

13  about what their understanding of these different

14  laws would be?

15      A    No --

16          MR. TRUE:  You mean between the

17  declaration and the report?

18          MR. McCAFFREY:  Yes.

19          THE WITNESS:  No.  It was based, much as

20  mine one, the experienced health care counsel,

21  from my long experience and discussions all

22  through the period with industry participants and

Capital Reporting Company
McAnaney, Kevin  01-16-2015

146

1   counsel.

2   BY MR. McCAFFREY:

3       Q    Look at paragraph 23 of your declaration,

4   if you would.  Are you there?

5       A    Yes.

6       Q    I didn't see where, in your declaration's

7   discussion of the payment to Dr. Keedy, any

8   reference to the isolated services exception.  Did

9   I miss it?  Do you reference that exception to the

10  Stark law in your declaration?

11      A    No, it doesn't appear so.

12      Q    But you added that to your report,

13  correct?

14      A    Yes.

15      Q    Why did you make that change?

16      A    Because I realized it potentially

17  applied.

18      Q    And you're offering some opinion to the

19  court about the applicability of this exception?

20      A    Yes.  I don't think I said it necessarily

21  applied.  I just said it doesn't require a written

22  agreement.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

147

1          MR. McCAFFREY:  Let me go through my

2   notes and make sure I don't have anything else

3   here for you, because I think I more or less

4   understand your report.  But maybe give me five

5   minutes.

6          (Whereupon, a short recess was taken.)

7   BY MR. McCAFFREY:

8     Q    Just a couple of quick follow-ups.  If

9   you'd look at Exhibit 1 to your report, so it's

10  Exhibit 1 to Exhibit 1 here today.

11    A    Yes.

12    Q    In your description of your work as chief

13  of the industry guidance branch, you say that you

14  worked closely with Department of Justice on

15  criminal and civil prosecutions involving the

16  anti-kickback statute and other fraud and abuse

17  laws.  What cases do you remember working on with

18  the Department of Justice that involved the

19  anti-kickback statute?

20    A    Well, I mean, there was a case when I

21  first came over.  The first case was -- and I

22  don't recall -- it basically dealt with, like --

Capital Reporting Company
McAnaney, Kevin  01-16-2015

148

1  it was a university -- it was a state university

2  hospital.  I think it was Minnesota or something

3  like that.  And it dealt with the financial

4  relationships between the university hospital and

5  I think the physicians on the staff.

6          I can't -- I don't quite -- I don't

7  recall.  It's a case -- it eventually -- actually,

8  I think it eventually -- I can't remember if

9  they -- if the government just dropped the case or

10  if they lost.  But, ultimately, it turned on

11  advice of counsel.

12          I then worked on -- one of the big ones

13  was the Columbia/HCA case, which was actually the

14  first big anti-kickback case that involved whether

15  or not a violation of the kickback statute would

16  trigger false claims.

17          And then I worked with them on a number

18  of cases that were really using that -- dealing

19  with that issue in the context of mostly motions

20  and things like that.  I worked with Jonathan

21  Diesenhaus at the Justice Department.  He was the

22  lead -- sort of the person in charge of kickback

Capital Reporting Company
McAnaney, Kevin  01-16-2015

149

1  and Stark Act civil frauds at that time.

2      Q    Do you remember specifically any of those

3  cases, either by name or by subject?

4      A    Well, I'm trying to separate -- I mean,

5  some were kickback -- I mean, certainly the

6  Columbia/HCA case, and there were several -- there

7  were several of those.  I mean, that was probably

8  the biggest one.  The rest I'm not -- I think

9  there was one, Badoni (phonetic), that was a

10  declined qui tam but they were monitoring.

11          Well, the -- there was a case involving

12  Tenet Alvarado Hospital.  I'm not sure I can

13  remember any other names specifically.

14      Q    Okay.  Is there any opinion that you

15  would offer at trial, if you're allowed to

16  testify, that is not included in your report or

17  specifically stated in your deposition testimony

18  here today?

19      A    Not that I'm aware of.

20          MR. McCAFFREY:  I have no further

21  questions for you, Mr. McAnaney.  Probably Guthrie

22  does.  And we'll go from there.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

150

1          MR. TRUE:  I have got a few.  But let me

2   first -- before I ask any questions, let me state

3   that, you know, opinions we may ask Mr. McAnaney

4   to provide, we disclosed the best we can at this

5   point in time, but that may be governed some by

6   evidence presented by the government that may make

7   other opinions, which we cannot identify at this

8   point in time, pertinent to the case.  But --

9          MR. McCAFFREY:  Well, let me just state

10   for the record that rule 26 requires a party who

11   is going to use expert testimony to disclose that

12   opinion in the expert's report, period, end of

13   story.  And there's a host of case law that says

14   that if it's not disclosed in the report, it can't

15   be used at trial.

16          So with that understanding, feel free to

17   go ahead.

18          EXAMINATION BY COUNSEL FOR DEFENDANTS

19           NURSES' REGISTRY AND LENNIE G. HOUSE

20   BY MR. TRUE:

21      Q   Mr. McAnaney, you've testified that

22   during the period 1997 to 2003 you were chief of

Capital Reporting Company
McAnaney, Kevin  01-16-2015

151

1   the industry guidance branch in the office of

2   inspector general of the U.S. Department of Health

3   and Human Services.  Can you describe for us what

4   your role was in the development of either the

5   Stark law and/or the Stark regulations?  If you

6   could, you know, generally describe for us what

7   your role was in the development of those.

8        A    Well, I had no role in the Stark law.

9   The Stark law was passed originally in 1989 and

10  then subsequently in 1993, the Stark II law.

11           As to the Stark regulations, when I -- I

12  joined OIG, as I said, in January of '77.  And one

13  of the first things that was on my desk was a

14  draft of the proposed -- I'm trying to think --

15  the -- the proposed Stark II regulations.  And

16  I -- I worked with CMS and the office of counsel

17  at HHS to review and offer my insights on that and

18  to offer some suggestions to it.  And then that

19  rule was put out as a proposed rule in, I think,

20  1998, or thereabouts.

21           Following that, CMS had a lot of trouble

22  getting the regs out.  There were some hearings on

Capital Reporting Company
McAnaney, Kevin  01-16-2015

152

1  the Hill.  There was a hearing on the Hill, I

2  think, before the ways and means committee.  And

3  Cathy Buto, who I think was the acting

4  administrator, she promised the chairman at that

5  time that she would get the final regs out by --

6  within a year or something.

7          CMS actually didn't have the -- they were

8  having difficulty finding the manpower and the

9  expertise, frankly, to do it.  And so I offered to

10  assist.  And basically I and my then colleague,

11  Vicki Robinson, wrote -- essentially wrote the

12  phase 1 regulations, along with input from the

13  office of general counsel.  And then,

14  subsequently, the Stark II regulations, which --

15  the first set came out in 2001.  I think the

16  second set came out in 2003.

17     Q    And then, in your capacity as chief of

18  industry guidance -- what does that mean?  How

19  would you perform that function of industry

20  guidance when you held that position from 1997 to

21  2003?  What would you all do?  How would you all

22  provide guidance on the Stark law and the Stark

Capital Reporting Company
McAnaney, Kevin  01-16-2015

153

1  regulations?

2      A     Well, what -- what my branch did was we

3  had responsibility, first and foremost, for

4  implementing and getting out the advisory opinions

5  that HIPAA had authorized.  That was the first.

6           And then OIG gives out other kinds of

7  guidance.  So they're authorized to issue special

8  fraud alerts.  They do something called special

9  advisory bulletins.  They also do safe harbor

10 regulations.  I also -- so our responsibility was

11 to do all of those.  Some we -- there were several

12 advisory opinions.  There were a number of

13 advisory opinions, several special advisory

14 bulletins/fraud alerts.

15          Also, we put out a -- we amended the

16 anti-kickback safe harbor regulations in 1999.  We

17 put out -- there was a rulemaking.  And then we

18 spoke -- we spoke both -- part of our job was to

19 speak to industry gatherings and to do that, to

20 make speeches, which we all did, as well as to

21 field phone calls from the industry and try to

22 respond.  I mean, those weren't -- those were not

Capital Reporting Company
McAnaney, Kevin  01-16-2015

154

1   official guidance, but that was part of our job

2   was to give as much, as we could, unofficial

3   guidance.

4        So, I mean, the idea was to -- we were

5   supposed to give as much guidance to the industry

6   as we could within the constraints of being

7   official agents.

8   Q    And if you could, could you provide a

9   summary or an overview of the nature and scope of

10  your practice since you've left government and

11  gone into the private practice of law in 2003, I

12  think it was?

13  A    Well, as I said, I mean, I -- basically

14  all of my work has been in -- dealing with the

15  anti-kickback statute and the Stark law.  I've --

16  I've -- most of it, over that whole period, has

17  involved mainly counseling, I mean, clients trying

18  to structure arrangements or -- yes, trying to

19  structure arrangements going forward.  Some

20  investigations, not that much, because I'm a sole

21  practitioner.  I don't have the resources.

22        I've also done contract work for the

Capital Reporting Company
McAnaney, Kevin  01-16-2015

155

1  Department of Health and Human Services.  I helped

2  write the Stark III regs per contract.  I worked

3  on those.  I also did some work for them dealing

4  with physician-owned hospitals and the Stark law.

5          I've also worked under contract with

6  the -- I always get it wrong exactly, but the -- I

7  think the assistant secretary for policy and

8  evaluation, I think, looking into -- working with

9  them, looking into the effectiveness of fraud and

10 abuse laws and enforcement.  They were doing a

11 study.

12         But -- and then -- and then a larger

13 proportion of my -- I mean, an increasing

14 proportion of my work over, I'd say, the last five

15 years or so has been in -- as a expert witness, as

16 there's been an increase in False Claims Act cases

17 based on Stark and anti-kickback violations.

18    Q    And since 2003 even up to the present, is

19 your advice on the Stark and the anti-kickback

20 statutes and on the Stark safe harbor regulations

21 frequently sought by other attorneys who practice

22 in the area, not just clients, but other attorneys

Capital Reporting Company
McAnaney, Kevin  01-16-2015

156

1  who practice in the area?

2      A    Yes.  I mean -- I mean, a number of my

3  clients are law firms.  I mean, I -- many law

4  firms practice in this area, but they don't have

5  the -- the depth or, frankly, the experience with

6  having seen as many arrangements as I have.  So I

7  have arrangements with many of them.  They'll call

8  me and use me as sort of a sounding board, or

9  bouncing off, to get a second opinion of -- so

10  they feel more comfortable with their own

11  opinions.

12      Q    And not to violate your bounds of

13  modesty, but do you believe that you are

14  recognized nationally as an expert in the area of

15  the anti-kickback statute, the Stark law and the

16  Stark safe harbor regulations?

17          MR. McCAFFREY:  Objection to form.

18          THE WITNESS:  Well, yes, I think I'm

19  considered a national expert in the Stark and

20  anti-kickback statute.  The Stark -- the safe

21  harbors are regulations that go with the

22  anti-kickback statute.  The Stark law has

Capital Reporting Company
McAnaney, Kevin  01-16-2015

157

1  exceptions.  So it's just nomenclature that people

2  frequently confuse.

3  BY MR. TRUE:

4      Q    But in those areas, you've come to

5  believe that you are recognized/viewed as a

6  national expert in those areas?

7          MR. McCAFFREY:  Object to form.

8          THE WITNESS:  Yes.  I think so.

9  BY MR. TRUE:

10     Q    You testified that an increasing portion

11 of your work over the last few years has been as

12 an expert witness in these areas of the Stark and

13 the anti-kickback statute.  Have you been

14 recognized by any federal courts as an expert in

15 those areas for purposes of offering expert

16 testimony?

17     A    Well, I'm not sure if that's what it is,

18 but I did survive -- the only Daubert motion, I

19 guess, that has actually gone to decision, the

20 court allowed my testimony to proceed.  I, in

21 fact, didn't testify at the trial because the

22 defendants didn't call any witnesses, but that's

Capital Reporting Company
McAnaney, Kevin  01-16-2015

158

1  the only motion that has gone to a decision.

2      Q    And to your knowledge, was that Daubert

3  challenge on the basis that the party opposing

4  your testimony was contending that you were

5  testifying on issues of law or on the ultimate

6  issues?

7      A    Yes.  That's what the -- that was the

8  Justice Department's objection, their basis for

9  the motion.

10     Q    And the court overruled that objection?

11     A    I mean -- yes, insofar as --

12     Q    Or denied --

13     A    They denied the motion.

14     Q    And that was in a federal court?

15     A    Yes.  It was the Northern District of

16  Mississippi.

17     Q    Mr. McAnaney, when Mr. McCaffrey was

18  asking you some questions, you testified that --

19  you testified, in response to his question, that

20  you had actually discussed some of the facts of

21  this case with Vicki Robinson, Jonathan

22  Diesenhaus, and I think you said Craig Holden.  I

Capital Reporting Company
McAnaney, Kevin  01-16-2015

159

1  guess, first of all, who is Vicki Robinson?

2      A     She was -- she followed me as chief of

3  the industry guidance branch in OIG.  She is now,

4  I think, a special counsel to the inspector

5  general, or some title like that.

6      Q     And Jonathan Diesenhaus, you said,

7  practices at Hogan Lovells in Washington, D.C.?

8      A     Yes.

9      Q     What are his past credentials in the area

10 of Stark and anti-kickback?

11     A     Well, he -- he was the Justice

12 Department -- I mean, the -- not the Justice --

13 the -- he was the -- well, he was a trial attorney

14 in the civil frauds unit at the Justice Department

15 at roughly the same time.  He stayed several years

16 after I had gone, I believe, but he came in at

17 virtually the same time.

18         He was -- he sort of became the

19 Justice -- the civil frauds point person on Stark

20 and anti-kickback statute, both in terms of

21 working with CMS and OIG in developing the

22 regulations and the safe -- and -- the kickback

Capital Reporting Company
McAnaney, Kevin  01-16-2015

160

1   regulations.  And also he was the -- he was the

2   Justice Department's point person, as I said, in

3   these kickbacks -- in the early kickback Stark,

4   False Claims Act cases.

5           So he -- he was in the HCA physician

6   compensation piece of the case.  I think -- and

7   he -- well -- and all the Justice Department cases

8   he was basically involved in those that were using

9   the Stark and/or kickback statute as a predicate,

10  or both.

11      Q    And, if you know, what is his primary

12  area of practice now in the private practice of

13  law?

14      A    I think it's the -- it's the -- it's the

15  same.  It's health care fraud and abuse.  I think

16  he is -- he has expertise in Stark and

17  anti-kickback, which he has.  I think he spends

18  more of his time on -- on -- as well on general

19  False Claims Act defense.

20      Q    Then you mentioned Craig Holden.  And I

21  did not get which firm he is currently with.

22      A    I think he's managing partner at the Ober

Capital Reporting Company
McAnaney, Kevin  01-16-2015

161

1    Kaler law firm in -- in Baltimore.

2        Q    Okay.  And what are his credentials in

3    the area of Stark and anti-kickback law?

4            MR. McCAFFREY:  Object to the relevance

5    of all these questions about the credentials of

6    other attorneys in the industry.

7    BY MR. TRUE:

8        Q    Go ahead.

9        A    He -- he actually was at the OIG at the

10   time they developed the original safe harbors, and

11   he's been practicing in the area for -- I mean,

12   since the 1990s.  And he's -- he's currently on

13   the board of the American Health Lawyers

14   Association.

15       Q    Are Ms. Robinson --

16       A    Plus he's a frequent speaker on Stark and

17   anti-kickback statute at the American Health

18   Lawyers Association and similar professional

19   groups.

20       Q    Based on your knowledge in the area and

21   your experience in the area, are Ms. Robinson,

22   Mr. Diesenhaus and Mr. Holden, all three also

Capital Reporting Company
McAnaney, Kevin  01-16-2015

162

1  considered to be national experts in the area of

2  Stark and anti-kickback law?

3          MR. McCAFFREY:  Objection.

4          THE WITNESS:  I would think so, yes.

5  BY MR. TRUE:

6      Q    You mentioned that you had discussed with

7  them this case, maybe not by name, but by --

8      A    Definitely not by name.

9      Q    -- but by fact, the fact that it involved

10  athletic tickets, concert tickets, gift baskets,

11  perhaps alcohol purchases.  And if I understood

12  your testimony, I think you said it was kind of a

13  "can you believe it" conversation.

14          What was the reaction of these three

15  persons when you discussed with them the facts of

16  this case?

17          MR. McCAFFREY:  Objection.  It's not

18  relevant.  It's hearsay.  It's completely

19  inadmissible.  And your recitation of the facts

20  that the witness allegedly disclosed to these

21  other attorneys is not consistent with his prior

22  testimony.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

163

1 BY MR. TRUE:

2     Q    Go ahead.

3     A    Basically, what I discussed was simply

4 the -- the fact of a Stark and anti-kickback case

5 with respect to transactions involving college

6 football and sports tickets below the Stark

7 monetary compensation amount.

8         And the -- the reaction was just that

9 was -- to their mind, they had not heard -- was

10 incredibly unusual.  They had never heard of such

11 a case for -- with respect to those -- that piece

12 of the case.  That's what was discussed with them.

13     Q    And Ms. Robinson is still with HHS at

14 this point in time?

15     A    Yes.

16     Q    Mr. McAnaney, between 2004 and 2011,

17 based on your education and training and

18 experience, what would the -- what would

19 experienced health care counsel and the

20 industry -- what was their understanding as to a

21 remuneration that satisfied a Stark exception --

22         MR. McCAFFREY:  Object to form.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

164

1            MR. TRUE:  I'm not finished.

2            MR. McCAFFREY:  Sorry, I thought you

3  were.

4  BY MR. TRUE:

5      Q    -- a Stark exception as to whether or not

6  such remuneration would violate the anti-kickback

7  statute?

8            MR. McCAFFREY:  Object to form.  I mean,

9  it's not -- that opinion is not disclosed in his

10 report.

11           MR. TRUE:  You can object to form.

12 You've objected to form.  And that's -- you know,

13 as you're famous for saying, that's the extent of

14 it.

15 BY MR. TRUE:

16     Q    Go ahead.

17     A    Well, I think that the -- the general

18 sense was if something fit in a Stark exception,

19 it was -- it -- it was lawful, and so, therefore,

20 it would be very hard to think that it was

21 unlawful, that the general idea in the industry

22 was -- I mean, that this wasn't a "gotcha" game,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

165

1   and if it was okay under the payment regulation

2   and they said you could do it, that it -- I think

3   most people thought, well, that doesn't -- that

4   it's not going to be a crime over here that

5   they'll send you to prison for five years.

6           So I think it's generally -- the general

7   thought was that it would go to intent, that

8   people didn't -- they don't think it's -- they

9   think -- first of all, many in the industry, and

10  especially a small place, conflate the two

11  statutes.  They don't quite understand the

12  difference.  But they do -- so they feel that if

13  they know that there's an exception over here and

14  they fit, that they assume that that probably is

15  okay.

16          So -- if that answers your question.

17  BY MR. TRUE:

18     Q    Mr. McCaffrey asked you a number of

19  questions about an intent to induce referrals.

20  Between 2004 and 2011, what was the prevailing

21  view of experienced health care counsel as to

22  whether or not a remuneration, particularly --

Capital Reporting Company
McAnaney, Kevin  01-16-2015

166

1  let's focus in on non-monetary compensations,

2  since that's the exception applicable, for the

3  most part, here -- that was within a Stark limit,

4  as to whether that would be sufficient to induce

5  referrals from a referral source?

6         MR. McCAFFREY:  Objection.

7         THE WITNESS:  Well, I mean, I think -- I

8  think, for the non-monetary compensation, that the

9  limit was set in a way that clearly that the

10  government had found, when they promulgated it,

11  posed no risk of fraud and abuse.  I mean, that's

12  the standard for -- that's the -- that's the legal

13  standard that the Secretary has to meet to issue

14  an exception.

15         So, therefore, I think that people

16  thought, well, if it was okay and no risk of fraud

17  or abuse, that it was generally -- that was a good

18  benchmark to use.

19  BY MR. TRUE:

20     Q    You've used in your report the phrase

21  "modest business gratuities."  Is it your -- is it

22  your intent to communicate that the gratuities

Capital Reporting Company
McAnaney, Kevin  01-16-2015

167

1  involved in this case, with the exception, as

2  you've noted, of the Derby tickets, fall into what

3  you're describing in your report as modest

4  business gratuities?

5      A    I think they could all be characterized

6  like that, with the exception of the Kentucky

7  Derby tickets.

8      Q    Mr. McCaffrey asked you a number of

9  questions about this issue of the volume or value

10  of referrals.  And I wanted to read from the

11  non-monetary compensation exception, which is

12  under subsection K of 42 CFR 411.357, I think.   In

13  subparagraph 1 under that exception it says, "The

14  compensation is not determined in any manner that

15  takes into account the volume or value of

16  referrals or other business generated by the

17  referring physician."

18          Between 2004 and 2011, in your opinion,

19  based on your education, training and experience,

20  what did competent health care counsel believe

21  that the phrase "the compensation is not

22  determined in any manner that takes into account

Capital Reporting Company
McAnaney, Kevin  01-16-2015

1   the volume or value of referrals" means?

2          MR. McCAFFREY:  Objection.

3          THE WITNESS:  Well, I think what it meant

4   was that the compensation did not vary or was not

5   calculated based on the volume or value of

6   exception.  So, I mean, typically -- so that if

7   something was the same compensation given to a

8   number of people who had varying degrees of

9   referrals, that was probably not -- it was not

10  being determined in a manner that took into

11  account the volume and value of referrals.  It

12  didn't vary.

13         MR. TRUE:  Let's take a short break.  I

14  want to talk to counsel outside the room here for

15  just a minute before we stop.

16         (Whereupon, a short recess was taken.)

17  BY MR. TRUE:

18    Q    I think just one other thing.

19  Mr. McAnaney, you've expressed a number of

20  opinions here today, but are -- the opinions that

21  you've expressed regarding what experienced health

22  care counsel and experienced industry participants

Capital Reporting Company
McAnaney, Kevin  01-16-2015

169

1   understood about the Stark law and the

2   anti-kickback statute between 2004 and 2011, have

3   those opinions been expressed at or above a

4   reasonable degree of probability based on what

5   experienced counsel and industry persons believed

6   at that time?

7            MR. McCAFFREY:  Objection.

8            THE WITNESS:  Yes.

9            MR. TRUE:  I think that's all I've got.

10                EXAMINATION BY COUNSEL FOR

11                DEFENDANT VICKI S. HOUSE

12   BY MR. CHILDERS:

13       Q    I have one question.  You said you spoke

14   to Vicki Robinson?

15       A    Yes.

16       Q    Okay.  I'm reading from your CV contained

17   in Exhibit 1.  I'll just read it aloud.  You

18   indicated that you joined government after 14

19   years of private law practice to accept a new IG

20   function to coordinate the -- and initial guidance

21   to the health care industry related to health care

22   fraud and abuse, including advisory opinions,

Capital Reporting Company
McAnaney, Kevin  01-16-2015

170

1   special fraud alerts and regulatory safe harbors

2   to the federal anti-kickback statute, correct?

3       A    Yes.

4       Q    Okay.  And the IG meant, of course,

5   industry guidance branch, correct?

6       A    Yes.

7       Q    Now, I'm going to ask you if you believe

8   this information is correct.  Catherine -- Vicki

9   Robinson, was she your successor?

10      A    Yes.

11      Q    All right.  And I believe her title

12  now -- correct me if I'm wrong -- is senior

13  advisor for health care reform at the office of

14  the inspector general, United States Department of

15  Health and Human Services, and is also chief of

16  industry guidance branch of the office of counsel

17  of the inspector general at HHS.

18      A    No, she's now -- the first title, in

19  fact -- I don't even know; it may have changed.

20  She's no longer chief of industry guidance.

21      Q    Okay.

22      A    She -- I don't know how long ago she left

Capital Reporting Company
McAnaney, Kevin  01-16-2015

171

1   that position.  Probably around the Affordable

2   Care Act.

3       Q    What I've got is current as of 2015, is

4   what I understand.

5       A    No, I mean, she is not.

6       Q    All right.  But she held that position,

7   and she was also responsible for reviewing

8   business arrangements for compliance with the

9   fraud and abuse laws, prepares advisory opinions,

10  drafts safe harbor regulations, provides guidance

11  to industry and government stakeholders of the

12  anti-kickback statute, safe harbor regulations and

13  other fraud and abuse authorities?

14      A    Yes.

15           MR. McCAFFREY:  Objection.

16  BY MR. CHILDERS:

17      Q    Is that what she used to do?

18      A    Yes.

19           MR. McCAFFREY:  Objection.

20  BY MR. CHILDERS:

21      Q    And that's what you did?

22      A    Yes.

Capital Reporting Company
McAnaney, Kevin  01-16-2015

172

1     Q    And you would -- would you consider her

2  to be an expert in that same area as you consider

3  yourself to be?

4          MR. McCAFFREY:  Objections.

5          THE WITNESS:  Yes.

6  BY MR. CHILDERS:

7     Q    Do you believe her to be an honest

8  person?

9          MR. McCAFFREY:  Objection.

10         THE WITNESS:  Yes.

11 BY MR. CHILDERS:

12    Q    And a competent person?

13         MR. McCAFFREY:  Objection.

14         THE WITNESS:  Yes.

15 BY MR. CHILDERS:

16    Q    And has the same degree of familiarity

17 with the Stark and anti-kickback laws as you

18 would?

19         MR. McCAFFREY:  Objection.

20         THE WITNESS:  I'm not sure she

21 necessarily has the same familiarity with the

22 Stark law as I do.  She's certainly very familiar

Capital Reporting Company
McAnaney, Kevin  01-16-2015

173

1  with it.  I don't know that she's -- she's

2  experienced as -- many practical applications and

3  fact scenarios.

4  BY MR. CHILDERS:

5     Q    And to the best of your recollection,

6  she's a graduate of Harvard Law School and

7  Stanford University?

8     A    Yes.

9          MR. McCAFFREY:  Objection.

10          MR. CHILDERS:  All right.  That's all the

11  questions.  Thank you.

12          MR. McCAFFREY:  I've got nothing else.

13          (Whereupon, at 2:10 p.m., the deposition

14  of KEVIN McANANEY was concluded.)

15

16

17

18

19

20

21

22

Capital Reporting Company
McAnaney, Kevin  01-16-2015

174

1                    CERTIFICATE OF NOTARY PUBLIC

2          I, Denise M. Brunet, the officer before

3  whom the foregoing deposition was taken, do hereby

4  certify that the witness whose testimony appears

5  in the foregoing deposition was duly sworn by me;

6  that the testimony of said witness was taken by me

7  stenographically and thereafter reduced to print

8  by means of computer-assisted transcription by me

9  to the best of my ability; that I am neither

10  counsel for, related to, nor employed by any of

11  the parties to this litigation and have no

12  interest, financial or otherwise, in the outcome

13  of this matter.

14

15

16

17          _____
            Denise M. Brunet
18          Notary Public in and for
            The District of Columbia

19

20  My commission expires:

21  November 30, 2017

22

Capital Reporting Company
McAnaney, Kevin  01-16-2015

175

1               ACKNOWLEDGEMENT OF DEPONENT

2          I, KEVIN McANANEY, do hereby acknowledge

3   I have read and examined the foregoing pages of

4   testimony, and the same is a true, correct and

5   complete transcription of the testimony given by

6   me, and any changes and/or corrections, if any,

7   appear in the attached errata sheet signed by me.

8

9

10

11

12

13

14

15

16

17

18

19

20
    _____          _____
21  Date                      KEVIN McANANEY

22

Capital Reporting Company
McAnaney, Kevin  01-16-2015

176

1  J. Guthrie True, Esquire
   True Guarnieri Ayer, LLP
2  124 West Clinton Street
   Frankfort, Kentucky  40601
3

4  IN RE:  USA vs. Nurses' Registry

5

6  Dear Mr. True:

7          Enclosed please find your copy of the

8  deposition of KEVIN McANANEY, along with the

9  original signature page.  You will be responsible

10 for contacting the witness regarding signature.

11          Within 30 days of receipt, please forward

12 errata sheet and original signed signature page to

13 counsel for Plaintiffs, Paul McCaffrey, Esquire.

14          If you have any questions, please do not

15 hesitate to call.  Thank you.

16 Yours,

17

18 Denise M. Brunet, RPR
   Reporter/Notary
19

20

21 cc:  Paul McCaffrey, Esquire

22

Capital Reporting Company
McAnaney, Kevin  01-16-2015

177

1  Capital Reporting Company
   1821 Jefferson Place, Northwest
2  3rd Floor
   Washington, D.C.  20036
3  (202) 857-3376

4             E R R A T A   S H E E T

5  Case Name:  USA vs. Nurses' Registry

6  Witness Name:  Kevin McAnaney

7  Deposition Date:  January 16, 2015

8  Page No.    Line No.     Change/Reason for Change

9

10

11

12

13

14

15

16

17

18

19

20

21

   _____          _____
22 Signature                     Date